No. 17-1918

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

ANTHONY MIMMS, M.D.,
Plaintiff-Appellee,

v.

CVS PHARMACY, INC.,
Defendant-Appellant.


_____

Appeal From The United States District Court
For the Southern District of Indiana,
Indianapolis Division
Case No. 1:15-cv-00970-TWP-MJD
The Honorable Judge Tanya Walton Pratt

_____

APPENDIX OF
DEFENDANT-APPELLANT CVS PHARMACY, INC.
VOL. I of VI (PAGES A-000001-235)

_____


Alice M. Morical
Amanda L.B. Mulroony
HOOVER HULL TURNER LLP
111 Monument Circle, Suite 4400
P.O. Box 44989
Indianapolis, IN  46244-0989
amorical@hooverhullturner.com
amulroony@hooverhullturner.com
317-822-4400 (telephone)
317-822-0234 (facsimile)

Attorneys for the
Defendant-Appellant, CVS Pharmacy, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 30(D)

Pursuant to 7th Cir. R. 30(d), I hereby certify that all materials required by 7th Cir. R. 30(a) and (b) are included in this appendix and the appendix bound with the brief.

s/ Alice M. Morical
Alice M. Morical

# TABLE OF CONTENTS

Deborah Doyle-Blanton Designated Deposition Testimony
(March 14, 2016) (Dkt. 89) (Ex. A)[1] ............................................................. A-1

Judith Mason Designated Deposition Testimony
(March 14, 2016) (Dkt. 89) (Ex. B) .............................................................. A-9

Alexis Fields Designated Deposition Testimony
(May 17, 2017) (Dkt. 89) (Ex. C) ................................................................. A-19

Terry McIntosh Designated Deposition Testimony
(March 16, 2016) (Dkt. 90) (Ex. D) .............................................................. A-24

Kim Petro Designated Deposition Testimony
(March 15, 2016) (Dkt. 91) (Ex. G) .............................................................. A-31

Declaration of Ryan Durham
(June 24, 2016) (Dkt. 99-2) (Ex. 1) .............................................................. A-42

Declaration of Michael Salazar
(June 24, 2016) (Dkt. 99-3) (Ex. 2) .............................................................. A-45

Declaration of Dana Flynn
(June 29, 2016) (Dkt. 99-4) (Ex. 3) .............................................................. A-48

Judith Mason Designated Deposition Testimony
(March 14, 2016) (Dkt. 99-6) (Ex. 5) .......................................................... A-50

Terry McIntosh Designated Deposition Testimony
(March 16, 2016) (Dkt. 99-7) (Ex. 6) .......................................................... A-53

Alexis Fields Designated Deposition Testimony
(May 17, 2017) (Dkt. 99-10) (Ex. 9) .......................................................... A-56

---

[1] CVS has exclusively used publicly-filed, redacted docket materials in the Appendix because the use of the redacted materials should not impede the Court's review of the issues. Because the identity of the Trial Statement witnesses who are patients of Dr. Mimms were later identified in court orders, subsequent court filings, and when they appeared at trial and testified in open court, the summary judgment deposition testimony associated with each Trial Statement witness has been identified by name per stipulation of the Parties. Non-testifying patient identifying information has been redacted from relevant portions of the Transcript consistent with the Parties' Joint Motion to Redact Transcripts in order to identify relevant individuals by initial only.

Judith Mason Designated Deposition Testimony
    (March 14, 2016) (Dkt. 113-2) (Ex. 8) .......................................................... A-60

Kim Petro Designated Deposition Testimony
    (March 15, 2016) (Dkt. 113-3) (Ex. 9) .......................................................... A-72

Terry McIntosh Designated Deposition Testimony
    (March 16, 2016) (Dkt. 113-6) (Ex. 12) ........................................................ A-92

Clint Thomas Designated Deposition Testimony
    (May 10, 2016) (Dkt. 113-9) (Ex. 15) ......................................................... A-103

Deborah Doyle-Blanton Designated Deposition Testimony
    (March 14, 2016) (Dkt. 113-17) (Ex. 23) .................................................... A-138

Alexis Fields Designated Deposition Testimony
    (May 17, 2016) (Dkt. 113-18) (Ex. 24) ....................................................... A-153

Deborah Doyle-Blanton Designated Deposition Testimony
    (March 14, 2016) (Dkt. 118-1) (Ex. 17) ...................................................... A-163

Email from J. Garlough to counsel for Mimms
    (May 31, 2016) (Dkt. 118-6) (Ex. 22) ......................................................... A-169

Kim Petro Designated Deposition Testimony
    (March 15, 2016) (Dkt. 118-8) (Ex. 24)....................................................... A-174

Mimms' Motions *in Limine*
    (February 15, 2017) (Dkt. 158) .................................................................. A-186

CVS's Motions *in Limine*
    (February 15, 2017) (Dkt. 175) .................................................................. A-192

Mimms' Response to Motions *in Limine*
    (February 22, 2017) (Dkt. 192) .................................................................. A-227

CVS's Opposition to Mimms' Motions *in Limine*
    (February 22, 2017) (Dkt. 205) .................................................................. A-236

Joint Proposed Jury Instructions with Objections
    (February 24, 2017) (Dkt. 217) .................................................................. A-332

CVS's Trial Exhibit List with Parties' Stipulations
    (March 22, 2017) (Dkt. 265)....................................................................... A-413

CVS Pharmacy's Memorandum in Support of its Motion for
Partial Reconsideration of the Court's February 27, 2017 Order
on Parties' Motions *in Limine*
    (March 24, 2017) (Dkt. 274) ....................................................................... A-457

CVS Pharmacy's Memorandum in Support of its Motion for
Partial Reconsideration of the Court's February 27, 2017 Order
On Parties Motions in Limine Regarding Evidence of
Plaintiff's Reputation
    (March 27, 2017) (Dkt. 279) ....................................................................... A-472

Excerpts of Deposition of Kim Petro
    (March 15, 2016) (Dkt. 282-1)
    (excerpts read to jurors during trial) ....................................................... A-510

Final Jury Instructions
    (March 31, 2017) (Dkt. 292) ....................................................................... A-519

Supplemental Jury Instruction
    (March 31, 2017) (Dkt. 293) ....................................................................... A-558

CVS's Submission of Redacted Exhibits
    (April 28, 2017) (Dkt. 304) ....................................................................... A-559

Mimms' Opening Statement by Mr. May
    (March 27, 2017) (Dkt. 315)
    (Vol. 1, pp. 31-39) ....................................................................... A-569

Excerpts of Direct Examination of Alex Zweig
    (March 27, 2017) (Dkt. 315)
    (Vol. 1, pp. 56-59, 68-71, 77-80, 87-91, 97-113) ....................................... A-578

Excerpt of Cross Examination of Alex Zweig
    (March 27, 2017) (Dkt. 315)
    (Vol. 1, p. 116) ....................................................................... A-612

Excerpts of Direct Examination of Joseph Grimes
    (March 27, 2017) (Dkt. 315)
    (Vol. 1, pp. 120-122, 129-149, 154-156) ................................................. A-613

Excerpts of Cross Examination of Joseph Grimes
    (March 27, 2017) (Dkt. 315)
    (Vol. 1, pp. 163-188, 194) ....................................................................... A-640

Excerpts of Direct Examination of Nicole Harrington
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 214-220, 222-224, 228-236, 238-239) ...................................... A-667

Excerpts of Cross Examination of Nicole Harrington
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 239-240, 244-246, 248-249) ...................................................... A-687

Excerpt of Recross Examination of Nicole Harrington
(March 28, 2017) (Dkt. 316)
(Vol. 2, p. 254)............................................................................................... A-694

Argument on Motions to Reconsider Motion *in Limine*
Orders (Dkt. 274, 279)
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 260-293) ..................................................................................... A-695

Court's Ruling on Motion to Reconsider Motion *in Limine* (Dkt. 279)
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 294-310) ..................................................................................... A-729

Court's Ruling on Motion to Reconsider Motion *in Limine* (Dkt. 273, 274)
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 311-317) ..................................................................................... A-746

Excerpts of Direct Examination of Mimms
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 321-322, 324, 338, 345-348, 358-359,
363-370) ......................................................................................................... A-753

Excerpts of Cross Examination of Mimms
(March 28, 2017) (Dkt. 316)
(Vol. 2, pp. 383-390, 394-395, 398-400) ...................................................... A-771

Excerpts of Cross Examination of Mimms
(March 29, 2017) (Dkt. 317)
(Vol. 3, pp. 411-412, 416-425, 433-438, 440-454) ...................................... A-784

Excerpts of Redirect Examination of Mimms
(March 29, 2017) (Dkt. 317)
(Vol. 3, pp. 457-461) ..................................................................................... A-817

Excerpts of Direct Examination of Terry McIntosh
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 503-509, 514-519, 521) ............................................................ A-822

Excerpts of Cross Examination of Terry McIntosh
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 522-524) ...................................................................................... A-836

Excerpts of Direct Examination of Deborah Doyle-Blanton
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 549-558) ...................................................................................... A-839

Excerpts of Cross Examination of Deborah Doyle-Blanton
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 562-568) ...................................................................................... A-849

Excerpts of Direct Examination of Alexis Fields
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 575-577, 585-592) ...................................................................... A-856

Excerpts of Cross Examination of Alexis Fields
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 599-600) ...................................................................................... A-867

CVS's Offer of Proof
    (March 29, 2017) (Dkt. 317)
        (Vol. 3, pp. 613-637) ...................................................................................... A-869

Excerpts of Direct Examination of Judith Mason
    (March 30, 2017) (Dkt. 318)
        (Vol. 4, pp. 651-662) ...................................................................................... A-894

Excerpts of Cross Examination of Judith Mason
    (March 30, 2017) (Dkt. 318)
        (Vol. 4, pp. 665-666, 669-671) ...................................................................... A-906

Argument and Ruling on CVS's Rule 50(a) Motion
    (March 30, 2017) (Dkt. 318)
        (Vol .4, pp. 674-692) ...................................................................................... A-911

Excerpts of Direct Examination of Ryan Durham
    (March 30, 2017) (Dkt. 318)
        (Vol. 4, pp. 693-697) ...................................................................................... A-930

Excerpts of Cross Examination of Ryan Durham
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 703-707) ................................................................ A-935

Excerpts of Redirect Examination of Ryan Durham
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 707-708) ................................................................ A-939

Excerpts of Direct Examination of Leah Bills
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 710-718) ................................................................ A-941

CVS's Offer of Proof for Google Review of Mimms
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 723-728) ................................................................ A-950

Excerpts of Direct Examination of Mimms
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 731-739) ................................................................ A-956

Excerpts of Direct Examination of Denise Fischer
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 740-769) ................................................................ A-965

Excerpts of Cross Examination of Denise Fischer
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 769-773) ................................................................ A-994

Excerpts of Cross Examination of Mimms
    (March 30, 2017) (Dkt. 318)
      (Vol. 4, pp. 775-776) ................................................................ A-999

Direct Examination of Dr. Eric Aitken
    (March 31, 2017) (Dkt. 319)
      (Vol. 5, pp. 790-800) ................................................................ A-1001

Cross Examination of Dr. Eric Aitken
    (March 31, 2017) (Dkt. 319)
      (Vol. 5, pp. 800-803) ................................................................ A-1011

Excerpts of Direct Examination of Dana Flynn
    (March 31, 2017) (Dkt. 319)
      (Vol. 5, pp. 805-808) ................................................................ A-1015

Parties' Objections to Final Jury Instructions
(March 31, 2017) (Dkt. 319)
(Vol. 5, pp. 815-823) ................................................................. A-1019

Mimms' Closing Argument
(March 31, 2017) (Dkt. 319)
(Vol. 5, pp. 826-838, 855-859) ................................................. A-1028

Excerpt from Court's Reading of Final Jury Instructions
(March 31, 2017) (Dkt. 319)
(Vol. 5, pp. 872-873) ................................................................. A-1046

Conference and Ruling Regarding Response to Jury Questions
During Deliberations
(March 31, 2017) (Dkt. 319)
(Vol. 5, pp. 878-896) ................................................................. A-1048

Co-Worker's Notes Regarding Harassment by Mimms
(April 26, 2011) (Tr. Ex. 1013)
(offered but not admitted)......................................................... A-1067

Complaint to AG about Mimms by Patient's Sister
(March 12, 2012) (Tr. Ex. 1015)
(offered but not admitted)......................................................... A-1069

RAI Complaint to AG about Mimms
(April 23, 2014) (Tr. Ex. 1016)
(offered but not admitted)......................................................... A-1071

RAI Complaint to AG about Mimms
(April 23, 2014) (Tr. Ex. 1016)
(as admitted) ............................................................................. A-1088

Letter from RAI to Mimms Regarding Sexual Harassment Investigation
(October 4, 2005) (Tr. Ex. 1036)
(offered but not admitted)......................................................... A-1092

Letter from RAI to Mimms Regarding Administrative Leave
(October 24, 2013) (Tr. Ex. 1040)
(offered but not admitted)......................................................... A-1094

Letter from RAI to Mimms Regarding Administrative Leave
(October 24, 2013) (Tr. Ex. 1040)
(as admitted) ............................................................................. A-1095

Letter from HHS to CVS Affiliate re: Federal Criminal Investigation
Into Mimms
    (August 8, 2016) (Tr. Ex. 1049)
    (offered but not admitted).........................................................A-1096

DEA Subpoena
    (June 17, 2014) (Tr. Ex. 1051) (as admitted) ........................A-1098

DEA Subpoena
    (September 30, 2014) (Tr. Ex. 1053) (as admitted)................A-1099

DEA Subpoena
    (January 14, 2016) (Tr. Ex. 1054)
    (offered but not admitted).........................................................A-1101

2016 Google Review of Dr. Mimms
    (Tr. Ex. 1062)
    (offered but not admitted).........................................................A-1103

CVS's Professional Standards
    (Tr. Ex. 1071).............................................................................A-1104

CVS's Code of Conduct
    (Tr. Ex. 1074).............................................................................A-1115

CVS's Red Flags
    (Tr. Ex. 1088).............................................................................A-1150

Portion of Mimms' Answers to CVS's First Set of Interrogatories
    (December 30, 2015) (Tr. Ex. 1180)
    (offered but not admitted).........................................................A-1151

Criminal Records of A.B.
    (Tr. Ex. 1205)
    (offered but not admitted).........................................................A-1155

Criminal Records of R.H.
    (Tr. Ex. 1268)
    (offered but not admitted).........................................................A-1171

Death Certificate of T.P.
    (March 14, 2011) (Tr. Ex. 1284)
    (offered but not admitted).........................................................A-1180

Death Certificate of R.P.
    (December 20, 2011) (Tr. Ex. 1289)
    (offered but not admitted) ........................................................................ A- 1182

Excerpts of Certified Copy of Transcript of D.P. Motion to Suppress
Hearing and Jury Trial
    (February 25, 2014, November 6, 2014) (Tr. Ex. 1294)
    (pp. 56-58, 61-63, 70-71, 450-455, 461-464, 467-468, 470-472)
    (offered but not admitted) ........................................................................ A-1184

Death Certificate of G.R.
    (August 8, 2016) (Tr. Ex. 1311)
    (offered but not admitted) ........................................................................ A-1207

Death Certificate of J.T.
    (June 28, 2011) (Tr. Ex. 1343)
    (offered but not admitted) ........................................................................ A-1208

CVS's Dispensing Controlled Substances and Refusal to Fill Guidelines
    (April 1, 2015) (Tr. Ex. 2077) ................................................................. A-1209

CVS's Guidelines for Dispensing Controlled Substances
    (Tr. Ex. 2085) ........................................................................................... A-1218

Grimes' Prescriber Notes for Mimms
    (Tr. Ex. 2106) ........................................................................................... A-1221

Grimes' Notes of Mimms Interview
    (March 21, 2014) (Tr. Ex. 2107) .............................................................. A-1222

Excerpts of Trial Clint Thomas (video played at trial)
    (March 17, 2017) (Tr. Ex. 3000)
    (pp. 6-9, 12-13, 24-29, 36, 38-39, 46-57, 58-61, 67-79,
    81-83, 106-109, 111-114, 117, 121-124, 126) .......................................... A-1224

Excerpts of Deposition of Mimms
    (January 4, 2017) (pp. 73-75) ................................................................... A-1248

Excerpts of Deposition of Mimms
    (May 18, 2016) (pp. 96-97) ...................................................................... A-1251

Court's Rulings on CVS's Objections to Mimms' Designations of
Kim Petro Deposition Testimony for Reading at Trial
(March 29, 2017) (Dkt. 317)
(Vol. 3, pp. 480-489, 525-529) ................................................................ A-1253

**PLAINTIFF'S DESIGNATION OF EVIDENCE**

**EXHIBIT A**

REDACTED

March 14, 2016

1 (Pages 1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CIVIL ACTION NO. 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.;

        Plaintiff,    )

Vs.

CVS PHARMACY, INC.,

        Defendant.

REDACTED ─────────────────── tion of
────────────────────── a witness produced and
sworn before me, Linda C. Callahan, a Court
Reporter and Notary Public in and for the County
of Hamilton, State of Indiana, taken on behalf of
the Defendant in the offices of Barnes & Thornburg
LLP, 11 South Meridian Street, 2nd Floor
Conference Center, Indianapolis, Marion County,
Indiana, on the 14th day of March, 2016,
commencing at 8:15 a.m., pursuant to the Federal
Rules of Civil Procedure, and by Notice of the
parties and subpoena of the witness as to time and
place thereof.

STRATOS LEGAL SERVICES, LP
4295 San Felipe, Suite 125
Houston, Texas 77027
(713) 482-2180

**Page 2**

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:
LAW OFFICES OF JASON D. MAY, LLC
BY:  JASON D. MAY, ESQ.
9247 N. Meridian Street
Suite 220
Indianapolis, IN  46260
jason.may@jasonmaylaw.com

FOR THE DEFENDANT:
FOLEY & LARDNER LLP
BY:  JONATHAN W. GARLOUGH, ESQ.
321 N. Clark Street
Suite 2800
Chicago, IL  60654-5313
jgarlough@foley.com

ALSO PRESENT VIA VIDEO CONFERENCE:
Hilary B. Dudley, Esq.
CVS Health,
Legal Department

I-N-D-E-X  O-F  E-X-A-M-I-N-A-T-I-O-N
                                        PAGE
BY MR. GARLOUGH                   4, 154
BY MR. MAY                        140, 163

**Page 3**

I-N-D-E-X  O-F  E-X-H-I-B-I-T-S

                                                    PAGE
1 -        Subpoena                    20
2 -        MFR patient chart           21
3 -        Pharmacy records            57
4 -        2-14-14 RAI letter          77
5 -        Patient CVS prescriptions   77
6 -        Kroger product info sheet   77
7 -        CDC Opioid article          89
8 -        NE Journal of Medicine article   89
9 -        US DOJ Kuzma business card  131
10 -       Map                         159

**Page 4**

REDACTED

the witness herein, having been first duly sworn
to tell the truth, the whole truth, and nothing
but the truth relating to said matter, was
examined and testified as follows:

DIRECT EXAMINATION,
   QUESTIONS BY MR. GARLOUGH
        MR. GARLOUGH:  Good morning, Deborah;
my name is Jonathan Garlough; I'm an attorney for   08:17
CVS Pharmacy in this case
Q   I understand, we were talking before this ─── REDACTED
deposition, that your name is no longer
REDACT ─── REDACTED
ED     is that correct?
A   Right.  It's
Q   Would you mind spelling that for the court
reporter?
A   ─── REDACTED
Q   Okay. REDACTED  have you ever been deposed before?
A   No.
        MR. GARLOUGH:  So I'd like to go over
some ground rules with you, just so that we're all
on the same page while we go through the
deposition today, okay?
        THE WITNESS:  Okay.

A-000002

REDACTED

March 19, 2016

5 (Pages 17 to 20)

## Page 17

1  A.  When they -- CVS refused to fill my prescription,
2  and when I inquired as to why they refused to
3  fill my prescription, I was told that Dr. Mimms
4  had been arrested, and if he wasn't, he was about
5  to be and that I needed to find a new doctor, and
6  I found that very upsetting, and that's a quote.
7  Q.  Is there anything else that you meant by incurred?
8  A.  No.
9  Q.  Other than your conversation with Mr. May, have
10  you discussed your deposition today or this case   08:30
11  with anybody else?
12  A.  When this happened back in March of last year.
13  Q.  Okay.
14  A.  My brother originally tried to fill my
15  prescription for me because I couldn't -- was
16  going to be out for a couple of days.  He's the
    REDACTED
17  one, my brother,          was told that it
18  could not be filled, that my doctor was under
19  investigation, and so he called me and told me
20  this, and a couple days later, I went to my CVS   08:31
21  and I was told what I just quoted you.  And the
22  next day, I had an appointment with Dr. Mimms,
23  and I thought I would find out then what was
24  going on.  So I talked to my brother about it
25  when this happened.

## Page 18

1  Q.  Okay.  Other than your brother in regards to the
2  incident, what I'm asking you is the basic
3  question, have you spoken with anybody about your
4  deposition today?
5  A.  My husband.
6  Q.  Your husband, okay?
7  A.  And your husband's name.
    REDACTED
8  A.
9  Q.
    REDACTED
10  A.          uh-huh.                               08:31
11  Q.  Okay.  Anybody else?
12  A.  No.
13  Q.  Mr. May?
14  A.  Mr. May, we talked about it, yes.
    REDACTED
15  Q.  All right.  Mr. May, your husband,
16  Have you spoken to your brother about your
17  deposition?
18  A.  Yes.  He was at the meeting.
19  Q.  All right.  Have you had any conversations with
20  your brother other than at that meeting about the   08:32
21  deposition?
22  A.  No.
23  Q.  Have you spoken with Dr. Mimms about your
24  deposition?
25  A.  No.

## Page 19

1  Q.  Other than the conversation you just related to me
2  regarding your appointment with Dr. Mimms back in
3  March of last year, have you spoken with Dr. Mimms
4  about the subject matter of this case --
5  A.  No.  Sorry.
6  Q.  -- other than that meeting?
7  A.  No.
8  Q.  That was the only time?
9  A.  That was the only time,
10  Q.  Do you have your own attorney?               08:32
11  A.  No.
12  Q.  Have you spoken with any other patients of Dr.
13  Mimms regarding this case?
14  A.  No.
15  Q.  Have you spoken with any other of Dr. Mimms'
16  patients regarding your deposition in this case?
17  A.  No.
18  Q.  Other than the three documents that you brought
19  with you today, the letter and the two sets of
20  prescription records, have you reviewed any other   08:33
21  documents in preparation for today's deposition?
22  A.  Yes.
23  Q.  What did you review?
24  A.  My Social Security application for disability, I
25  looked to find out exactly when I started seeing

## Page 20

1  Dr. Mimms.
2  Q.  Okay.  That was the purpose of your reviewing that
3  document?
4  A.  Yes.
5  Q.  Okay.  When did you look at that document?
6  A.  Last night.
7  Q.  Okay.  And the best you can recall, when did you
8  start seeing Dr. Mimms?
9  A.  June of '06.
10  Q.  And at that time, was Dr. Mimms affiliated with   08:33
11  Rehabilitation Associates of Indiana?
12  A.  That's correct.
13        (Exhibit No. 1 was marked for
14        identification.)
    REDACTED
15  Q.          I'm showing you a document that's
16  been marked as Exhibit 1.  Do you recognize that
17  document?
18  A.  Yes, I do.
                          REDACTED
19  Q.  And it's addressed to             You are now
    REDACTED
20            ; is that correct?                      08:35
21  A.  That's correct.
                      REDACTED
22  Q.  The address              is that your
23  address?
24  A.  Yes, it was.
25  Q.  Did you receive this document?

A-000003

REDACTED

March 14, 2016

3 (Pages 9 to 12)

**Page 9**

1    THE WITNESS: Okay, okay.
2    MR. GARLOUGH: Are you familiar with
3    that entity?
4    THE WITNESS: Yeah. I've never used
5    those -- that terminology, so it may take me a
6    little bit to catch onto what you --
7    MR. GARLOUGH: Understood. And if I
8    say MAFR and you're not sure what I'm referring
9    to, just let me know.
10   THE WITNESS: Okay.           08:21
11   Q.  You have heard of Mimms Functional Rehabilitation?
12   A.  Yes.
13   Q.  Mr. May is here in the room. Are you being
14   represented by Mr. May today?
15   A.  No.
16   Q.  Have you ever spoken to Mr. May?
17   A.  Once.
18   Q.  Okay. When did you speak with him?
19   A.  Last week.
20   Q.  Over the phone or in person?        08:21
21   A.  In person.
22   Q.  How long did you meet with Mr. May?
23   A.  One hour.
24   Q.  And what was the subject of your conversation?
25   A.  Basically what you just told me, what to expect

**Page 10**

1    on here.
2    Q.  Okay.
3    A.  And what we would talk about.
4    Q.  Okay. And what did Mr. May tell you?
5    A.  Same thing you just did about what to expect on a
6    deposition.
7    Q.  Okay. That lasted over five or ten minutes that
8    you spoke with Mr. May. What did you speak about
9    during the other 50 minutes?
10   A.  We talked about why I was being deposed, because  08:22
11   of what I incurred with CVS's.
12   Q.  Okay. Did you meet with anybody other than Mr.
13   May?
14   A.  My brother.
15   Q.  Okay. And what is your brother's names?
         REDACTED
16   A.
17   Q.  Would you mind spelling that for the court
18   reporter, please?
         REDACTED
19   A.
20   Q.  And do you have an understanding that   REDACTED     08:22
21   is going to be deposed in this case, as well?
22   A.  Yes.
23   Q.  Later today, as well?
24   A.  Yes.
25   Q.  Okay. All right. Did   REDACTED   meet with you

**Page 11**

1    at the same time --
2    A.  Yes.
3    Q.  -- as Mr. May? There's an example.
4    A.  Oh, I'm sorry.
5    Q.  No worries, I just --
6    A.  Yes, he did.
7    Q.  All right. Anybody other than you, David, and Mr.
8    May?
9    A.  No.
10   Q.  So you both met with Mr. May for an hour?   08:22
11   A.  Uh-huh, yes, at the same time.
12   Q.  No problem. Did you bring any materials with you?
13   A.  Yes, I did.
14   Q.  Okay. What did you bring?
15   A.  I brought the letter that I received from
16   Rehabilitation Associates when Mr. Mimms left the
17   practice.
18   Q.  Do you have a copy of that letter with you today?
19   A.  It's not -- I have my original.
20   Q.  Do you mind if I take a look at that letter?    08:23
21   A.  No, go right ahead.
22   Q.  Thank you. CVS. At the conclusion of the
23   deposition today, would you mind if I made a copy
24   of this document?
25   A.  You're more than welcome to.

**Page 12**

1    Q.  Thank you. We'll just tender that for the moment.
2    Did you bring any other documents to your meeting
3    with Mr. May?
4    A.  I -- this is the only thing that Mr. May has a
5    copy of.
6    Q.  Okay. Did you bring any other documents with you
7    to your meeting with Mr. May?
8    A.  Yes.
9    Q.  What did you bring?
10   A.  I have my receipts from CVS showing that on 3-4,   08:24
11   3-5, my prescriptions that were picked up from
12   CVS, including one, two -- two of them that was
13   written by Dr. Mimms, but they were a standing
14   prescription, in other words, filled every month
15   on a regular basis, CVS allowed me to pick those
16   up, but they refused to fill my narcotic
17   prescription.
18   Q.  Okay. And we have a court reporter here, a
19   transcript -- this is, as I mentioned, an oral
20   exercise. I see that you're holding copies of    08:25
21   those prescriptions in your hands, is that
22   correct?
23   A.  That's correct.
24   Q.  Did you bring these with you to your meeting with
25   Mr. May?

A-000004

REDACTED

March 24, 2016

26 (Pages 101 to 104)

### Page 101

1    Q.   At that point, can you recall how many pills --
2         let me back up. Do you recall what drug that had
3         been prescribed that your brother was presenting
4         to the pharmacist on your behalf?
5    A.   It was for my ~~REDACTED~~
6    Q.   For the Percocet, okay. At the time of the phone
7         conversation you had with your brother, do you
8         recall which date this was?
9    A.   I went to the pharmacy on the 4th, so it would
10        have been the 1st or 2nd of March.          10:34
11   Q.   Okay. As of the 1st or 2nd of March, 2015, do you
12        recall how many pain pills of _____ you had
13        left with you?
14   A.   I wasn't in a concern. My pain medication is
15        prescribed, but if I don't need it, I don't take
16        it, so I always have a few days in the bottle
17        past the date it's to be filled.
18   Q.   You don't take it on a daily basis?
19   A.   I take it on a daily basis, but the prescription
20        was for like three a day, but if I don't feel  10:35
21        like I really need it, then I will wait. I
22        always take it at night and usually in the
23        afternoon, early afternoon, but if I don't need
24        it, I won't take it. I'm -- come a long way from
25        where I was a few years ago, so I just --

### Page 102

1    Q.   You try to not take it unless you need to?
2    A.   That's correct.
3    Q.   And that's because you understand that    REDACTED
4         and other controlled substances --
5    A.   Can be very addicting.
6    Q.   Just a reminder to let me finish the question
7         before you --
8    A.   I'm sorry.
9    Q.   No, no; no problem. It makes her job easier,
10        that's all. And part of the reason you're      10:36
11        concerned about that is not just having addiction
12        but also the side effects of the drugs?
13   A.   That's correct.          REDACTED
14   Q.   Okay. So ED ____ calls you on March 1st or 2nd, and
15        I understand you weren't really focusing on the
16        word for word. You went on the computer next, is
17        that right?
18   A.   I went on the Internet.
19   Q.   What did you do on the Internet?
20   A.   I typed in Dr. Anthony Mimms.          10:36
21   Q.   Okay.
22   A.   Expecting to see a news article on him if he had
23        been arrested or something was going on that I
24        missed in the news. Did not find anything.
25   Q.   And then did you call Dr. Mimms?

### Page 103

1    A.   No. I actually had a standing appointment on the
2         5th.
3    Q.   Okay. Did you attempt to present your
4         prescriptions to any pharmacy between the time
5         your brother called you and the 5th?
6    A.   I did.
7    Q.   Where did you go?
8    A.   I went to my CVS in McCordsville.
9    Q.   Is that the McCordsville address that we looked at
10        before?          10:37
11   A.   That's correct.
12   Q.   Okay. And when did you do that?
13   A.   On the 4th.
14   Q.   On the 4th. March 4, 2015?
15   A.   That's correct.
16   Q.   Okay. And when did you go, nighttime,
17        daytime, morning?
18   A.   I normally am not out at night, so it would have
19        been sometime in the afternoon.
20   Q.   Do you have a recollection of it being in the   10:37
21        afternoon, or are you guessing based on your sort
22        of schedule?
23   A.   Very rarely am I out at night, especially in the
24        winter, and I am not out in the mornings, so you
25        are an exception to the rule. I normally don't

### Page 104

1         leave my house before 10:30 in the morning for
2         anything. So it would have been afternoon. It
3         might have been late afternoon, but it would have
4         been afternoon.
5    Q.   And again, you're basing that on normal schedule?
6    A.   Yes.
7    Q.   You don't have a specific recollection of being
8         there in the afternoon?
9    A.   Well, actually, I'll tell you exactly what time I
10        was there.          10:38
11   Q.   That would be great.
12   A.   It's in our exhibit.
13   Q.   Well, there you go. You are looking at which
14        exhibit?
15   A.   CVS Exhibit on 3-4; they should have a time stamp
16        on there.
17   Q.   No, I'm sorry, which exhibit is it marked?
18   A.   5.
19        MR. MAY: Exhibit 5.
20   Q.   Thank you. Well, actually, they don't have a time  10:38
21        stamp. Yeah, they do. 1:27 p.m. No, that was
22        was the promise date, promise time. Let's see
23        what time the others were promised. 1:29
24   Q.   Okay. So just to be clear, Exhibit 5, these are
25        the prescriptions that you presented to the

A-000005

REDACTED

March 14, 2016

28 (Pages 109 to 112)

**Page 109**

1  uh-huh.
2  Q. Okay. So again, March 4, 2015, you go to the
3  pharmacy desk and you present your prescription --
4  A. That's correct.
5  Q. -- to be filled, prescription for 0    REDACTED
6  A. On the 4th.
7  Q. Right.
8  A. Yes.
9  Q. Okay. So then what happens?
10 A. The gentleman informed me that they could not    10:44
11 fill the prescription.
12 Q. Do you recall that gentleman's name?
13 A. No, because they were both there. Both of the
14 men, both of them, the other one walked over and
15 was standing.
16 Q. Are these the two regulars or --
17 A. Two regular.
18 Q. Maybe Ryan, maybe Eric, but we're not sure?
19 A. Yeah, Ryan, Eric, Drew, something short, it seems
20 like. I'm not sure.    10:44
21 Q. Okay. And so the -- so you presented your
22 prescription to --
23 A. At the -- at the window to whoever is standing
24 there.
25 Q. And this is -- you didn't do the drive-through.

**Page 110**

1  you walked in?
2  A. Yeah, I always walked -- yeah, I tried to walk in
3  there.
4  Q. Was there a line in front of you or --
5  A. No.
6  Q. So you went there, you presented your prescription
7  for    REDACTE
8  A. That's correct.
9  Q. And then what happened?
10 A. I was told they couldn't fill it.    10:45
11 Q. All right. Did they go back to see a list or do
12 anything, or did it happen right away?
13 A. At that time, I just remember the second
14 gentleman walking over, so I don't know if he
15 motioned over or if he heard the conversation
16 that we were having.
17 Q. Okay. So the person you presented the
18 prescription to --
19 A. To.
20 Q. -- was that the same person who told you that they    10:45
21 couldn't fill the prescription?
22 A. Yes.
23 Q. And what did he say?
24 A. He said he could not fill Dr. Mimms'
25 prescription, and that's when the other gentleman

**Page 111**

1  walked over.
2  Q. Okay. And then what happened, did you say
3  something in response?
4  A. I said, why not.
5  Q. Okay. And what happened next?
6  A. What happened next was I was told that Dr. Mimms
7  had been arrested or was about to be arrested.
8  Q. And the person told you that?
9  A. One of the two, either -- one of those two -- two
10 men.    10:46
11 Q. You can't recall --
12 A. Which one is which, I can't. I can picture them
13 but I can't --
14 Q. Okay. Can you describe to me the person you
15 presented the prescription to, please.
16 A. He had dark hair, lean, but then they both are
17 lean built. They're both similar built, for that
18 matter.
19 Q. Caucasian, African-American?
20 A. Caucasian.    10:46
21 Q. Okay. And again, to focus your attention, this is    REDACTED
22 the person you presented your
23 prescription to, okay?
24 A. Right, but I -- I can't separate the two. They
25 were both standing there. I can't -- it's been a

**Page 112**

1  year. I can't separate the two.
2  Q. Okay.
3  A. It was one of those two.
4  Q. Okay. So one gentleman, and they're both
5  Caucasian?
6  A. Yes.
7  Q. One has dark hair or --
8  A. Yes.
9  Q. The other?
10 A. They're both lean built, they're both -- I can't    10:47
11 tell you.
12 Q. Okay. How about height, so standing up, I'm
13 6-foot-3, shorter, taller?
14 A. Oh, shorter. I'm thinking 5'9", maybe. I'm
15 5'2", so I'm -- yeah, somewhere 5-8, 5'9".
16 Q. Both gentlemen?
17 A. Both gentlemen, uh-huh.
18 Q. You say they were both lean?
19 A. Yes.
20 Q. Eye color?    10:47
21 A. I don't remember. I don't --
22 Q. Do you recall whether -- pale like I am, tanned?
23 A. No. They -- they're just the regular techs.
24 They both have on their jackets with their
25 stitching, but I can't remember.

A-000006

REDACTED

March 14, 2016

29 (Pages 113 to 116)

Page 113

Q. Do you recall whether they spoke with the distinctive accent or anything like that?

A. No.

Q. Again, this conversation was in the course of you presenting your prescription?

A. That's correct.

Q. All right. And they were providing a response to you presenting your prescriptions be filled?

A. Yes.

Q. That was the subject of this meeting; this conversation was you filling your prescriptions on -- for controlled substances, right?

A. That's correct.

Q. Okay. And was there anybody else there around you when --

A. My now-current husband. We had just started dating, and he was standing behind me.

Q. He was standing behind you?

A. On my shoulder here. Not looking over my shoulder but standing right behind my shoulder.

Q. About the distance from you to the court reporter?

A. Or closer.

Q. And I'm sorry, I apologize, because I think I've asked you this before. What is your husband's name again?

Page 114

REDACTED

A.

Q. Okay, thank you. Anybody other than REDACTED

A. No.

Q. No other patient that you could see?

A. The store is never busy.

Q. Okay. So you presented your prescription to the pharmacist, and he told you we can't fill for Dr. Mimms. You said, why not, and what did they say?

A. They told me that Dr. Mimms had been arrested or was about to be arrested if he wasn't already.

Q. Did they explain that further?

A. I said why, and they says, same as everyone else, you have a prescription.

Q. Okay. Did you understand what they meant by everyone else?

A. Yeah, because it was all in the news. It seemed like there had been several doctors in that -- maybe that month or two-month period that was in the news.

Q. So you were familiar, this is an ongoing story?

A. Yeah, the -- this was happening, it seems like -- if I remember, it seems like there was two or three doctors, like just, boom, boom, boom, the first of the year that had been arrested.

Q. And they told you that he was arrested or soon to

Page 115

be arrested?

A. Or about to be arrested.

Q. Again, this seems to be a silly question, but did you have a notepad that you were taking down notes of what they were saying?

A. No.

Q. This is your recollection of what they said?

A. Oh, it piss -- yes, totally.

Q. And is that verbatim, word for word, out of his mouth was, he was arrested or is about to be arrested?

A. In -- correct, and then he added to it.

Q. Okay. What did he add to it?

A. He added to it that I needed to find a new doctor.

Q. His opinion was that you needed to find a new doctor?

A. That's correct.

Q. Okay. You understood that to be the pharmacist's opinion that you needed to find a new doctor?

A. It was this technician that told me that Dr. Mimms had been arrested or was about to be arrested if he wasn't already and that I needed to find out new doctor, period.

Q. I just want to be clear here, because you said

Page 116

something, and it was inconsistent with what you said before --

A. Go ahead.

Q. -- so I just want to make sure. You described the speaker a moment ago as a technician. Do you know whether the speaker was a technician or a pharmacist?

A. I want to call him a technician.

Q. Why do you say that?

A. Because he always seems to be in front of the counter.

Q. Okay.

A. I know that there's as female pharmacist, I don't know if who I see is also a pharmacist and working both, but I had a lot of personal contact where I turn papers in or been rung out by these two guys, so I don't know what technically they are.

Q. And if I understood you before, you said that shortly after you presented your prescription to the first person, a second gentleman came over?

A. That's correct.

Q. And you can't recall who that was?

A. No.

Q. Do I have that right?

A-000007

REDACTED

March 14, 2016

4 (Pages 13 to 16)

## Page 13

1  A. Yes. I had them.
2  Q. And you showed them to Mr. May?
3  A. We discussed them.
4  Q. You discussed them. May I see them?
5  A. You're welcome to see those.
6  Q. Thank you. Prior to your meeting with Mr. May,
7     had you provided these documents to him or anybody
8     from his firm?
9  A. No.
10 Q. At the conclusion of today's deposition, would you   08:25
11    mind if I made copies of these documents, as well?
12 A. You may.
13 Q. Thank you.
14    MR. MAY: I'll probably want some,
15    too. I didn't take a copy of those.
16 A. No, I have one left.
17 Q. Can I see the other documents you have left? The
18    document that you are holding in your hands, what
19    is that?
20 A. This is the narcotics that was filled by Kroger   08:26
21    because CVS refused.
22 Q. Okay. And on the same day?
23 A. No, this was done two days later, after I had
24    seen Dr. Mimms.
25 Q. Thank you. May I see those?

## Page 14

1  A. Uh-huh.
2  Q. And may I take -- at the conclusion of today's
3     deposition, may I make a copy of this document?
4  A. Yes, you may.
5  Q. Thank you. Other than the three documents that
6     you've brought with you today, that is, the
7     February 14, 2014 letter from Rehabilitation
8     Associates of Indiana, your prescriptions from the
9     CVS pharmacy and your prescription with Kroger,   08:26
10    were there any other documents that you brought
11    with you to your meeting with Mr. May?
12 A. No.
13 Q. Okay. Did you discuss these documents in your
14    meeting with Mr. May?
15 A. I did.
16 Q. What did you -- what was the discussion?
17 A. I explained to him why I pulled these, that I
18    thought they were of interest, and the same with
19    the letter, I thought they were of interest.
20 Q. Okay. And that also goes for your copy of your   08:27
21    prescription from Kroger?
22 A. Yes, that was, I thought, also of interest.
23 Q. So these prescriptions date back to March of last
24    year, correct?
25 A. Correct.

## Page 15

1  Q. So almost a year ago to the date?
2  A. Correct.
3  Q. Do you keep copies of all your prescriptions?
4  A. Yes, I do.
5  Q. Where do you keep them?
6  A. They are in a file with all receipts for the
7     entire year, and they're bagged, I -- I bag them
8     up, and they are stored with my tax returns for
9     that year.
10 Q. Okay. So how far back do you keep your   08:27
11    prescription records?
12 A. It varies. I know I have '12, '13, '14, and '15,
13    I know that I have most of them, all the way up
14    through 2009 to 2010.
15 Q. You're not sure about 2011?
16 A. Yeah, I'm not sure I was -- I started through the
17    process of a divorce and so some things were
18    purged in trying to sort things out, so I'm not
19    clear.
20 Q. And the records prior to 2009, do you still have   08:28
21    those?
22 A. Some of them.
23 Q. Okay. Are they kept outside or are they kept at
24    your home?
25 A. At my home.

## Page 16

1  Q. Okay. And why do you keep your records of your
2     prescriptions?
3  A. I have found that with my children and my
4     husband, things that were bought throughout the
5     entire year, that somewhere along the line,
6     something doesn't work or whatever, and I just
7     keep all receipts for the entire year together,
8     everything from grocery receipts to my pharmacy
9     receipts.
10 Q. So keeping your pharmacy receipts is part of a   08:28
11    larger practice of keeping all receipts?
12 A. Yes.
13 Q. Its not because they are prescription records,
14    it's because they are --
15 A. Part of -- yes.
16 Q. -- purchase records?
17 A. Correct, purchase.
18 Q. Gotcha. Understood?
19 A. I know it's weird. But I do.
20 Q. Do you recall what Mr. May told you about the case   08:29
21    in your meeting with him?
22 A. We didn't discuss exactly what his case was about,
23    only what I have incurred in relation to CVS and
24    Dr. Mimms.
25 Q. When you say incurred, what do you mean?

A-000008

PLAINTIFF'S DESIGNATION OF EVIDENCE

EXHIBIT B

A-000009

REDACTED

March 14, 2016

1 (Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CIVIL ACTION NO. 1:15-cv-00970-TWP-MJD

ANTHONY NIMNIS, M.D. et al. )

            Plaintiff )

v.  )

CVS PHARMACY, INC.  )

            Defendant )

REDACTED
REDACTED deposition upon oral examination of █
█, a witness produced and sworn before me,
Linda C. Callahan, a Court Reporter and Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendant in the
offices of Dentons & Thornburg LLP, 11 South
Meridian Street, 2nd Floor Conference Center,
Indianapolis, Marion County, Indiana, on the 14th
day of March, 2016, commencing at 3:50 p.m.,
pursuant to the Federal Rules of Civil Procedure
and by Notice of the parties and subpoena of the
witness as to time and place thereof.

STRATOS LEGAL SERVICES, LP
4295 San Felipe, Suite 125
Houston, Texas 77027
(713) 482-2180

## Page 2

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF
LAW OFFICES OF JASON D. MAY, LLC
BY: JASON D. MAY, ESQ.
9230 N. Meridian Street
Suite 220
Indianapolis, IN 46260
jason.may@jasonmaylaw.com

FOR THE DEFENDANT
FOLEY & LARDNER LLP
BY: JONATHAN W. GARLOUGH, ESQ.
321 N. Clark Street
Suite 2800
Chicago, IL 60654-5313
jgarlough@foley.com

ALSO PRESENT VIA VIDEO CONFERENCE:
Hilary B. Dudley, Esq.
CVS Health
Legal Department

I-N-D-E-X OF E-X-A-M-I-N-A-T-I-O-N

                                      PAGE

BY MR. GARLOUGH          3, 125
BY MR. MAY                    100, 154

## Page 3

I-N-D-E-X OF E-X-H-I-B-I-T-S

                                              PAGE

14 -     Subpoena                         9
15 -     CVS prescription records       19
16 -     Map                             19
17 -     Map                             23
18 -     Narcotic agreement             48
19 -     Affidavit                      84
20 -     Statement, May-Mason           88
21 -     "Just a note" notes            90

## Page 4

REDACTED

the witness herein, having been first duly sworn
to tell the truth, the whole truth, and nothing
but the truth relating to said matter, was
examined and testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. GARLOUGH
            MR. GARLOUGH   REDACTED   good
afternoon. My name is John Garlough, attorney for 03:53
CVS Pharmacy. I will be taking your deposition
this afternoon. Have you ever been deposed
before?
            THE WITNESS: What do you mean by
that?
            MR. GARLOUGH: Have you ever had a
deposition taken?
            THE WITNESS: Yes, I have.
            MR. GARLOUGH: When was the last time   03:53
you took a deposition?
            THE WITNESS: It's been probably 10
years ago.
            MR. GARLOUGH: Okay. Was it just one
deposition or have you taken multiple?
            THE WITNESS: One

A-000010

REDACTED

March 15, 2016

15 (Pages 69 to 72)

**Page 69**

```
 1   Q.  So just so we're all on the same page, if you
 2       don't mind -- let me monkey with this real quick.
 3       Okay, yes.  So you were at the Pendleton Pike
 4       store, right, you had left the store, right,
 5       because they wouldn't fill --
 6   A.  That's Greenfield.
 7   Q.  Right?
 8   A.  Right.
 9   Q.  And then you traveled down here and you went to
10       this store?                              05:36
11   A.  And they did not have enough.
12   Q.  Right.  And so they called a third store?
13   A.  The CVS at Fort Harris.
14   Q.  We're all talking this is -- one thing happened
15       after the other, right, you went directly from
16       here to here?
17   A.  Right.
18   Q.  From the Greenfield store to the Pendleton Pike
19       store?
20   A.  Uh-huh.                                  05:36
21   Q.  Yes?
22   A.  Yes.
23   Q.  You didn't stop at home, you didn't --
24   A.  No.
25   Q.  All right.  So you went to the Pendleton Pike
```

**Page 70**

```
 1       store, you presented the same prescription for
 2   REDACTED   at the Pendleton Pike store?
 3   A.  Yes.
 4   Q.  They didn't have enough, correct?
 5   A.  Right.
 6   Q.  They told you they didn't have enough?
 7   A.  Right.
 8   Q.  Do you remember who you spoke with at the
 9       Pendleton Pike store when you presented your
10       prescription?                           05:36
11   A.  Her name?
12   Q.  Yes, do you recall her name?
13   A.  Alexis.
14   Q.  Alexis, okay.  Now, you've obviously been to the
15       Pendleton Pike store a number times, correct?
16   A.  Yes.
17   Q.  Did you recognize Alexis from prior visits?
18   A.  Yes.
19   Q.  Was she a pharmacist or a tech?
20   A.  Tech.                                   05:37
21   Q.  How can you tell?
22   A.  She gets on the -- computer, she puts -- you
23       know, run to see if -- whatever they do when you
24       have a prescription.  She does to the window,
25       gets -- collects money, takes the prescription,
```

**Page 71**

```
 1       get prescriptions out, you know, was the cashier.
 2   Q.  So you believe she was a tech based on the
 3       services she performed?
 4   A.  Yes.
 5   Q.  Anything else, any other reason why you think she
 6       was a tech?
 7   A.  Just by watching her.
 8   Q.  So you met Alexis before, correct, this was not
 9       the first time you met Alexis?
10   A.  No.                                     05:37
11   Q.  So can you describe what Alexis looks like?
12   A.  She's young, black, petite.
13   Q.  When you say young, are we again forties or --
14   A.  Thirties, early thirties; late twenties, early
15       thirties, petite.
16   Q.  Late twenties, thirties, okay.
17   A.  Helpful.
18   Q.  And so when you presented the prescription to
19       Alexis, can you tell me exactly what Alexis told
20       you?                                    05:38
21   A.  She told me -- Alexis is the one at the Pendleton
22       Pike CVS that told me Dr. Mimms was under
23       investigation with the DEA and that I better find
24       another doctor.
25   Q.  Okay.  Let's walk through that a little bit.  You
```

**Page 72**

```
 1       walked -- first of all, was this inside the store
 2       or was it the drive-through?
 3   A.  Inside.  I always go inside.
 4   Q.  Okay.  Was there anybody else behind the pharmacy
 5       desk other than Alexis?
 6   A.  Yes.
 7   Q.  Can you recall how many?
 8   A.  Probably four.
 9   Q.  Is that a guess or is that a recollection?
10   A.  There was probably four.  With the pharmist, the  05:39
11       head pharmist and about three other women.
12   Q.  Okay.  Were there any other customers there?
13   A.  Yes, probably one or two.
14   Q.  You keep saying probably.  Do you have a
15       recollection of there being one or two?
16   A.  That's -- when I say probably, that's what I mean,
17       one or two.
18   Q.  Okay.  And before --
19   A.  Their setup is different.
20   Q.  Thank you.  You just anticipated where I was     05:40
21       going.  So how is their setup different?
22   A.  It's the opposite.
23   Q.  Okay.  There's still a drop-off and a pickup?
24   A.  But it's opposite.
25   Q.  Okay.  So one or two other customers who were in
```

A-000011

REDACTED

March 14, 2016

19 (Pages 73 to 76)

## Page 73

the pharmacy area. Were they near you or store
they in the pick-up line?

A. They were setting over by the pick-up line.

Q. Okay, again --

A. But I don't know who's wandering around, you know,
behind me or standing behind me or anything at
that time.

Q. Okay. But the people that you know of, they were
in the other line?

A. They were setting in the chair.    05:40

Q. Oh, sitting, okay. Gotcha. I apologize. And
again --

A. I don't know who was around me, but --

Q. I understand. Let me finish my question. I
understand that you didn't have a tape measure
there, so an approximation is fine, but again,
would you say about seven to eight feet, a
difference?

A. Longer.

Q. So a longer distance?    05:40

A. Uh-huh.

Q. Maybe 12 feet, 15 feet, something like that?

A. Uh-huh.

Q. Yes?

A. Yes.

## Page 74

Q. Okay. So you walked in the store, there's
approximately four employees at the pharmacy desk.
The first person you spoke with, was that Alexis
or was that somebody else?

A. Alexis.

Q. You presented your prescription to Alexis?

A. Yes.

Q. Now, we're talking about the Pendleton Pike store?

A. Yes.

Q. Okay. So maybe I misheard you, but I thought you   05:41
told me that they initially told you that they
didn't have enough on hand to fill your
prescription.

A. Right.

Q. Okay. So let's walk through what happens from the
moment you give them -- presented the prescription
to the moment you leave the store

A. I was afraid they were going to tell me the same
thing at CVS Pendleton Pike, they weren't going to
fill my prescription. And then when I went -- and   05:41
then when they didn't have enough, they called
over to Fort Harrison, and they had enough to fill
my full prescription. And when I went to CVS Fort
Harrison, I was going, oh, please, please, please,
you know, fill my prescription. They will see Dr.

## Page 75

Mimms' name and they're not going to fill it, you
know.

Q. Why did you have that reaction?

A. Because of what she told me, that he was under DEA
investigation.

Q. But why were you so nervous that you wouldn't be
able to get your medication?

A. Because I have to take that medication. Where
else am I going to go? And if he's under
investigation, for what? My own doctor, for what?   05:42

Q. All right. Now let's walk through this a little
bit. You went to the store at Pendleton Pike,
right?

A. Yes.

Q. Okay. You present the prescription to Alexis,
correct?

A. Right.

Q. What happens immediately after you provide the
prescription to Alexis?

A. She was looking to see if they had enough, and at   05:42
that time, she was telling me that Dr. Mimms was
under investigation with the DEA.

Q. Okay. Are those --

A. And for me, I better find another doctor.

Q. Okay. Were those exact words she used?

## Page 76

A. Yes. Basically, yes.

Q. Did you take notes?

A. No.

Q. Did you record that conversation?

A. No.

Q. So you just qualified your answer by saying
basically. What I'm trying to understand is are
those the exact words she used or were --

A. The exact words.

Q. Let me finish my question. Were those the exact   05:43
words she used or is that the general gist of what
she's telling you?

A. No. She said, Dr. Mimms is under investigation
from the DEA. Judith, you better find you another
doctor.

Q. Are those the exact words she used?

A. Yes.

Q. Because they've changed three times now

A. No, they've been the same.

Q. Is that -- the last version you just gave me, are   05:44
those the exact words?

A. Yes.

Q. At what point in the conversation did she tell you
that the store didn't have enough of her -- of
REDACTED    n stock?

A-000012

REDACTED

March 14, 2016

16 (Pages 61 to 64)

## Page 61

1   A. Yes.
2   Q. REDACTED
3   A. No, never.
4   Q. You get that through the mail-order?
5   A. Yes.
6   Q. Okay. And so --
7   A. And REDACTED
8   Q. Robaxin. Okay. And both of those prescriptions
9      have been written by Dr. Murane?
10  A. Yes.         05:26
11  Q. All right. It was mid afternoon, you said there
12     was about 4 or 5 employees, approximately, working
13     at the pharmacy desk. Yes?
14  A. Yes.
15  Q. Were there any other customers in line or around
16     the pharmacy?
17  A. Yes.
18  Q. Any other customers around the pharmacy desk when
19     you went to the desk?
20  A. Yes.         05:27
21  Q. How many?
22  A. Around seven.
23  Q. Did you stay in line to wait to present to the
24     desk?
25  A. Yes.

## Page 62

1   Q. And so were you the seventh person in line?
2   A. No.
3   Q. People filled in behind you?
4   A. No.
5   Q. Explain.
6   A. The seven people are standing over there to get --
7     waiting to get their prescriptions.
8   Q. Okay.
9   A. I was over here where the computers are, and you
10    wait for the pharmist or in pharmist helper and  05:27
11    you put your prescriptions down, so they get on
12    the computer and put your insurance information
13    in, see if they have enough prescrip -- you know,
14    pills and if it's covered, et cetera, et cetera,
15    that's where I was.
16  Q. Okay. So there's a drop-off line and a pick-up
17    line?
18  A. Uh-huh.
19  Q. Yes?
20  A. Yes.         05:28
21  Q. Okay. And in the drop-off line, was there anybody
22    in front of you?
23  A. No.
24  Q. Was there anybody behind you?
25  A. I don't know.

## Page 63

1   Q. Okay. So how far -- and I realize you didn't have
2     a tape measure, but just to give me an idea, how
3     far are you in the drop-off line from the folks
4     waiting in the pick-up line, the length of this
5     table?
6   A. Yeah, that's pretty good.
7   Q. About eight feet long; is that right, give or
8     take?
9   A. Six to seven feet long, back then. This store has
10    been remodeled since.     05:28
11  A. Yes. There were three registers.
12  Q. Now, this wasn't your first time going to the
13    Greenfield store, correct?
14  A. No.
15  Q. But it's not your home base store, either, right,
16    the Pendleton Pike?
17  A. It was.
18  Q. At that time?
19  A. Yes.
20  Q. Did you recognize the person to whom you dropped  05:29
21    off the prescription?
22  A. I didn't drop it off, I stood there and waited.
23  Q. Did you recognize the person to whom you presented
24    the prescription?
25  A. The head, lead pharmist.

## Page 64

1   Q. And why do you believe that was the lead
2     pharmacist?
3   A. The badge or his name tag, plus there's a picture
4     of him.
5   Q. Do you recall his name?
6   A. No.
7   Q. Has badge identified him as the lead pharmacist?
8   A. His name, picture, it was the lead pharmist.
9   Q. His name matched the picture on the wall; there's
10    a picture on the wall identifying the lead  05:29
11    pharmacist?
12  A. Yes.
13  Q. And the name on his badge matched the picture; is
14    that what you're saying?
15  A. No. He looked like the picture.
16  Q. So can you describe for me what he looked like?
17  A. No.
18  Q. You can't tell me?
19  A. White, light, light-colored hair.
20  Q. Light hair. How tall?     05:30
21  A. I'm pretty short, so everybody looks tall to me.
22    Not that tall, probably 5-10, young.
23  Q. Thirties young or forties young?
24  A. I'd -- I'm 62, so he was probably 40; 39, 40, in
25    the forties.

A-000013

REDACTED

March 14, 2016

26 (Pages 101 to 104)

**Page 101**

place?

A.  When I was 16 years old, a senior in high school,
I had a ruptured disk that affected my left leg
where I couldn't walk and I had my first back
surgery then, they took the disk out, and that was
the first one.

Q.  How many back surgeries have you had?

A.  Four.  Three lower, one upper.

Q.  And what was the -- you said four, so you said you
had a ruptured disk is what caused the first one.      06:20

A.  Yes.

Q.  What necessitated the second surgery?

A.  The -- they just took the disk out, and then it --
my bones went together and started rubbing, so
they did a fusion.  The second one, they made a
disk and fused it in there.  I was in the hospital
30 days straight on my back.

Q.  How old were you when you had your second one?

A.  My second one, I was 24, and my son was five
months old.  I was in the hospital 30 days, had to      06:20
learn how to walk again.  They fused it.  The
second back surgery was higher up, and they put
metal plates, rods, screws, donor bone, fusions.
The last -- the next surgery was in
2000-something.

**Page 102**

Q.  You said a lot there.  When was the third surgery?

A.  It was in 2000 like '1 and it was farther up.

Q.  And this is the one with the screws, rods, and
other bone, or donor bone?

A.  Yes.

Q.  Okay.

A.  The last one was done like 2003.  They went
through my neck, through my upper back, and donor
bone and metal plates, screws, rods.

Q.  Okay.  More?                                         06:21

A.  More.

Q.  Excuse, rods.

A.  I go off on -- in airports.

Q.  Okay.  Can you tell us what the trajectory of your
pain was over the course of those four surgeries?

Did it -- I guess I can break it up.  Before the
first one, were you in a lot of pain?

A.  I was in a lot of pain, I was at a 10, and I had
to use my hands to move my left leg, I was --
nerve damage was going down my -- I was losing my   06:22
left leg.

Q.  And that was 16?

A.  This was when I was 16.

Q.  Okay.  So after the surgery, what was your pain
level?

**Page 103**

A.  It was probably, once it -- it started going and
rubbing when I was 24, the pain level was a 10.

Q.  So would it be fair to say after the surgery, your
pain subsided some and then it went back up to a
10?

A.  Yeah.

Q.  And then you had the second surgery, the same
thing, did it subside again?

A.  The next surgery, I was in hospital 30 days, went
through therapy, had to learn to walk again, was     06:23
in a harness brace for 15 months, and it -- I
never really got much relief after that surgery.

Q.  So you were still -- your pain threshold was still
at a 10?

A.  9 to 10.

Q.  Okay.  At what point did your doctor -- and was it
after the fourth surgery or after the third
surgery that they said you need to see a pain
management specialist?

A.  I didn't see a pain specialist until after my       06:23
fourth surgery.

Q.  Okay.

A.  Because -- because it was unsuccessful, they had
to fuse a nerve in my upper back, so the nerve in
this arm will constantly shoot down the pain, but

**Page 104**

he had to fuse the nerve, so I will suffer with
that the rest of my life.

Q.  So what type of pain do you experience a daily
basis?

A.  It's a 8, 9, and 10.

Q.  And what does your pain medication do to that?

A.  My pain medication keeps me from spasms that will
pull my body to one side or the other where I look
crooked, real crooked.  And it -- if I didn't have
it, I'd be in a wheelchair right now, and I          06:24
wouldn't be being able to walk.

Q.  Take your time.

A.  And I wouldn't be able to sit, have any quality of
life because I'd be laying in bed or laying down
all the time, because I wouldn't be able to walk,
and the pain would be so bad that I'd be crying a
lot, and people don't want to be around someone
that hurts all the time or cries all the time.  So
the pain patch helps that, the REDACTED helps,
and I take it as needed.  I don't take it all the   06:25
time, I take it as needed.  And the muscle
relaxer, I have to take that so I don't get the
spasms that I've had all my life, since I was
16 years old.

Q.  I understand.

A-000014

REDACTED

March 14, 2016

15 (Pages 57 to 60)

### Page 57

1   A.  In his new practice?
2   Q.  In his new practice, right, at MIR, not at his old
3       practice.  Let me try to give you an example and
4       maybe that will help.  Have you ever -- for
5       example, has Dr. Mimms asked you, how are those
6       REDACTED            working out for you, and you said
7       something to the effect of: I received them
8       through the mail, they work great, or are you
9       going to be filling a prescription for REDACTED
10      and you mentioned you filled it at some pharmacy    05:21
11      other than the Pendleton Pike pharmacy?
12   A.  No.
13          MR. MAY:  When you say no, are you
14      saying those examples never happened or are you
15      answering his original question whether or not you
16      discussed where you get your prescriptions filled,
17      if they're beyond or outside of the CVS on
18      Pendleton Pike?
19          THE WITNESS:  See, that's what I
20      don't understand.                                   05:21
21   Q.  Okay.  Let me try to narrow it down for you.  Have
22      you ever discussed with Mr. Mimms where you fill
23      your prescriptions?
24   A.  Yes.
25   Q.  Okay.  Tell me about that conversation.  Tell me

### Page 58

1       bit.  I will ask you questions about that, but I
2       just want to focus on the locations of stores for
3       right now.  Okay.  Why don't we talk about that
4       right now.
5          So do you recall when it was, the date that
6       you went to the Greenfield store and the
7       pharmacist told you what you just told me?
8   A.  It had to be before October of 2014.
9   Q.  And why do you --
10   A.  It had to be before that date.                     05:24
11   Q.  Why do you say it had to be before October 2014?
12   A.  Because I think I got medicine filled at Pendleton
13      Pike.  No, at -- I went to Pendleton Pike to fill
14      it and they didn't have it, enough quantity, so
15      then I went to Fort Harrison and they did have
16      enough quantity to fill it, it was around that
17      time, maybe, seems like it.
18   Q.  You're positive it happened before October of
19      2014?
20   A.  Yeah, yes.                                         05:24
21   Q.  Okay.  And so can you explain that to me?  It
22      sounds like you went to more than one store.
23   A.  Went to Greenfield CVS.
24   Q.  Okay.  So you went to the CVS in Greenfield.  And
25      is that -- either of those pharmacies located on

### Page 59

1       the answer to the question, please.  Tell me about
2       the conversation that you had regarding Dr. Mimms.
3   A.  I told Dr. Mimms that I went to CVS to fill my
4       prescription, and the head pharmacist at CVS in
5       Greenfield said he would not fill Dr. Mimms'
6       prescriptions, period.
7   Q.  Okay.  Is the Greenfield store the same store that
8       you've identified as Pendleton Pike, or are those
9       two differences stores?
10   A.  Greenfield store, the Greenfield CVS.              05:22
11   Q.  Okay.  That's different than the Pendleton Pike
12      store?
13   A.  Right.
14   Q.  Okay.  You know, sometimes people use different
15      names and I just don't know.  Okay.  So in that
16      conversation, at least, you had told Dr. Mimms
17      that you had gone to the Greenfield store to fill
18      a prescription, correct?
19   A.  Yes.
20   Q.  And did Dr. Mimms tell you that there was anything  05:22
21      inappropriate about you going to the Greenfield
22      store as opposed to going to the Pendleton Pike
23      store to fill your prescription?
24   A.  No, no.
25   Q.  Okay.  We'll get to that conversation in a little

### Page 60

1       either of our maps here?
2   A.  On Exhibit 17.
3   Q.  It's the item identified as 17.B, B as in two?
4   A.  Yes.
5   Q.  Okay.  So did you go in the store or outside?
6   A.  In the store.
7   Q.  Okay.  Were you accompanied by anybody?
8   A.  No.
9   Q.  And you went to the pharmacy desk, I assume?
10   A.  Yes.                                               05:25
11   Q.  How many people were working at the pharmacy desk
12      that evening?
13   A.  Approximately 4 or 5, with the head pharmist
14      [sic].
15   Q.  And you know, I apologize because I just made an
16      assumption that may not be true.  Do you recall
17      what time of day you went to --
18   A.  In the afternoon.
19   Q.  In the afternoon.  And were you presenting
20      multiple prescriptions that day?                   05:26
21   A.  I could have been.
22   Q.  Do you recall what you were presenting, what
23      prescriptions you were presenting?
24   A.  REDACTED
25   Q.  REDACTED         for one?

A-000015

REDACTED

March 14, 2016

16 (Pages 61 to 64)

## Page 61

1  A.  Yes.
2  Q.  REDACTED
3  A.  No, never.
4  Q.  You get that through the mail-order?
5  A.  Yes.
6  Q.  Okay.  And so --
   REDACTED
7  A.  And
8  Q.  Robroxin.  Okay.  And both of those prescriptions
9  have been written by Dr. Mimms?
10  A.  Yes.                                05:26
11  Q.  All right.  It was mid-afternoon, you said there
12  was about 4 or 5 employees, approximately, working
13  at the pharmacy desk.  Yes?
14  A.  Yes.
15  Q.  Were there any other customers in line or around
16  the pharmacy?
17  A.  Yes.
18  Q.  Any other customers around the pharmacy desk when
19  you went to the desk?
20  A.  Yes.                                05:27
21  Q.  How many?
22  A.  Around seven.
23  Q.  Did you stay in line to wait to present to the
24  desk?
25  A.  Yes.

## Page 62

1  Q.  And so were you the seventh person in line?
2  A.  No.
3  Q.  People filled in behind you?
4  A.  No.
5  Q.  Explain.
6  A.  The seven people are standing over there to --
7  waiting to get their prescriptions.
8  Q.  Okay.
9  A.  I was over here where the computers are, and you
10  wait for the pharmist or in pharmist helper and   05:27
11  you put your prescriptions down, so they get on
12  the computer and put your insurance information
13  in, see if they have enough prescrip -- you know,
14  pills and if it's covered, et cetera, et cetera,
15  that's where I was.
16  Q.  Okay.  So there's a drop-off line and a pick -up
17  line?
18  A.  Uh-huh.
19  Q.  Yes?
20  A.  Yes.                                05:28
21  Q.  Okay.  And in the drop-off line, was there anybody
22  in front of you?
23  A.  No.
24  Q.  Was there anybody behind you?
25  A.  I don't know.

## Page 63

1  Q.  Okay.  So how far -- and I realize you didn't have
2  a tape measure, but just to give me an idea, how
3  far are you in the drop-off line from the folks
4  waiting in the pick-up line, the length of this
5  table?
6  A.  Yeah, that's pretty good.
7  Q.  About eight feet long, is that right, give or
8  take?
9  A.  Six to seven feet long, back then.  This store has
10  been remodeled since.                    05:28
11  A.  Yes.  There were three registers.
12  Q.  Now, this wasn't your first time going to the
13  Greenfield store, correct?
14  A.  No.
15  Q.  But it's not your home base store, either, right,
16  the Pendleton Pike?
17  A.  It was.
18  Q.  At that time?
19  A.  Yes.
20  Q.  Did you recognize the person to whom you dropped   05:29
21  off the prescription?
22  A.  I didn't drop it off, I stood there and waited.
23  Q.  Did you recognize the person to whom you presented
24  the prescription?
25  A.  The head, lead pharmist.

## Page 64

1  Q.  And why do you believe that was the lead
2  pharmacist?
3  A.  The badge or his name tag, plus there's a picture
4  of him.
5  Q.  Do you recall his name?
6  A.  No.
7  Q.  Has badge identified him as the lead pharmacist?
8  A.  His name, picture, it was the lead pharmist.
9  Q.  His name matched the picture on the wall, there's
10  a picture on the wall identifying the lead      05:29
11  pharmacist?
12  A.  Yes.
13  Q.  And the name on his badge matched the picture, is
14  that what you're saying?
15  A.  No.  He looked like the picture.
16  Q.  So can you describe for me what he looked like?
17  A.  No.
18  Q.  You can't tell me?
19  A.  White, light, light-colored hair.
20  Q.  Light hair.  How tall?                05:30
21  A.  I'm pretty short, so everybody looks tall to me,
22  Not that tall, probably 5-10, young.
23  Q.  Thirties young or forties young?
24  A.  I'd -- I'm 62, so he was probably 40; 39, 40, in
25  the forties.

Judith Mason
March 14, 2016

17 (Pages 65 to 68)

## Page 65

1. Q. Eye color?
2. A. No.
3. Q. Did he have a distinctive accent or facial hair?
4. A. Just very loud, loud.
5. Q. Loud, loud voice?
6. A. Not really.
7. Q. What do you mean, not really?
8. A. Just to me, very loud to me. Rude.
9. Q. Okay.
10. A. Made me cry.                                  05:31
11. Q. Okay. So you presented your prescription to the
12.    pharmacist?
13. A. Yes.
14. Q. And had you filled oxycodone at that store before?
15. A. The month before.
16. Q. And you can't recall exactly when this was?
17. A. No.
18. Q. But it was before October of 2014; is that right?
19. A. I think so.
20. Q. That's what you told me before, so --          05:31
21. A. It is.
22. Q. Okay. So you presented the prescription to the
23.    pharmacist, and in as close to -- well, can you
24.    describe for me what he said back to you?
25.    MR. MAY: What she said back or he

## Page 66

1. said back?
2.    MR. GARLOUGH: What he said back.
3.    MR. MAY: In response to what, I
4. didn't understand.
5.    MR. GARLOUGH: Yeah, no -- I'm sorry.
6. Q. So you presented the prescription to the
7.    pharmacist, there you go, here's my prescription?
8. A. Uh-huh.
9.    MR. MAY: Oh, okay. Now I
10. understand, okay.                                  05:32
11. Q. What did the doctor -- or excuse me -- the
12.    pharmacist say in response after you presented it?
13. A. That he would not fill Dr. Mimms' prescriptions.
14. Q. Okay. And --
15. A. I said, why not. He said, I am not filling Dr.
16.    Mimms' prescriptions, no. I said, but I have the
17.    prescription right here, this is for me, I need
18.    this medicine, this is my prescription.
19. Q. And did Dr. Mimms -- did the pharmacist fill your
20.    prescription?                                   05:33
21. A. No.
22. Q. Did say anything else?
23. A. Very loud, he will not fill any of Dr. Mimms'
24.    prescriptions, ever.
25. Q. Okay.

## Page 67

1. A. And that's -- he was louder than I was right
2.    there. He made me cry. I don't know who else
3.    heard, but there was people there looking at me,
4.    the pharmist, and because -- it's always crowded
5.    in --
6. Q. Yeah, busy store?
7. A. Very busy. And I had to go and sit down.
8. Q. Where did you sit down?
9. A. They have like three chairs at that time.
10. Q. For the little clinic area?                     05:33
11. A. Way over where you pay for your stuff.
12. Q. Okay. Did you present any other prescriptions to
13.    the pharmacy that day, other than the REDACTED ?
14. A. No. He said he would not fill any of Dr. Mimms'
15.    prescriptions.
16. Q. Okay.
17. A. I asked, why not. He said, I will not fill any of
18.    his prescriptions.
19. Q. Did he say anything else?
20. A. No.                                            05:34
21. Q. Now, you have prescriptions for multiple doctors,
22.    right?
23. A. Yes.
24. Q. Okay. That day, did you bring any prescriptions
25.    in from any other doctors?

## Page 68

1. A. No.
2. Q. So you were just presenting Dr. Mimms'
3.    prescription?
4. A. Uh-huh, yes.
5. Q. Okay. So after you sat down and gathered
6.    yourself, I understand you were upset, did you
7.    have another discussion with the pharmacist or did
8.    you leave at that point?
9. A. I left.
10. Q. Have you ever been back to that store since?   05:34
11. A. No.
12. Q. After you left that store, what did you do?
13. A. I went --
14. Q. Where did you go?
15. A. I'm trying to remember. I know I went to
16.    Pendleton Pike to see if they would fill my
17.    prescription, my REDACTED . The pharmist didn't
18.    have enough REDACTED , so --
19. Q. Go ahead.
20. A. With REDACTED  and different pain medications, if  05:35
21.    they don't have enough to fill the prescription,
22.    say like if they only have one or two, that's your
23.    whole prescription, you can't get the amount --
24.    the whole amount anymore, so they called over to
25.    Fort Harrison CVS. They had the full amount.

A-000017

REDACTED

March 18, 2016

18 (Pages 69 to 72)

## Page 69

1  Q. So just so we're all on the same page, if you
2     don't mind -- let me monkey with this real quick.
3     Okay, yes. So you were at the Pendleton Pike
4     store, right, you had left the store, right,
5     because they wouldn't fill --
6  A. That's Greenfield?
7  Q. Right?
8  A. Right.
9  Q. And then you traveled down here and you went to
10    this store?         05:36
11  A. And they did not have enough.
12  Q. Right. And so they called a third store?
13  A. The CVS at Fort Harris.
14  Q. We're all talking this is -- one thing happened
15     after the other, right, you went directly from
16     here to here?
17  A. Right.
18  Q. From the Greenfield store to the Pendleton Pike
19     store?
20  A. Uh-huh.          05:36
21  Q. Yes?
22  A. Yes.
23  Q. You didn't stop at home, you didn't --
24  A. No.
25  Q. All right. So you went to the Pendleton Pike

## Page 70

1     store, you presented the same prescription for
2    REDACTED   at the Pendleton Pike store?
3  A. Yes.
4  Q. They didn't have enough, correct?
5  A. Right.
6  Q. They told you they didn't have enough?
7  A. Right.
8  Q. Do you remember who you spoke with at the
9     Pendleton Pike store when you presented your
10    prescription?     05:36
11  A. Her name?
12  Q. Yes, do you recall her name?
13  A. Alexis.
14  Q. Alexis, okay. Now, you've obviously been to the
15     Pendleton Pike store a number times, correct?
16  A. Yes.
17  Q. Did you recognize Alexis from prior visits?
18  A. Yes.
19  Q. Was she a pharmacist or a tech?
20  A. Tech.         05:37
21  Q. How can you tell?
22  A. She gets on the -- the computer, she puts -- you
23     know, run to see if -- whatever they do when you
24     have a prescription. She does to the window,
25     gets -- collects money, takes the prescription,

## Page 71

1     get prescriptions out, you know, was the cashier.
2  Q. So you believe she was a tech based on the
3     services she performed?
4  A. Yes.
5  Q. Anything else, any other reason why you think she
6     was a tech?
7  A. Just by watching her.
8  Q. So you met Alexis before, correct; this was not
9     the first time you met Alexis?
10  A. No.          05:37
11  Q. So can you describe what Alexis looks like?
12  A. She's young, black, petite.
13  Q. When you say young, are we again forties or --
14  A. Thirties, early thirties; late twenties, early
15     thirties, petite.
16  Q. Late twenties, thirties, okay.
17  A. Helpful.
18  Q. And so when you presented the prescription to
19     Alexis, can you tell me exactly what Alexis told
20     you?        05:38
21  A. She told me -- Alexis is the one at the Pendleton
22     Pike CVS that told me Dr. Mimms was under
23     investigation with the DEA and that I better find
24     another doctor.
25  Q. Okay. Let's walk through that a little bit. You

## Page 72

1     walked -- first of all, was this inside the store
2     or was it the drive-through?
3  A. Inside. I always go inside.
4  Q. Okay. Was there anybody else behind the pharmacy
5     desk other than Alexis?
6  A. Yes.
7  Q. Can you recall how many?
8  A. Probably four.
9  Q. Is that a guess or is that a recollection?
10  A. There was probably four. With the pharmist, the  05:39
11     head pharmist and about three other women.
12  Q. Okay. Were there any other customers there?
13  A. Yes, probably one or two.
14  Q. You keep saying probably. Do you have a
15     recollection of there being one or two?
16  A. That's -- when I say probably, that's what I mean,
17     one or two.
18  Q. Okay. And before --
19  A. Their setup is different.
20  Q. Thank you. You just anticipated where I was   05:41
21     going. So how is their setup different?
22  A. It's the opposite.
23  Q. Okay. There's still a drop-off and a pick-up?
24  A. But it's opposite.
25  Q. Okay. So one or two other customers who were in

A-000018

PLAINTIFF'S DESIGNATION OF EVIDENCE

EXHIBIT C

A-000019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


ANTHONY MIMMS, M.D. and          )
MIMMS FUNCTIONAL                 )
REHABILITATION, P.C.,            )
                                 )
          Plaintiffs             )
                                 )
     -v-                         ) CAUSE NO.
                                 ) 1:15-cv-00970-TWP-MJD
CVS PHARMACY, INC.,              )
                                 )
          Defendant              )


     The deposition upon oral examination of
REDACTED     , a witness produced and sworn before
me, Marsha A. Traphagan, Notary Public in and for the
County of Marion, State of Indiana, taken on behalf
of the Plaintiffs at the offices of Jason D. May,
9201 North Meridian Street, Suite 220, Indianapolis,

Indiana, on May 17, 2016, pursuant to the Indiana

Rules of Trial Procedure.



          Marsha A. Traphagan

          8122 Folkstone Road

       Indianapolis, IN  46268

          (317) 872-4233

Page 24

1    Q  Have you ever been told by anyone that Dr. Anthony
2       Mimms is under investigation by the DEA?
3    A  Yes.
4    Q  Okay.  Who told you that?
5    A  I don't remember.
6    Q  Were you told while you were at work?
7    A  Yes.
8    Q  Were you ever told that as a result of Dr. Anthony
9       Mimms being under DEA investigation that CVS would
10      not fill his prescriptions for controlled
11      substances?
12   A  No.
13   Q  Is it your understanding, and I'm asking your
14      opinion, that a doctor who was under DEA
15      investigation is a bad doctor?
16         MR. GARLOUGH:  Object to the form.
17   A  No.
18   Q  Why not?
19   A  Because if he was bad, he wouldn't be filling
20      prescriptions.  Well, be able to write
21      prescriptions.
22   Q  With respect to Dr. Anthony Mimms, have you ever
23      advised any patient that he prescribes for that he
24      was under DEA investigation?
25   A  Well, what do you mean, like --

Page 25

1    Q  Did you ever tell one of Dr. Mimms' patients he was
2       under DEA investigation?
3    A  Yes.
4    Q  Do you know who that patient was?
5    A  REDACTED
6    Q  Why did you tell REDACTED Dr. Mimms was under
7    A  DEA investigation?
8    A  Well, when she came in for her prescription, she
9       was upset, and she just came up here because she went
10      somewhere, I guess went to where his office used to
11      be, and she told me he just closed up.  She said
12      she didn't have a notice, and she went to every
13      pharmacy down there, and nobody would fill for him.
14      And I said, well -- I just said, maybe because he
15      is under investigation from the information that
16      she gave me, but I still filled her prescription
17      and, you know, that was it.
18   Q  Okay.  When was this?
19   A  I don't remember.  I just -- I know it.  There
20      wasn't no snow and I know it was cold.
21   Q  Was this after you came back from maternity leave?
22   A  No, while I was pregnant.
23   Q  Okay.  So before you left in April?
24   A  Yes.
25   Q  Okay.

Page 26

1       MR. GARLOUGH:  April?
2       MR. MAY:  2013.  Sorry.
3       MR. GARLOUGH:  Okay.
4    Q  Okay.  Did REDACTED tell you why his store was --
5       strike that.  Did REDACTED tell you where Dr.
6       Mimms' office was located?
7    A  No.  She just said she went somewhere where his
8       office was, and she just came up here because she
9       had a hard time filling her prescription, and his
10      office wasn't open anymore, and she was just
11      frustrated about that and I -- you know, I said I'd
12      take care of her, fill her prescription.
13   Q  Do you know where she originally tried to fill her
14      prescription?
15   A  No.
16   Q  Do you know if it was another CVS location?
17   A  No.
18   Q  Did you receive a phone call from another CVS
19      location with respect to REDACTED
20      prescriptions?
21   A  No.
22   Q  Did REDACTED tell you why Dr. Mimms' store was
23      closed?
24   A  No.  She told me she didn't know.  She said it was
25      like out of nowhere.  That is the impression she

Page 27

1       gave me.
2    Q  Okay.  So I guess my question is, why did you
3       correlate her telling you his store was closed to
4       Dr. Mimms being under DEA investigation?
5    A  I never heard of a, anybody just closing up a place
6       without notifying their patients, because she never
7       told me -- I asked her, did she know anything about
8       it, and she said no.
9    Q  So, again, what was your basis for connecting a DEA
10      investigation to those facts?
11         MR. GARLOUGH:  Objection.  Asked and answered.
12   A  Because she said that they closed up for no reason,
13      like it disappeared.
14   Q  So I'm still trying to get how you get DEA
15      investigation out of that, is what I'm trying to
16      figure out.
17         MR. GARLOUGH:  Object to the form.  Objection.
18      Asked and answered.
19   A  If a doctor just up and disappears for no reason,
20      what would you think?
21   Q  I'm sorry, I'm asking.  The way this works is I
22      have to ask you the questions.
23   A  I'm just like she -- if you go see a pain
24      specialist all the time, and you never have a
25      problem, and he up and disappears, so that's why I

9  (Pages 24 to 27)

Page 20

1  before today?
2  A  Yes, it looks familiar.
3  Q  How does it look familiar?
4  A  From the Learnnet.
5  Q  Okay.  Do you recall when the first time you saw
6     that document was?
7  A  When I first got hired, I believe.  I'm not for
8     sure.
9  Q  Okay.  So you believe you saw that in and around
10    2011?
11 A  Yes.
12 Q  Okay.  Do you recall if you attended any training
13    with respect to talking points -- strike that.  Did
14    you ever have any in-person training, whether it
15    occurred at the regional business office or someone
16    coming to your store, surrounding talking points
17    for refusing to fill controlled medication
18    prescriptions?
19        MR. GARLOUGH:  Asked and answered.  You can
20    answer.
21 Q  I guess a better way of putting the question -- I'm
22    sorry.  Other than Learnnet, did anyone come and
23    talk to you about the substance of this document?
24        MR. GARLOUGH:  Same objection.
25 A  No.

Page 21

1  Q  Okay.  I want to draw your attention to the middle
2     section of the page --
3  A  Uh-huh.
4  Q  -- where there is bold language starting "Under no
5     circumstances."  I will have you take a look at
6     that.
7  A  Yes.
8  Q  While you've been an employee of CVS, have you ever
9     heard a pharmacist advise a patient that their
10    doctor is under investigation by the DEA or local
11    police?
12 A  No.
13 Q  Same question as to operating a pill mill.
14 A  No.
15 Q  Same question with respect to, have you ever heard
16    a, heard a pharmacist or CVS employee tell a
17    patient that their doctor is going to lose his or
18    her license?
19 A  No.
20 Q  Same question as to, is going to jail, your doctor
21    is going to jail, should go to jail, or may go to
22    jail?
23 A  No.
24 Q  Are you familiar with the name [REDACTED]?
25 A  Yes.

Page 22

1  Q  How are you familiar with that name?
2  A  She's a customer.
3  Q  When you say customer, is she a patient that fills
4     prescriptions at CVS?
5  A  Yes.
6  Q  How often have you received or have you helped this
7     customer, if you know?
8  A  I would say several.
9  Q  Several?
10 A  Times.
11 Q  When was the last time you assisted [REDACTED]
12    [REDACTED]?
13 A  This year, but I don't remember like a date.
14 Q  2016?
15 A  Uh-huh.  Yes.
16 Q  Do you know when you started seeing [REDACTED]?
17 A  No, I don't remember.
18 Q  Okay.  Do you know what type of prescriptions she
19    fills?
20 A  She fills a lot of prescriptions, but I don't know
21    like each and every one of them, no.
22 Q  Does [REDACTED] ill prescriptions for controlled
23    substances?
24 A  Yes.
25 Q  To your knowledge, have you ever received a call

Page 23

1  from another CVS pharmacy on behalf of [REDACTED]
2  to see if your store has enough medication to fill
3  her prescription?
4  A  Not that I know of, no.
5  Q  Okay.  Do you know who [REDACTED] doctors are?
6  A  No.
7  Q  Okay.  Have you ever heard the name Dr. Anthony
8     Mimms?
9  A  Yes
10 Q  Where did you hear it?
11 A  Seeing it on prescriptions.
12 Q  Do you know if Dr. Mimms is a prescriber for [REDACTED]
13    [REDACTED]?
14 A  Yes.
15 Q  How do you know?
16 A  Just looking -- I don't remember all her doctors
17    but, you know, I know that is one of her doctors.
18 Q  Do you know what type of medication Dr. Mimms
19    prescribes for [REDACTED]?
20 A  No.
21 Q  Generally speaking, do you know if it's pain
22    medicines, antibiotics?
23        MR. GARLOUGH:  Object to the form.  Compound.
24 A  I know he -- I mean I see it for her, pain
25    medicine, but all her other stuff, no.

A-000022

Page 40

1  comments to REDACTED to have been disparaging
2  about Dr. Mimms, be Dr. Mimms as a prescriber?
3      MR. GARLOUGH: Objection to the form.
4  Objection to the foundation. Ambiguous. It calls
5  for a legal conclusion.
6  Q  Well, let's look at the top line. See the area I
7  told you to look at?
8  A  Yes.
9  Q  Under the area we directed your attention to with
10 respect to "Under no circumstances," what's the
11 first line say, the first bullet point that is?
12 A  Right here?
13 Q  Yes.
14 A  "The prescriber is under investigation by the DEA
15 or local police."
16 Q  And this document that you received in training
17 from CVS when you first started, it seems to say
18 under no circumstances are you to make any
19 disparaging comments; is that correct?
20 A  Yes.
21 Q  Is your statement that you made to REDACTED
22 with respect to Dr. Mimms being under DEA
23 investigation a disparaging comment?
24      MR. GARLOUGH: Same objection as before.
25 Q  You can answer the question.

Page 41

1  A  Yes.
2  Q  Okay. What was your basis for connecting the
3  closure of Dr. Mimms' office to a DEA
4  investigation?
5      MR. GARLOUGH: Objection. Asked and answered
6  three separate times.
7  A  What REDACTED told me about a doctor's office
8  disappearing with no, not providing any
9  information, and that's why I made the comment.
10 Q  Okay. And at the time when you made that comment,
11 your testimony is you had no facts to support that
12 statement?
13      MR. GARLOUGH: Objection. Mischaracterizes
14 the testimony.
15 Q  Well, I will ask it a different way. At the time
16 you made the statement, did you have any factual
17 information to support Dr. Mimms' office being
18 under investigation?
19 A  No.
20      MR. MAY: I have no further questions.
21      MR. GARLOUGH: Just a couple of follow-up
22 questions.
23
24 RECROSS-EXAMINATION
25

Page 42

1  BY MR. GARLOUGH:
2  Q  I'm going to make sure we understand what you told
3  Ms. Mason. Did you tell REDACTED Dr. Mimms was
4  under a DEA investigation?
5      MR. MAY: Objection. Asked and answered.
6  Q  Or did you say to REDACTED perhaps his office was
7  under investigation because his office was closed?
8  A  I told her that -- I told her it might be because
9  of him being investigated.
10 Q  Okay. Were you communicating to her that you knew
11 Dr. Mimms was under investigation?
12 A  No.
13 Q  Were you communicating to her, here is a possible
14 reason why his office might have closed suddenly?
15      MR. MAY: Objection. She's already testified
16 and it's calling for speculation at this point.
17 A  No.
18 Q  Okay. As we sit here today, you're currently an
19 employee of CVS?
20 A  Yes.
21 Q  Do you understand that in speaking with customers
22 regarding their prescriptions for controlled
23 substances that you should not refer to any DEA
24 investigations?
25 A  Yes.

Page 43

1  Q  Okay. Were you intending to disparage Dr. Mimms in
2  any way in your comments with REDACTED ?
3  A  No.
4  Q  What were you trying to do?
5  A  I was just trying to comfort her. I never thought
6  nothing was wrong with the doctor. I still filled
7  her prescriptions. She was just standing there
8  crying.
9      MR. GARLOUGH: No further questions.
10      MR. MAY: Just a few.
11
12 REDIRECT EXAMINATION FURTHER
13 BY MR. MAY:
14 Q  As an employee of CVS, do you routinely make
15 statements that are not supported by fact to
16 comfort patients?
17      MR. GARLOUGH: Objection to the form.
18 A  No.
19 Q  Okay.
20      MR. MAY: I have no further questions.
21      MR. GARLOUGH: Thank you.
22
23      THE COURT REPORTER: Is signature waived or
24 not waived?
25      MR. GARLOUGH: So you have two options, but I

13 (Pages 40 to 43)

PLAINTIFF'S DESIGNATION OF EVIDENCE

EXHIBIT D

A-000024

REDACTED

March 16, 2016

1 (Pages 1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CIVIL ACTION NO. 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.)

  Plaintiff,       )

  vs.              )

CVS Pharmacy, INC.,  )

  Defendant         )

REDACTED

The deposition upon oral examination of TED
_____, a witness produced and sworn before me,
Linda C. Calderaro, a Court Reporter and Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendant in the
offices of Barnes & Thornburg LLP, 11 South
Meridian Street, 2nd Floor Conference Center,
Indianapolis, Marion County, Indiana, on the 16th
day of March 2016, commencing at 5:03 p.m.,
pursuant to the Federal Rules of Civil Procedure,
and by Notice of the parties and subpoena of the
witness as to time and place thereof.

STRATOS LEGAL SERVICES, LP
4295 San Felipe, Suite 125
Houston, Texas 77027
(713) 482-2180

**Page 2**

A·P·P·E·A·R·A·N·C·E·S

FOR THE PLAINTIFF
LAW OFFICES OF JASON D. MAY, LLC
BY: JASON D. MAY, ESQ.
9230 E. N. Meridian Street
Suite 220
Indianapolis, IN 46260
jason.may@jasonmaylaw.com

FOR THE DEFENDANT
FOLEY & LARDNER LLP
BY: JONATHAN W. GARLOUGH, ESQ.
321 N. Clark Street
Suite 2800
Chicago, IL 60654-5313
jgarlough@foley.com

ALSO PRESENT VIA VIDEO CONFERENCE
Hilary B. Dudley, Esq.
CVS Health
Legal Department

I·N·D·E·X   O·F   E·X·A·M·I·N·A·T·I·O·N
                                    PAGE
BY MR. GARLOUGH               4; 127
BY MR. MAY                    169

**Page 3**

I·N·D·E·X   O·F   E·X·H·I·B·I·T·S
                                    PAGE

35 -   MFR Narcotics agreement        36
36 -   Statement                      95
37 -   Handwritten pharmacist statement  98
38 -   Mimms chart                     102

**Page 4**

REDACTED

the witness herein, having been first duly sworn
to tell the truth, the whole truth, and nothing
but the truth relating to said matter, was
examined and testified as follows:

DIRECT EXAMINATION,
    QUESTIONS BY MR. GARLOUGH
    MR. GARLOUGH:  REDACTED       my name
is Jon Garlough, I'm an attorney for CVS Pharmacy.
I will be taking your deposition this afternoon.
Before we sort of get started, just so it's on the
record, you're going to be eating during the
course of this deposition.
    THE WITNESS:  No, I'll -- go ahead.
    MR. GARLOUGH:  I have no problem with
that.  As you can see, we have a court reporter
who's here.  She's going to be taking down words
that you say, so if she has any difficulty hearing
you pronunciate something during the course of
eating, we may ask you just to sort of follow up
so we can make sure that the transcript is clean.
If you're okay with that, I'm okay with that.
    THE WITNESS:  Have at it
    MR. GARLOUGH:  Okay.  Great.  Have

A-000025

REDACTED

March 25, 2016

18 (Pages 69 to 72)

## Page 69

1  discussing one particular medication, I was
2  discussing, like I said, REDACTED
3  REDACTED                There's a new pill that --
4  once every 24 hours.
5  Q. Did you explain to him why you were asking about
6  those drugs?
7  A. Yeah, we -- this is how the conversation began.
8  I'm going to see my doctor.
9  Q. That's what I'm trying to get to, is I'm trying
10  to understand how -- let me first ask, did Dr
11  Mimms come up in the conversation?
12  A. Yes.
13  Q. I'm trying to understand how Dr. Mimms came up in
14  that conversation, so can you explain to me how
15  the subject of Dr. Mimms came up in that
16  conversation?
17  A. We were talking about the place getting robbed so
18  much, and one of the robbers actually jumped out
19  the drive-through window.
20  Q. I assume Tony told you this?
21  A. Yes.
22  Q. It's not something you had seen?
23  A. No, it's -- it's two guys talking.
24  Q. Sure, okay.
25  A. And whenever I told him, that's when he told me

## Page 70

1  that they don't fill for Dr. Mimms and compared
2  him to a pill mill.
3  Q. You said compared him to a pill mill?
4  A. Pill mill, because I actually asked him what a
5  pill mill was.
6  Q. Okay. So before we get to pill mill, how did he
7  compare him to a pill mill; do you recall how --
8  the words he used to compare him to a pill mill?
9  A. We don't fill prescriptions for Dr. Mimms or any
10  other pill mills.
11  Q. Are you paraphrasing or --
12  A. That's pretty close to word for word.
13  Q. And this would have been June 2014?
14  A. Yeah.
15  Q. Okay. How long into the conversation did -- I
16  assume it was Tony who made this remark?
17  A. Uh-huh.
18  Q. That's a yes?
19  A. Yes. Sorry.
20  Q. No problem. How long into the conversation was
21  it that Tony made this remark?
22  A. Well, we had been talking for more than a few
23  minutes. I mean, I had asked him about several
24  different things in there.
25  Q. More than half hour at this point?

## Page 71

1  A. Probably not a complete half hour, but it had
2  been --
3  Q. 20 minutes --
4  A. -- more than hello, how are you.
5  Q. Okay. It was fairly deep into the conversation
6  at that point?
7  A. Yes, but it was -- yeah --
8  Q. Okay. So he said, CVS doesn't fill for Dr.
9  Mimms, right?
10  A. Or other pill mills.
11  Q. Or other pill mills, okay. And then what was
12  your response to that?
13  A. I took offense to it.
14  Q. Did you verbalize a response?
15  A. That's when I -- here we are again; that's when I
16  asked about the pill mills.
17  Q. Okay. And what were the words that you said, the
18  best that you can recall?
19  A. What is a pill mill.
20  Q. Okay. Do you recall what Tony's response to that
21  was?
22  A. Basically that physicians who just parade
23  patients one after another through their office
24  writing prescriptions. Some get kickbacks, some
25  give them -- they over-write the prescriptions

## Page 72

1  to -- because they get kickbacks or -- he didn't
2  go into great detail, but the impression that I
3  got from it, if my impression really matters at
4  this point, was that he had a very low opinion of
5  doctors in that position, and I feel like it was
6  wrapping Dr. Mimms in that without having
7  personal knowledge of Dr. Mimms. Like I said, I
8  kind of took offense to it, because I'm piss
9  tested, blood tested, you know, I'm weighed,
10  blood pressure, oxygen, everything whenever I go
11  to his office, I'm signing agreements like this,
12  and how could a doctor be considered what he is
13  calling a pill mill? I mean, if he was a pill
14  mill, I would think that he would be writing me
15  for three times what he would be.
16  Q. I don't want to interrupt you
17  A. Go ahead. It's kind of frustrating at this
18  point.
19  Q. So it sounds like you understood that Tony was
20  expressing his opinion about Dr. Mimms?
21  A. Exactly wrong.
22  Q. Okay.
23  A. How would he have an opinion of Dr. Mimms unless
24  he had heard something about Dr. Mimms or tried
25  to fill prescriptions for Dr. Mimms? You asked

A-000026

REDACTED

March 16, 2016

16 (Pages 61 to 64)

**Page 61**

1   with Dr. Mimms immediately following your
2   experience at CVS Pharmacy, other than telling
3   Dr. Mimms that the CVS would not fill his
4   prescriptions, did you have any other discussion
5   about CVS Pharmacy at that visit with Dr. Mimms?
6   A. Yes.
7   Q. What else?
8   A. I had told him the prior -- the days prior to my
9   visit to him, I had gone in there to talk to a
10  pharmacist who I talked to on several occasions
11  prior to that and told him what had been said,
12  and I wanted to know if this true, because if
13  this was true, it would question --
14  Q. Okay. So now you haven't shared that with me
15  yet, so I'm trying to understand that.
16  A. Okay.
17  Q. When did you go in to see the pharmacist at CVS
18  Pharmacy?
19  A. Just a few days prior to my visit with Dr. Mimms.
20  Q. Just so I'm understanding, to be sure, this was a
21  visit you had to CVS a few days before your next
22  appointment with Dr. Mimms following June 26th of
23  2014?
24  A. No. This was a few days prior to this date.
25  Q. Okay, okay. And why did you go into the CVS

**Page 63**

1   have that correct?
2   A. Correct.
3   Q. So you were going to talk to a friendly
4   pharmacist at CVS. Was this at the Greenfield
5   store?
6   A. Yes.
7   Q. I presume, then, you went in at night?
8   A. Yes.
9   Q. Okay. And you want to -- I guess I'm not clear
10  yet on the purpose of you going in to talk with
11  this friendly pharmacist that particular night a
12  couple days before June 26th.
13  A. Okay.
14  Q. So why did you go to CVS that night?
15  A. Because from what I had read online on the
16  discount cards and -- because you can go up to
17  Rxpricequotes.com, punch in your medication, how
18  many times a day, your zip code, and it will tell
19  you the cash price for that drug with this
20  discount card. And the REDACTED, it
21  was generic, it was still available in generic at
22  this point in time, the patent had gone back on,
23  and it had gone from 60 a to $70 a month, all the
24  way up to 600, at that point in time. I'm not
25  saying it's $600 today, because I know it's more,

**Page 62**

1   prior to June 26, 2014?
2   A. Because there was a pharmacist there who was one
3   of the nicest pharmacists I had ever seen and he
4   helped me with pricing. There again, I'm a
5   cash-paying customer, I have to -- you know, is
6   this available, is this available, because there
7   are some medications that they don't even carry.
8   The one drug, they wanted a $2,000 deposit just
9   to have it ordered in.
10  Q. Okay
11  A. So I'm trying to get some sense of -- but he
12  wasn't there, and I talked to another pharmacist.
13  Q. So let's back that up a little bit. The
14  pharmacist who you were referring to a moment ago
15  who you referred to as one of the nicest
16  pharmacists you ever met, do you recall that
17  person's name?
18  A. No. He was a retired navy guy, and I just talked
19  to him a few times about his navy days, and you
20  know, just daily conversation.
21  Q. Did he work days, nights?
22  A. Nights. I always went at night.
23  Q. Okay, okay. So at this point, you hadn't seen
24  Dr. Mimms now for awhile, right, because you
25  hadn't had your first visit with him at MFR, do I

**Page 64**

1   Q. Yeah, I understand
2   A. But what I'm saying is I wanted to know because
3   online, it's telling me there is a generic
4   version, the pharmacist tells me that there's
5   not. If there's not, I need to talk to Dr. Mimms
6   about getting back on the REDACTED or a cheaper
7   drug, or I need to find out if there is a
8   generic, if he knows of a generic, to see if I
9   could get back on a patient assistance
10  program, because believe it or not, the generic
11  form versus the patented form, they're the same
12  drug, same dosage, act totally different on the
13  human body, in my case.
14  Q. Okay. That helps. Thank you. If I'm
15  understanding you correctly, although you had not
16  seen Dr. Mimms yet, you had made an appointment
17  and you were anticipating a visit with Dr. Mimms?
18  A. Yes.
19  Q. And is it fair to say that you were going to --
20  and I realize this is a paraphrased version of
21  the detailed answer you just provided, but is it
22  fair to say, then, you were going to CVS that
23  night shortly before June 26, 2014 to inquire
24  about the availability of generic drugs for
25  REDACTED    do I have that right?

A-000027

REDACTED

March 16, 2016

17 (Pages 65 to 68)

Page 65

A. Yes, REDACTED But I had made a list of what
I -- there's a list you can go on that starts
with aspirin and goes all the way down to heroin
and tells you the strengths and dosages and the
level that they are. It doesn't go into the cost
of it, though, you have to talk to a pharmacist.

Q. You were trying to figure what it's going to cost
if Dr. Mimms prescribes it for you?

A. If I'm going to go back on the REDACTED I know
it's going to be X amount of dollars. If
REDACTED is not available in a generic, I
can't afford it so that's off the table. If
REDACTED is -- like REDACTED is a perfect example. The
extended release, there is no generic, but the
immediate release, there is. One is a tenth of
the price of the other, and this is what the navy
gentleman had helped me out with prior, on
previous occasions.

Q. Can you recall how long ago it was that you had
these sort of conversations with the friendly
pharmacist?

A. It was a period of a year or two that I had
talked to him. It wasn't just a one-time
passing.

Q. I understand, I just didn't -- I'm just trying to

Page 66

understand whether you spoke with this gentleman
every month or whether there had been a large gap
in time since the last time you spoke with him,
and it sounds like the latter, that there had
been a gap in time since the last time you spoke
with the friendly retired Navy --

A. Yes. It would have been a short period of time.
It wasn't years, by any means, but it had been a
short period of time.

Q. Had it been since you had -- were last receiving
treatment from Dr. Mimms?

A. I don't recall. That, I don't recall.

Q. So you went in hoping to speak with a friendly
pharmacist at CVS at the Greenfield store?

A. Yes.

Q. Okay. And he wasn't there that night?

A. No.

Q. Okay. Do you recall who was there that you spoke
with?

A. Anthony.

Q. Anthony.

A. Tony.

Q. Tony, okay. Was anybody there besides Tony?

A. There was a security guard there.

Q. Was there anybody -- were there any other

Page 67

pharmacists or technicians there?

A. Not that I'm aware of.

Q. Do you have an understanding of whether Tony was
a pharmacist or a technician?

A. He was a pharmacist.

Q. Okay. And you already acknowledged that this
conversation occurred at night. Seven o'clock at
night, two in the morning at night, like how late
at night?

A. I actually have a record of it someplace. Do you
have that?

Q. What record are you referring to?

A. I have a receipt from the night that I was there.

Q. And you provided that receipt to Mr. May?

A. Yes.

Q. Okay. Without consulting the receipt, what is
your best recollection?

A. The middle of the night.

Q. Middle of the night, like midnight?

A. Probably.

Q. Okay. So was that an uncommon -- was that a
common time for you to go into the CVS store to
have those kinds of conversations?

A. I try to -- if I go shopping, it's usually
midnight to four a.m., because nobody -- I'm not

Page 68

in people's way, because sometimes I move a
little slow because of my disabilities, and it's
just easier for me, and I feel like it saves
other people cussing me and --

Q. Okay. So you didn't speak with the retired navy
pharmacist, you spoke with Tony?

A. Uh-huh.

Q. Okay. As best you can recall, how did you
initiate the conversation with Tony?

A. I began the conversation with the question about
REDACTED being available in generic form or not.

Q. Okay. Do you recall what Tony said in response
to that question?

A. That it was not available in generic form
anymore.

Q. And then?

A. They had changed the formulators on it. He gave
me a $10 explanation for something that -- is it
generic or not.

Q. He gave you a lengthy explanation?

A. Yes.

Q. What was your response to that explanation?

A. I guess I can't afford that anymore.

Q. And then did he respond to that comment?

A. Not in any great detail, no. I'm not just

A-000028

REDACTED

March 16, 2016

19 (Pages 73 to 76)

**Page 73**

1  me if -- if I questioned what happened with Dr.
2  Mimms at RAI. What happened at CVS to make
3  people think that Dr. Mimms was such a bad guy
4  and comparing him to a pill mill? That's the
5  long and the short of it. I mean, if I have an
6  opinion about why he left or what happened with
7  him and RAI and all of that, I also have an
8  opinion about what happened at CVS that night. I
9  also have an opinion about what happened at CVS
10  later. I also have the text here about telling
11  me that my prescriptions are ready and they're
12  not.
13  Q. I understand.
14  A. No, I don't think you are understanding. You're
15  not -- you're grabbing one context of the
16  conversation whenever there's more facts to it.
17  Q. Okay.
18  A. He took a statement to a total stranger. He
19  didn't know me from Adam when I walked in that
20  door. I went in there to get information from
21  somebody who I actually considered somebody I
22  knew and could trust in my pharmacist, and then I
23  get this guy who starts in on this with me.
24  Q. Okay.
25  A. And you're asking me to form opinions.

**Page 74**

1  Q. Okay. I think maybe you misheard my question.
2  My question was it sounds like Tony was
3  expressing his opinions about Dr. Mimms. Did you
4  interpret what Tony was saying as expressing a
5  negative opinion about Dr. Mimms?
6  A. Yes.
7  Q. Thank you. That's what I'm asking you.
8  A. But in my mind, you wanted my opinion, how did
9  Tony get an opinion of Dr. Mimms?
10  Q. That's fine. I want to make sure we're not
11  talking past each other, so if you don't
12  understand my question, just let me know, and I'm
13  sure that I can ask questions a better way.
14     But just so we're clear, my question to you
15  is did you understand that Tony was expressing a
16  negative opinion about Dr. Mimms?
17  A. Yes.
18  Q. Thank you. Okay. So as we talk through the
19  conversation, I want take make sure I have my
20  arms around everything that was said. So after
21  you did what is a pill mill, your description
22  sounded like a paraphrase of what Tony said. You
23  said there's a -- well, let me back up. Did Tony
24  specifically refer to kickbacks?
25  A. Not for CVS, no. Not to him personally.

**Page 75**

1  Q. Okay.
2  A. There again, there again, I was taking what he
3  said about pill mills in the same grain as what
4  he said about Dr. Mimms.
5  Q. I understand. And I'm just trying to understand
6  what Tony actually said.
7  A. I -- let me back up.
8  Q. I'm trying to understand whether your testimony
9  is there are the exact words Tony said in terms
10  of explaining what a pill mill is versus this is
11  the gist of what he said, okay?
12  A. No. There again, I cannot say that it was word
13  for word, but talking about over-prescribing
14  doctors and kickbacks and stuff like that --
15  Q. Okay.
16  A. -- led me to believe one thing, okay, not -- I
17  was not misinterpreting it, I was going by what
18  he directly said to me.
19  Q. Mr. McIntosh, I'm not suggesting that you are
20  misinterpreting anything, just so we're clear.
21  I'm just trying to understand exactly what was
22  said and what -- take -- try to understand the
23  words that were used versus --
24  A. I get that.
25  Q. So that's it. I'm not suggesting anything

**Page 76**

1  improper on your part, I'm just trying to
2  understand exactly what happened word for word
3  versus a paraphrasing message that you received.
4  So is it fair to say that the prescription you
5  provided of -- is it fair to say that you don't
6  recall word for word exactly what Tony said
7  regarding pill mills?
8  A. Not the long -- not the lengthy version that he
9  had. I remember the gist of the conversation,
10  the highlights of the conversation, but as far as
11  word for word, it would be like you looking at
12  this one time and remembering every word.
13  Q. It's fair to say it was a lengthy conversation
14  you had?
15  A. Yeah, no, it was -- the definition he gave was
16  lengthy.
17  Q. Understood, okay. In response to that
18  definition, can you recall what you said in
19  response?
20  A. I was kind of in disbelief that -- of, A, I guess
21  at the top of the list was why Dr. Mimms was
22  being bunched into this, and B, having seen the
23  news and doctors in Kokomo had been recently
24  arrested for these types of things, which
25  before -- before any of this, it was just news,

A-000029

REDACTED

March 16, 2016

30 (Pages 117 to 120)

Page 117

1    ever had with Dr. Mimms at RAI or Mimms Rehab?
2  A.   Not at all.
3  Q.   And you took that type of behavior to mean that
4      they weren't really concerned about your
5      wellbeing or health, is that a fair statement?
6  A.   That's very fair statement, yes.
7  Q.   Okay. And that is -- it would be your testimony
8      that that's quite the opposite for Dr. Mimms?
9  A.   Absolutely.
10 Q.   So I want to turn to your June 23, 2014 visit to
11     CVS.
12 A.   The one with Anthony?
13 Q.   Yes.
14        MR. GARLOUGH: I don't think we've
15     established that it was June 23, we just
16     established that it was --
17        MR. MAY: It was days before.
18        MR. GARLOUGH: -- days before.
19 Q.   We'll go with days before.
20 A.   Okay.
21 Q.   In the days before your appointment with Dr.
22     Mimms on June 26th, it's a true statement that
23     you actually were not a patient of Dr. Mimms at
24     that time, is it not?
25 A.   That's a true statement.

Page 118

1  Q.   Okay. It's a true statement that you didn't have
2      an actual prescription in hand at that meeting?
3  A.   Correct.
4  Q.   In fact, you were simply walking into the
5      pharmacy to get some pricing information about --
6  A.   Pricing and availability, yes.
7  Q.   Now, the retired navy gentleman you were going in
8      there to see --
9  A.   Uh-huh.
10 Q.   -- as best you can, can you tell me prior to that
11     visit you had with Tony, when was the last time
12     you had spoken with the retired navy?
13        MR. GARLOUGH: Asked and answered.
14 Q.   Was it a month before?
15 A.   No, it was a few months before.
16 Q.   So three or four?
17 A.   Yeah. Or -- yeah, or longer, yeah.
18 Q.   Okay. Was there a -- who was your pain doctor at
19     the time?
20 A.   I believe at that time, I was still going through
21     my personal physician.
22 Q.   At any time in that conversation with Anthony or
23     Tony, did you say, I am a patient of Dr. Mimms?
24 A.   No.
25 Q.   What if anything did you say to Tony about Dr.

Page 119

1      Mimms to elicit the response he gave you?
2  A.   I believe that his name came up in the context
3      that I had an upcoming appointment with him -- I
4      had an upcoming appointment with him, which I
5      did.
6  Q.   Is it your understanding that a pill mill is
7      something that's illegal?
8  A.   Yes, sir.
9  Q.   Is it something that -- is it your understanding
10     that saying a pain management specialist or pain
11     management doctor operating a pill mill means
12     that they're committing misconduct in their
13     profession?
14        MR. GARLOUGH: Asked and answered.
15 A.   Yes.
16 Q.   Okay. Do you believe that Tony made those
17     statements to hurt the reputation of Dr. Mimms?
18        MR. GARLOUGH: Objection, calls for
19     speculation as to what somebody else intended.
20 Q.   I'll ask it a different way. Why do you think
21     Tony said what he said about Dr. Mimms?
22        MR. GARLOUGH: Same objection.
23 A.   I have no idea, but in my opinion, it really drug
24     his name through the mud. Also in my opinion,
25     that these so-called pill mills, as they have

Page 120

1      been coined, are killing people, and I've asked
2      around, and Dr. Mimms, I found, is not
3      responsible for a single death.
4  Q.   So you took it that Tony's comments could have
5      something to do with killing people?
6  A.   Pill mills have been shown to be responsible for
7      killing people.
8  Q.   So is that a yes?
9  A.   Yes.
10 Q.   Okay. You and Mr. Garlough had some lengthy
11     back-and-forth over his lengthy definition of --
12        MR. GARLOUGH: Tony's lengthy
13     definition.
14 Q.   Yes. Tony's lengthy definition of a pill mill,
15     and all I want to know is during that definition,
16     did he say the words over-prescribing doctor, yes
17     or no?
18 A.   Yes.
19 Q.   Did he say the word kickback?
20 A.   I believe so, yes.
21 Q.   When he said his original statement, we don't
22     fill for Dr. Mimms or for pill mills, who is the
23     we he was talking about?
24 A.   CVS. He's the pharmacist there.
25 Q.   Okay. You also had some lengthy back-and-forth

A-000030

**PLAINTIFF'S DESIGNATION OF EVIDENCE**

**EXHIBIT G**

REDACTED

March 15, 2016

1 (Pages 1 to 4)

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

ANTHONY MIMMS, M.D.,
et al.,
            Plaintiffs,
   vs.        CASE NO.
            1:15-cv-00970-TWP-MJD
CVS PHARMACY, INC.,
            Defendant.

Deposition of  REDACTED
Pursuant to:  Subpoena
Date and Time:  Tuesday, March 15, 2016
            12:17 p.m.
Place:         REDACTED

Reporter:     Wendy Haehnle

Page 2

1   APPEARANCES OF COUNSEL:
2
3       For the plaintiffs:
4          Jason D. May, Esq.
5             of
            Law Offices of Jason D. May, LLC
            9201 North Meridian Street
6          Suite 220
            Indianapolis, Indiana 46260
7          317.218.3859
            jason.may@jasonmaylaw.com
8
9
10      For the defendant:
11         Jonathan W. Garlough, Esq.
             of
12         Foley & Lardner, LLP
            321 North Clark Street
13         Suite 2800
            Chicago, Illinois 60654-5313
14         312.832.4500
            jgarlough@foley.com
15
16
17               . . .
18
19
20
21
22
23
24
25

Page 3

INDEX
REDACTED
                                    PAGE
EXAMINATION BY MR. GARLOUGH        4
EXAMINATION BY MR. MAY         103
FURTHER EXAMINATION BY
    MR. GARLOUGH      162
FURTHER EXAMINATION BY MR. MAY    170

EXHIBITS          MARKED  REFERENCED
DEPOSITION EXHIBIT 22    8      8
DEPOSITION EXHIBIT 23    85
DEPOSITION EXHIBIT 24   158    158
DEPOSITION EXHIBIT 25   153

            . . .

Page 4

REDACTED

a witness herein, having been duly sworn, was
examined and deposed as follows:
            EXAMINATION
BY MR. GARLOUGH:
   Q.  Good afternoon.  REDACTED  My name is
John Garlough, an attorney with CVS Pharmacy.
I'll be taking your deposition this afternoon.
   A.  Okay.
   Q.  Have you ever been deposed before?
   A.  Uh-uh.
   Q.  Okay.  Is that a no?
   A.  No.
   Q.  So I'm going to go through some ground
rules with you first, just to make sure you
understand the process and we're all on the same
playing field and understand each other.
   A.  Okay.
   Q.  Is that okay?
   A.  Yes.
   Q.  Okay.  So, as you can see, there is a
person to your right, a court reporter, here who
is taking down every word you say, every word I
say, every word that Mr. May will say, so long as
we're on the record.  Okay?

A-000032

REDACTED

March 15, 2016

4 (Pages 13 to 16)

## Page 13

1  appointment with Dr. Mimms?
2      A. Yes, in May.
3      Q. So you see Dr. Mimms once every three
4  months?
5      A. Yes.
6      Q. Okay. Do you have any understanding of
7  what this lawsuit's about?
8      A. Yes, I do.
9      Q. Okay. What's your understanding?
10     A. That I had told him two-and-a-half,
11 three years ago that I went into CVS to fill my
12 prescription, and they had told me that they
13 would no longer fill for him.
14     So on my next appointment, after that
15 happened, I told Dr. Mimms what they had told me,
16 that they wouldn't fill for him anymore.
17     Q. Okay. So I'd like to -- I'm going to
18 ask you, as you might imagine, some questions
19 about that.
20     But was that the only time you've
21 spoken with Dr. Mimms about that conversation
22 you had with -- at CVS Pharmacy?
23     A. Yes. Yes.
24     Q. After -- okay. At the time you told
25 Dr. Mimms about this, was this at an appointment

## Page 14

1  for you?
2      A. Yes.
3      Q. This was your next regularly scheduled
4  appointment?
5      A. Excuse me?
6      Q. This was your next regularly scheduled
7  appointment after your visit to CVS Pharmacy?
8      A. Yes.
9      Q. Okay. And can you give me a time frame
10 as to when you think that occurred at CVS
11 Pharmacy?
12     A. Not exactly, because it's been -- it's
13 been a good two-and-a-half years.
14     Q. Okay. Okay. Do you recall how much
15 time passed between the -- your visit to CVS
16 Pharmacy and your appointment with Dr. Mimms,
17 where you told him about it?
18     A. No, I don't, because it was my next
19 scheduled appointment. So it to would have had
20 to have been in a three-month period.
21     Q. Okay. That's the best you can recall?
22     A. Uh-huh. Yes.
23     Q. Yes.
24     Did you give Dr. Mimms any notes or any
25 documents from that visit to CVS Pharmacy?

## Page 15

1      A. Yes. I wrote down on a piece of paper
2  in his office -- he asked me if I would write
3  down what they said on a piece of paper and sign
4  my name.
5      And I told him yes, and I did.
6      Q. And just to be clear, your writing that
7  down at his office, that occurred at that visit
8  that you had after the visit to CVS Pharmacy?
9      A. Yes.
10     Q. So you didn't go in like the very next
11 day --
12     A. No.
13     Q. -- and write something down?
14     A. No.
15     Q. It was sometime within a three-month
16 period?
17     A. Yes.
18     Q. But you just can't recall when that
19 three-month period was?
20     A. No.
21     Q. Okay. I mean, I understand it was
22 two-and-a-half, three years ago. So if you can't
23 recall, you can't recall. I understand that.
24     Okay. Can you tell me what you told
25 Dr. Mimms?

## Page 16

1      A. I told him exactly what they had told
2  me.
3      I went in to fill my prescription. I
4  gave it to a girl named -- a lady named Dana that
5  works in the pharmacy, at CVS Pharmacy. And she
6  said we can -- we no longer fill prescriptions
7  for him because he has been in jail and is a bad
8  doctor.
9      And I said, no, he is changing offices.
10 and, no, he is not a bad doctor.
11     And then there was another male
12 pharmacist there -- and I had told her -- I said,
13 this is a very religious man. I said, he even
14 wants to become a preacher someday -- because he
15 does.
16     And the male pharmacist butted in and
17 said, no, he uses the -- the preaching thing and
18 the religion thing as a cover-up.
19     And that was all that was said.
20     I turned around and left.
21     Q. Okay. Do you recall the name of the
22 male pharmacist you just described?
23     A. I can't really say for positively sure,
24 because he's not from Rushville. I think he -- I
25 know they have one that comes from Greensburg, or

A-000033

REDACTED

March 15, 2016

22 (Pages 85 to 88)

Page 85

1    Indianapolis.
2         But I also cannot take steps.  I can't
3    walk.  I mean, I can't even walk from here, two
4    doors down to my neighbor's house.
5         Q.  So we talked earlier about the
6    conversation you had with Dr. Mimms following
7    your -- the occurrence at CVS Pharmacy.
8         If I understood you right, that was
9    your next regularly scheduled appointment?
10        A.  The note that I wrote?
11        Q.  Right.
12        A.  Yes.
13        Q.  So you didn't go in for -- just for the
14   purpose of giving that note?
15        A.  No.
16        Q.  Did Dr. Mimms provide treatment on that
17   day?
18        A.  Yes.
19        (Deposition Exhibit 23 was marked for
20        identification.)
21   BY MR. GARLOUGH:
22        Q.  Ms. Petro, I'm showing you a document.
23   I'll represent that these are the patient files,
24   your patient files, that were produced by
25   Dr. Mimms in this case.

Page 86

1         Are you familiar with what a Bates
2    number is?
3         A.  No.
4         Q.  Okay.  If you look to the bottom
5    right-hand corner, it's small font, but there's a
6    series of numbers on the very bottom right-hand
7    corner.
8         Can you see that?
9         A.  Yeah.  There's only one number.
10        Q.  Yeah.  Well, 00168?
11        A.  Oh, down here.
12        Q.  Yeah.  You see what I'm saying?
13        A.  Yeah.
14        Q.  So what Bates numbers are -- those are
15   like unique identifier numbers that attorneys put
16   on documents so that we can refer to each page of
17   every document that's used in a case so there's
18   no confusion.
19        A.  Okay.
20        Q.  So you're more than welcome to look
21   over this entire thing, but I'll tell you that my
22   question to you is going to be directed to
23   page 192, almost at the very end.
24        It looks like this.
25        A.  Okay.  When was this paper -- 55 years

Page 87

1    old -- because this paper has spouse on it.
2    We've been divorced -- this says I was 55.  I
3    just turned 56 January 26th.
4         And this is the first page of this
5    document.  It says, Next of kin,              And
6    we have been divorced for a year and three
7    months.
8         So I don't know when this -- actually,
9    we've been away from each other for two years.
10   So I don't know when this paper was documented.
11        Q.  Well, if you look at the upper
12   left-hand corner, it says, 12/23, 2015, which is
13   when it was produced.
14        A.  Okay.  Yeah, we were already divorced
15   then.
16        Q.  So, again, my question to you is going
17   to be regarding page 192, which is labeled 25/27.
18        192 looks like this.
19        A.  Okay.
20        Q.  Are you there?
21        A.  Yeah.
22        Q.  Okay.  Thank you.
23        A.  Yes.
24        Q.  So these are patient records from a
25   visit that appears to be on July 24, 2014.  And

Page 88

1    I'm getting that by the seen by date in the upper
2    right-hand corner.
3         Do you see that?
4         A.  Yes.
5         Q.  Okay.  Do you know who              is --
6    or REDACTED  is?
7         A.  No, I don't.  I was just getting ready
8    to ask you who it was.
9         Q.  So there are -- you're welcome to,
10   again, thumb through this and compare this
11   patient visit record to other records.
12        A.  REDACTED, was that -- REDACTED     was
13   that -- used to be one of his -- Dr. Mimms'
14   assistants maybe?
15        He used to have an assistant named
16   REDACTED, but she's not there anymore.  I don't know
17   what her last name was, though.
18        Q.  That's possible.  I -- I don't know.
19        So my question for you -- if you can
20   direct your attention to the section, Chief
21   Complaint, it says, Consent for statement.  Do
22   you see that?
23        A.  Yes.
24        Q.  Okay.  So you are welcome to compare
25   the chief complaint statement on page 192 to the

A-000034

REDACTED

March 10, 2016

3 (Pages 9 to 12)

**Page 9**

1   Deposition in a Civil Matter, is that correct?
2       A.  Yes.
3       Q.  And does that subpoena look familiar to
4   you?
5       A.  Yes.
6       Q.  Okay.  And you are testifying today
7   pursuant to this subpoena?
8       A.  Excuse me?
9       Q.  Sure.
10          You are testifying today pursuant to
11  this subpoena?
12      A.  Yes.
13      Q.  And, just for the record, if you
14  wouldn't mind turning back to the first page.
15  I have your address as REDACTED
16  REDACTED  That address is incorrect, right?
17      A.  Yes.
18      Q.  It's actually REDACTED?
19      A.  Yes.
20      Q.  Okay.  Thank you.
21  REDACTED  , we're joined here by
22  Mr. May.
23          Have you ever met Mr. May before?
24      A.  No, I haven't.
25      Q.  Okay.  Have you ever spoken to him on

**Page 10**

1   the phone?
2       A.  Yes.
3       Q.  Okay.  Is Mr. May representing you
4   today?  Is he your attorney?
5       A.  No.  I don't have an attorney.
6       Q.  Okay.  So you spoke with Mr. May on the
7   phone once or more than once?
8       A.  More than once.
9       Q.  Okay.  How many times?
10      A.  I really can't recall.  Maybe -- maybe
11  four times, four or five times.
12      Q.  Okay.
13      A.  I've called him just to see what was
14  going on.
15      Q.  Okay.  When you say, what was going on,
16  what are you referring to?
17      A.  Like me having a problem, because of my
18  disability, to get to the subpoena and that -- to
19  try to see if you guys could come to me.
20      Q.  Okay.  So, other than the logistics and
21  the scheduling of the subpoena, have you
22  discussed anything else with Mr. May?
23      A.  No.
24      Q.  Well, have you ever let -- let me ask
25  you this.

**Page 11**

1           What's the first time -- when's the
2   first time that you can recall speaking with
3   Mr. May?
4       A.  When's the first time I talked to him?
5       Q.  Yes.  Yes, ma'am.
6       A.  I'm sorry, but I can't really give you
7   a date.  I --
8       Q.  Sure.  Was it in 2016?
9       A.  Yes.  I think we talked in 2015, too.
10      Q.  You think so?
11          Do you recall why you would have had a
12  reason to talk to Mr. May in 2015?
13      A.  Just about -- actually, no.  I think it
14  was just about us setting stuff up for me to do a
15  deposition.
16      Q.  Have you ever spoken with Mr. -- anyone
17  else from Mr. May's office; his colleague,
18  Stephanie, for example?
19      A.  Yes.
20      Q.  Okay.  Did you speak with Stephanie
21  before you spoke with Mr. May?
22      A.  No.
23      Q.  So the first time you spoke with anyone
24  from his office was Mr. May?
25      A.  Yes.

**Page 12**

1       Q.  And it was in regards to the
2   subpoena?
3       A.  Yes.
4       Q.  Okay.  Well, do you have an
5   understanding of why you're being deposed in this
6   case?
7       A.  Not really.
8       Q.  Okay.  Have you ever spoken with Mr. --
9   Dr. Mimms regarding this lawsuit?
10      A.  Yes.
11      Q.  So Dr. -- you're a patient of
12  Dr. Mimms?
13      A.  Yes.
14      Q.  You're currently a patient of
15  Dr. Mimms?
16      A.  Yes.
17      Q.  When's the last time you saw
18  Dr. Mimms?
19      A.  February.
20      Q.  Okay.  And I assume that was for
21  treatment, not socially?
22      A.  Yes.  Yes.
23      Q.  Okay.  And February 2016?
24      A.  Yes.
25      Q.  Okay.  Do you have an upcoming

A-000035

REDACTED

March 15, 2016

6 (Pages 21 to 24)

## Page 21

1 Q. Okay. And you -- did you receive
2 multiple prescriptions from Dr. Mimms?
3 A. Yes. I have -- yeah, I have three --
4 well, four prescriptions once in the while.
5 Q. From Dr. Mimms?
6 A. Yes.
7 Q. Okay. What are those?
8 A. Once in a while, I have to get a sleep
9 med from him. But I've kind of backed off that
10 because it doesn't help me much, which is REDACTED
11 Q. Okay.
12 A. And I haven't taken it for some time,
13 because I found something over the counter that's
14 working for me.
15 Q. When did you stop taking REDACTED ?
16 A. Just this past year I haven't been
17 taking it.
18 Q. Okay.
19 A. I haven't been taking it for seven
20 months -- six, seven months.
21 Q. Okay. So in 2014, you -- you would
22 have been taking it?
23 A. Yeah. Yes. Yes. Yes.
24 Q. Okay. I'm sorry. I didn't mean to
25 interrupt you.

## Page 22

1 What else -- what else has Dr. Mimms
2 prescribed you?
3 A. Soma, which is --
4 Q. REDACTED
5 A. -- for my muscles. I have very bad
6 muscle spasms.
7 Q. Okay.
8 A. It's a muscle relaxant.
9 Q. Got it. Okay.
10 A. And --
11 Q. I'm sorry. I didn't mean to interrupt
12 you.
13 The o REDACTE would you have been taking
14 that in 2014, as well?
15 A. Yes.
16 Q. Okay. I'm sorry. Go ahead.
17 A. And also REDACTED
18 Q. And what's the dosage that you're on
19 now of the oxy --
20 A. Thirty milligrams.
21 Q. And is this -- would you have been
22 taking the same dosage back in 2014?
23 A. Yes.
24 Q. What about 2015? In 2015, as well?
25 A. Yes.

## Page 23

1 Q. Okay. And I think you mentioned four.
2 So I've got three: REDACTED and
REDACTED
3 Is there another?
4 A. Yes. It was REDACTED which now I take
5 the generic of the REDACTED
6 Q. Okay. And what's REDACTED , I'm sorry.
7 A. Oh, it's REDACTED It's a pain
8 medication for -- because I have degenerative
9 disc disease and a lot of bone problems.
10 I have two kinds of lupus. I'm in a
11 lot of pain all the time, even with pain
12 medicine.
13 Q. Okay. So do you -- and do you recall
14 what the dosage is of the o REDACTE that you're
15 taking now?
16 A. Forty milligrams.
17 Q. And how about back in 2014?
18 A. The same.
19 Q. Okay. Thank you.
20 All right. So when -- when did you
21 start seeing Dr. Mimms?
22 A. I've been seeing him for years. Golly,
23 I'm -- it's probably been 10, 12 years I've been
24 seeing him.

## Page 24

1 Q. Okay. So you saw Dr. Mimms at his old
2 practice?
3 A. Yeah. I seen him when he was -- when
4 he was in -- Greenfield is where I used to go.
5 Q. And, at that time, was he associated
6 with Rehabilitation Associates?
7 A. Yes.
8 Q. Okay. So I'd like to walk through your
9 background with Dr. Mimms in a minute.
10 But before I do, I'd like to maybe go
11 through some other doctors, just to make sure I
12 understand who's who and what is what.
13 A. Okay.
14 Q. Because I only have a rudimentary
15 understanding of -- Dr. Arbuck? Does that name
16 ring a bell to you?
17 A. Arbuck.
18 Q. Arbuck?
19 A. Yes.
20 Q. Okay. Who is Dr. Arbuck?
21 A. He's a pain specialist --
22 Q. Okay.
23 A. -- in Indianapolis.
24 Q. And do you currently see Dr. Arbuck?
25 A. No.

A-000036

REDACTED

March 15, 2016

15 (Pages 57 to 60)

Page 57

1    A.  Just Dr. Mimms.
2    Q.  Do you recall what those prescriptions
3  were for?
4    A.  Yes.  I already gave them to you.
5    Q.  Right.
6       So, to be clear, you listed -- we went
7  through the different prescriptions that Dr.
8  Mimms writes for you --
9    A.  Right.
10   Q.  -- or at least has for the last couple
11 years.
12      And what I'm asking now is, on that day
13 or night --
14   A.  On that particular day --
15   Q.  -- were you presenting all those
16 prescriptions written by Dr. Mimms or just one
17 or -- that's what I'm trying to figure out.
18   A.  I'm not sure.  I -- I think I just had
19 two of them.
20   Q.  Okay.  And can you recall what they
21 were for?
22   A.  Actually, no, I can't, because not all
23 of my prescriptions are due on the same date.
24 So --
25   Q.  Got it.

Page 58

1      So how frequently do you go to the
2  pharmacy?
3    A.  Well, I have -- I have to go every
4  month, because I have my -- my lupus.  Yeah.
5  I've got medicines due every month.
6    Q.  Okay.  So do you go once a month or
7  multiple times a month?
8    A.  Probably two or three times a month.
9    Q.  Okay.
10   A.  Because I also have my rheumatologist
11 for my medicine for my lupus, which are regular,
12 automatic prescriptions, automatic fill.
13   Q.  Yeah.
14   A.  So --
15   Q.  And Dr. Mimms has written you a
16 prescription for REDACTED right?
17   A.  Yeah.
18   Q.  Yes?
19   A.  Yes.
20   Q.  And you still take REDACTED correct?
21   A.  Yes.
22   Q.  Okay.  Do you have any understanding
23 whether that's a controlled substance?
24   A.  Yes, I believe it is.
25   Q.  Okay.  You understand it's a bit more

Page 59

1  restricted than other prescription medications
2  because it's a controlled substance?
3    A.  I imagine.
4    Q.  For example, it would have to be
5  specific pill count with dispensing controlled
6  substances?
7    A.  Yes.
8    Q.  Okay.  So when you went in this
9  particular day to the Rushville -- well, let me
10 back up before we get to that.
11      Up until that day, you would fill your
12 prescriptions for REDACTED at the Rushville
13 location of CVS Pharmacy?
14   A.  Yes.
15   Q.  Okay.  Including for REDACTED
16   A.  Yes.
17   Q.  Okay.  When you -- did you present your
18 prescription yourself or did you have family
19 members do it for you?
20   A.  At that time, I was doing it myself.
21   Q.  Okay.  And, currently, as I
22 understand -- because we've talked off the
23 record -- you've -- you're currently homebound;
24 is that -- is that correct?
25   A.  Yes.

Page 60

1    Q.  Okay.  So is somebody else filling
2  prescriptions for you?
3    A.  Yes.  Either my daughter will go pick
4  them up or my aide --
5    Q.  Okay.
6    A.  -- or my son-in-law will go pick them
7  up for me.
8    Q.  Okay.  And they have written
9  authorization to do so?
10   A.  Yes.  I -- I call and let them know.
11   Q.  Okay.
12   A.  I just kind of -- on the phone.
13   Q.  Okay.  And can you just explain briefly
14 why you're homebound at the moment?
15   A.  Because I had a complete total knee
16 replacement surgery.
17   Q.  And when was that?
18   A.  That was the end of November.
19   Q.  Of 2015?
20   A.  Yes.
21   Q.  And you're recovering from that?
22   A.  Yes.
23   Q.  Are you taking any medications as a
24 result of that knee surgery?
25   A.  Not any -- no.

A-000037

REDACTED

March 15, 2016

25 (Pages 109 to 112)

## Page 109

1 Sometimes I'm on my walker.
2 Q. So you have a walker, as well?
3 A. Yeah.
4 I also have an electric wheelchair.
5 Q. When did you -- okay. So when did you
6 first get -- let's take the cane.
7 When did you first get the cane, last
8 three years?
9 A. No. I've had it longer than that.
10 Q. What, five years?
11 A. Probably had it for about seven
12 years.
13 Q. Seven years. So that would be 2009?
14 A. Yeah. Yeah, 2009 -- anywhere from 2006
15 to 2009 --
16 Q. Okay.
17 A. -- I've had it.
18 Q. Now, with respect to the walker, would
19 it be the same -- same time frame for the
20 walker --
21 A. Yes.
22 Q. -- and the electric wheelchair?
23 A. The electric wheelchair I've had
24 since -- I've had the electric wheelchair for
25 about six years.

## Page 110

1 Q. Okay. So 2009 for that?
2 A. Yeah.
3 Q. Okay.
4 A. And then I also have a hospital bed.
5 Q. Okay. When you were testifying with
6 respect to the dosages that Dr. Mimms -- of the
7 medications you take, have your -- have your
8 dosages stayed consistent since you've been
9 seeing Dr. Mimms, or have they changed where
10 you're prescribed more milligrams or less
11 milligrams or anything like that?
12 A. They've stayed the same since I got on
13 the -- since he put me on the new medicine.
14 He put me on the REDACTED when it came
15 out.
16 Q. When Opana came out, did -- did it
17 replace one of the other medicines that you had
18 been taking?
19 A. Yeah.
20 Q. Okay. What medicine was that?
21 A. I don't remember. I don't remember,
22 because I had been tried on -- Dr. Arbuck -- they
23 had tried me on REDACTED , a 30-milligram
24 REDACTED , and it wasn't helping me.
25 They tried me on REDACTED , and I was

## Page 111

1 kind of scared of it because I had heard so much
2 bad stuff about it. And then the -- it didn't
3 help me much, either.
4 And then the REDACTED when it came out
5 new, they tried me on that. It helped me really
6 good. It helped me for years.
7 I mean, now my body's a little used to
8 it, so it doesn't help as much. But it still
9 helps me.
10 Q. When -- when did REDACTED came out?
11 A. Oh, man, I've been on that for -- and,
12 yeah, it has been consistent at the same -- the
13 medications have.
14 Q. Uh-huh.
15 A. I've been on that for probably ten
16 years or so.
17 Q. Okay. Now, you said something with
18 respect to Dr. Arbuck. You said he was pushing
19 it on everybody that came in the door. It was
20 about REDACTED ?
21 A. Yeah.
22 Q. What is that?
23 A. It's actually a -- he was giving it to
24 people for pain.
25 And when I went and seen Dr. Mimms, he

## Page 112

1 said, why -- when I told him about it, he said,
2 why in the world is that doctor giving patients
3 Suboxone for pain, because REDACTED is actually a
4 drug to get people off of like opiates and stuff.
5 Q. Okay. In your meetings with
6 Dr. Arbuck, did -- how -- let me -- strike that.
7 How long did you take REDACTED ?
8 A. Oh, two months at the most.
9 Q. Okay. And why was it only two
10 months?
11 A. Because it wasn't helping me.
12 It was just a new drug that came out,
13 and he was pushing it to everybody. Because
14 everybody -- he would have everybody come in --
15 you'd see him writing it for everybody that came
16 in the door.
17 Q. And is this something you witnessed --
18 A. Yeah.
19 Q. -- individ -- with your own eyes?
20 A. Oh, yes.
21 Q. Okay. And what's your understanding of
22 why he did that?
23 A. I have no idea.
24 He was telling everybody it was for
25 pain.

A-000038

REDACTED

March 15, 2016

5 (Pages 17 to 20)

Page 17

1   at least -- I don't know now, because I haven't
2   been in there since that occurred.
3       I know they had one named Steve. He
4   would come up from Greensburg. He's kind of a
5   big guy, tall, kind of stocky -- the one that
6   told me this.
7       And then there's another younger guy
8   that comes in once in a while. So I really can't
9   exactly tell you for sure what was his name.
10      Q.   Okay. And the gentleman that you did
11  talk to at CVS Pharmacy, not Steve but the person
12  whose name you're having a hard time recalling,
13  you said he's big and stocky?
14      A.   Yeah.
15      Q.   Is he tall, short?
16      A.   He's kind of tall. Yeah, he's tall.
17  To me, he's tall.
18      Q.   Okay. So I'm 6'3". Is he taller than
19  me, shorter than me?
20      A.   No. He's probably -- I'm sizing him up
21  with my son.
22      He's probably 6'.
23      Q.   6'0"?
24      A.   6', 6'1", probably.
25      Q.   Okay. Caucasian, African American,

Page 18

1   Asian, Hispanic?
2       A.   American.
3       Q.   Is that caucasian?
4       A.   Oh, yeah. Caucasian, yeah.
5       Q.   Okay. What color hair did he have?
6       A.   Dark, dark brown?
7       Q.   What color eyes?
8       A.   I have no clue.
9       Q.   Okay. Did he have any facial hair?
10      A.   I don't think so.
11      I didn't pay that much -- close
12  attention to him, you know, to know his eye color
13  or anything like that.
14      Q.   Okay. Did he have a distinctive accent
15  or anything about his voice?
16      A.   No.
17      Q.   Could you give me an approximation of
18  his age?
19      A.   Maybe in his 30s, maybe early to
20  mid-30s.
21      Q.   Okay. And you mentioned somebody named
22  Dana.
23      A.   Uh-huh. Yes.
24      Q.   Now, which CVS Pharmacy store are we
25  talking about here?

Page 19

1       A.   The one in Rushville, Indiana.
2       Q.   Was that your normal -- your normal CVS
3   store that you went to?
4       A.   Yes.
5       Q.   Was that store located at 101 West
6   Rush? Does that sound right to you?
7       A.   101 West Rush?  I've never heard of a
8   street named West Rush here.
9       Q.   Rush Street?
10      A.   Not that I know of.
11      It's on Main Street. It's on the
12  corner of Main Street and First Street.
13      Q.   Okay. What time of day did the visit
14  occur?
15      A.   Late afternoon, I think it was. I
16  don't -- I can't be real sure about the time, but
17  I think it was late afternoon.
18      Q.   Okay.
19      A.   I know it was in the daytime.
20      Q.   Okay. And you mentioned a person named
21  Dana.
22      A.   Yes.
23      Q.   Had you seen Dana before?
24      A.   Yes. She regularly works back in that
25  pharmacy department.

Page 20

1       Q.   Do you recall whether she was a
2   technician or pharmacist?
3       A.   She was a technician.
4       Q.   And how can you tell?
5       A.   Because there's only one real
6   pharmacist in that store.
7       Q.   And do you recall that pharmacist's
8   name?
9       A.   Her name is Amber.
10      Q.   Okay. So you came into the store --
11  bless you -- came into the store, and I assume
12  you were attempting to present a prescription to
13  be filled.
14      A.   Yes.
15      Q.   Did you have more than one prescription
16  with you?
17      A.   Yes.
18      Q.   Okay. So do you recall what
19  prescription you were presenting to be filled?
20      A.   No.
21      Q.   You don't know what it was for?
22      A.   No.
23      Q.   Was it --
24      A.   I don't know which one it was, but it
25  was from Dr. Mimms, though.

A-000039

REDACTED

March 10, 2016

17 (Pages 65 to 68)

## Page 65

1  assistant,
2      That's where she was standing. So I
3  just walked up to her --
4      Q.  Okay.
5      A.  -- and handed her my prescriptions.
6      Q.  All right. Are you -- okay. I just
7  want to make sure that I understood you
8  correctly, that you weren't there with anybody
9  else, you were doing it by yourself?
10     A.  Yes.
11     Q.  Okay. So you presented your
12 prescriptions from Dr. Mimms.
13     Did you have any prescriptions from --
14 written by any other doctors that you were
15 bringing in that day?
16     A.  No.
17     Q.  So you presented your prescription by
18 Dr. Mimms to --
19     A.  Dana.
20     Q.  -- Dana. Thank you.
21     What's Dana look like?
22     A.  She's short, kind of small. She's in
23 her 50s probably. Well, I know she's in her 50s.
24     Last time I seen her, she was short
25 hair.

## Page 66

1      Q.  Short hair? Thank you.
2      Caucasian, African American, Hispanic?
3      A.  Caucasian.
4      Q.  Okay. And pale like me, dark
5  skinned?
6      A.  Just normal. I don't --
7      Q.  Okay.
8      A.  -- have a habit of just looking at
9  people's skin to see --
10     Q.  Okay. I'm just trying to be able to --
11     A.  -- how light or dark it is.
12     Q.  -- if I'd be able to look at a
13 picture -- if I could figure out who --
14     A.  Oh.
15     Q.  -- it might be.
16     Is she a slender woman, heavy-set, any
17 sense -- anything -- anything distinctive? Sort
18 of medium build?
19     A.  Yeah.
20     Q.  Okay. So you had seen Dana before?
21 You met her before?
22     A.  Oh, yeah. She's worked there for a
23 long time.
24     Q.  Okay. So you knew her from -- from the
25 past?

## Page 67

1      So you presented the prescriptions by
2  Dr. Mimms to Dana.
3      And tell me exactly what happened next,
4  please.
5      A.  I already did.
6      Q.  Bear with me.
7      A.  I gave her my prescriptions. She said,
8  we cannot fill for Dr. Mimms anymore because he
9  went to jail. He's a bad doctor.
10     And I said, no, he is a religious
11 doctor. He -- he is planning to become a
12 preacher someday. He is not a bad doctor -- and
13 he's not a bad doctor.
14     And then that's when the guy that was
15 working there butted in and said, oh, he's
16 just -- he's covering -- trying to cover up with
17 this religion.
18     Q.  Okay.
19     A.  And I took my prescriptions and I
20 left.
21     Q.  So when you presented your
22 prescriptions and Dana said, we're not filling
23 prescriptions for Dr. Mimms, did you ask why, and
24 then she told you, you know, something to the
25 effect of, Dr. Mimms had been in jail, or --

## Page 68

1      A.  I didn't need to ask why. She just
2  come out with it.
3      Q.  Okay. So she said that before you
4  asked why?
5      A.  Yeah.
6      Q.  Okay. And so that happened, maybe
7  2013, maybe 2014 --
8      A.  It wasn't 2014.
9      Q.  Okay.
10     A.  It was before that.
11     Q.  It was before 2014?
12     A.  Yeah.
13     Q.  Okay. All right. My question is -- so
14 that's, you know, three years ago.
15     Is that -- are you providing me sort of
16 the gist, like the -- the paraphrases, the
17 message of what she said, or are those her words
18 word for word, every single word you just said is
19 exactly what she said?
20     A.  Yeah. That's pretty much exactly what
21 she said, from what I remember.
22     Q.  Okay. So you just qualified that by
23 saying pretty much. So I'm just trying to
24 understand --
25     A.  That -- I mean, I wrote it down, exact

A-000040

REDACTED

March 15, 2016

16 (Pages 61 to 64)

**Page 61**

1  Q. Okay.
2  A. Just my regular medication.
3  Q. Are you attending any physical rehab or
4  physical therapy?
5  A. I went through physical therapy, yes,
6  here at home.
7  Q. That's concluded?
8  A. Yes.
9  What I have to do now is -- I do it on
10  my own here with -- my aide --
11  Q. Okay.
12  A. -- helps me. She's here every day.
13  Q. That's the woman who walked by here
14  earlier?
15  A. Yes.
16  Q. Okay.
17  A. So we know what all to do. I've even
18  got pictures up hanging on my wall.
19  So that's how I do it now.
20  Q. Okay. Got it. All right.
21  In the past, when you have presented
22  your prescriptions to CVS Pharmacy for -- for
23  REDACTED    have you asked the pharmacist to count
24  out the pills in front of you?
25  A. Yep. I used to in CVS, because I

**Page 62**

1  caught them short a couple times.
2  Q. Okay.
3  A. So I got to where, every time I went, I
4  would make them count them in front of me.
5  Q. Can you explain what you mean by that?
6  A. Because I had came home and counted my
7  medicine and -- like I had a prescription for
8  REDACTED one time. I came home straight from the
9  drugstore and I counted them, and they were ten
10  short.
11  Q. Okay.
12  A. So, after that, I started making them
13  count all my medicines to me, everything I got --
14  Q. Okay.
15  A. -- in front of me.
16  Q. Okay. Including REDACTED ?
17  A. Yes.
18  Q. And do you have the same practice at
19  Kroger pharmacy?
20  A. No. I've never had any problems out of
21  them.
22  Q. Okay. Have you required or asked --
23  did you ever ask CVS Pharmacy to count out the
24  pills in front of a security camera or anything
25  like that?

**Page 63**

1  A. They automatically have a security
2  camera up there.
3  Q. So when you went in the day we were
4  talking about earlier, to the CVS Pharmacy
5  location in Rushville to present the
6  prescriptions for Dr. Mimms, were you joined by
7  any family members? Did you go by yourself?
8  A. I was by myself.
9  Q. Okay. Did you do the drive-in --
10  drive-through or walk in?
11  A. I walked in.
12  Q. And, again, what time of day do you
13  think it was?
14  A. I don't know. I don't have a clue.
15  Q. Okay.
16  A. I know it wasn't -- I know it wasn't
17  dark, but it wasn't morning, either.
18  Q. Okay.
19  A. So it was probably late -- later in the
20  day.
21  Q. Okay. And am I correct in assuming
22  that you presented your prescription to the
23  pharmacy desk?
24  A. Yes.
25  Q. Okay. Was there a line of people in

**Page 64**

1  front of you?
2  A. No. But there was people behind me.
3  Q. Now, as I understand it, the
4  pharmacies -- the CVS pharmacies, at least, have
5  different setups. Often, they'll have like a
6  drop-off line and a pickup line.
7  Does the Rushville store have that kind
8  of --
9  A. Yes.
10  Q. -- setup?
11  Okay. So I presume that you went into
12  the drop-off line first?
13  A. Where was I standing?
14  Yes. I -- there wasn't anybody in
15  front of me, there was a man behind me, and there
16  was somebody sitting down.
17  I just walked up to wherever Dana was
18  standing, like we always did. We handed them to
19  her.
20  I don't know if we was right there at
21  the regular -- I think we was at the regular
22  desk, actually.
23  Q. Okay. You're saying we. Why did you
24  mean -- why are you using the term we?
25  A. Her and -- and me, the pharmacist

A-000041

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

ANTHONY MIMMS, M.D., and MIMMS )
FUNCTIONAL REHABILITATION, P.C., )
)
      Plaintiffs, )
)
    vs. )         Case No. 1:15-cv-00970-TWP-MJD
)
CVS PHARMACY, INC., )
)
      Defendant. )
)

### DECLARATION OF RYAN DURHAM

I, Ryan Durham, declare and state as follows

1.    I am over 21 years of age and am competent to make this declaration. I have personal knowledge of the matters stated herein, and they are true and correct to the best of my knowledge.

2.    I am currently employed at CVS Pharmacy, Inc., and am presently staffed at CVS store #7541, located in McCordsville, Indiana. I am a Caucasian male.

3.    The document bates-numbered CVS00131-145, and attached as Exhibit A to this Declaration, is a true and correct copy of the time card report for store #7541, covering the period of March 1, 2015 to March 7, 2015. This time card report is generated on a weekly basis based on daily inputs in the course of CVS's regularly conducted business and as a regular practice of CVS's business.

4.    As the attached time card report reflects, I was the only male pharmacy technician working at CVS store #7541 on March 4, 2015.

A-000043

5.    During the course of my employment at CVS, I never said to ████████ formerly ████████ or to any other CVS customer, that Dr. Anthony Mimms "had been arrested or was about to be arrested," that Dr. Anthony Mimms was under DEA investigation, or that they needed to find a different doctor than Dr. Mimms, or any words to that effect.

6.    During the course of my employment at CVS, I never heard any CVS employee say to ████████ formerly ████████ or to any other CVS customer, that Dr. Anthony Mimms "had been arrested or was about to be arrested," that Dr. Anthony Mimms was under DEA investigation, or that they needed to find a different doctor than Dr. Mimms, or any words to that effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24 day of June, 2016

Ryan Durham

A-000044

# EXHIBIT 2

A-000045

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

ANTHONY MIMMS, M.D., and MIMMS )
FUNCTIONAL REHABILITATION, P.C., )
                                 )
        Plaintiffs,              )
                                 )
    vs.                          )        Case No. 1:15-cv-00970-TWP-MJD
                                 )
CVS PHARMACY, INC.,              )
                                 )
        Defendant.               )
                                 )

DECLARATION OF MICHAEL SALAZAR

I, Michael Salazar, declare and state as follows

1.      I am over 21 years of age and am competent to make this declaration. I have personal knowledge of the matters stated herein, and they are true and correct to the best of my knowledge.

2.      I am currently employed at CVS Pharmacy, Inc., ("CVS") and am presently staffed at CVS store #7541, located in McCordsville, Indiana.

3.      According to CVS's prescription records, which are maintained in the course of CVS's regularly conducted business and as a regular practice of CVS's business, I verified a prescription that Deborah Blanton filled on March 4, 2015 at CVS store #7541. I was the only pharmacist on duty on March 4, 2015 at the time.

4.      During the course of my employment at CVS, I never said to ███████████ formerly ██████████ or to any other CVS customer, that Dr. Anthony Mimms "had been arrested or was about to be arrested," that Dr. Anthony Mimms was under DEA investigation, or that they needed to find a different doctor than Dr. Mimms, or any words to that effect.

A-000046

5.    During the course of my employment at CVS, I never heard any CVS employee say to ████████████ formerly ████████████ or to any other CVS customer, that Dr. Anthony Mimms "had been arrested or was about to be arrested," that Dr. Anthony Mimms was under DEA investigation, or that they needed to find a different doctor than Dr. Mimms, or any words to that effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24 day of June, 2016

_Michael Salazar_ (signature)

Michael Salazar

2

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

ANTHONY MIMMS, M.D., and MIMMS        )
FUNCTIONAL REHABILITATION, P.C.,      )
                                      )
        Plaintiffs,                   )
                                      )
    vs.                               )       Case No. 1:15-cv-00970-TWP-MJD
                                      )
CVS PHARMACY, INC.,                   )
                                      )
        Defendant.                    )
                                      )

### DECLARATION OF DANA FLYNN

I, Dana Flynn, declare and state as follows

1.    I am over 21 years of age and am competent to make this declaration. I have personal knowledge of the matters stated herein, and they are true and correct to the best of my knowledge.

2.    From September 2004 to November 2014, I was employed as a pharmacy technician at CVS Pharmacy, Inc. During the time of my employment, I was staffed at CVS store #6645, located in Rushville, Indiana. At the time of my departure, the pharmacy manager for the Rushville store was Amber Myers.

3.    During the course of my employment at CVS, I never said to ▓▓▓▓▓ or to any other CVS customer, that Dr. Anthony Mimms "went to jail" or that he was a "bad doctor," or any words that effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of June, 2016

Dana Flynn

A-000049

# EXHIBIT 5

A-000050

███████

March 14, 2016

Page 1

          IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
                INDIANAPOLIS DIVISION

        CIVIL ACTION NO.: 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.,)
                           )
            Plaintiff,     )
                           )
       vs.                 )
                           )
CVS PHARMACY, INC.,        )
                           )
            Defendant.     )


     The deposition upon oral examination of ████
████, a witness produced and sworn before me,
Linda C. Callahan, a Court Reporter and Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendant in the
offices of Barnes & Thornburg LLP, 11 South
Meridian Street, 2nd Floor Conference Center,
Indianapolis, Marion County, Indiana, on the 14th
day of March, 2016, commencing at 3:50 p.m.,
pursuant to the Federal Rules of Civil Procedure,
and by Notice of the parties and subpoena of the
witness as to time and place thereof.




              STRATOS LEGAL SERVICES, LP
              4295 San Felipe, Suite 125
               Houston, Texas  77027
                  (713) 482-2180

March 14, 2016

Page 44

1   Q.   You only saw him at the one office?

2   A.   Yes.

3   Q.   Do you have an understanding of whether Dr. Mimms'

4        old practice had a second office located in

5        Indianapolis?

6   A.   No.

7   Q.   You never visited him at that practice?

8   A.   No.

9   Q.   So Dr. Mimms has a new practice at a new location;

10       correct?                                              04:58

11  A.   The one that he has now?

12  Q.   Correct.  You have an understanding that he has

13       moved buildings; right?

14  A.   Yes.

15  Q.   And he has a new organization that he is

16       affiliated with; right?

17  A.   Correct.

18  Q.   So how did you come to learn that he had changed

19       practices?

20  A.   I went to the office and he was no longer there.    04:59

21       They said that he had moved, so when I went to my

22       family doctor, she gave me his new office number

23       and I called and made an appointment.

24  Q.   So when you went to Dr. Mimms' old office and they

25       told you he had moved, did you ask why?

A-000052

# EXHIBIT 6

A-000053

March 16, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CIVIL ACTION NO.: 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.,)
                           )
          Plaintiff,       )
                           )
     vs.                   )
                           )
CVS Pharmacy, INC.,        )
                           )
          Defendant.       )


    The deposition upon oral examination of ███████
███████, a witness produced and sworn before me,
Linda C. Callahan, a Court Reporter and Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendant in the
offices of Barnes & Thornburg LLP, 11 South
Meridian Street, 2nd Floor Conference Center,
Indianapolis, Marion County, Indiana, on the 16th
day of March, 2016, commencing at 5:00 p.m.,
pursuant to the Federal Rules of Civil Procedure,
and by Notice of the parties and subpoena of the
witness as to time and place thereof.




              STRATOS LEGAL SERVICES, LP
              4295 San Felipe, Suite 125
               Houston, Texas  77027
                  (713) 482-2180

March 16, 2016

```
 1        understand whether you spoke with this gentleman

 2        every month or whether there had been a large gap

 3        in time since the last time you spoke with him,

 4        and it sounds like the latter, that there had

 5        been a gap in time since the last time you spoke

 6        with the friendly retired Navy --

 7   A.   Yes.  It would have been a short period of time.

 8        It wasn't years, by any means, but it had been a

 9        short period of time.

10   Q.   Had it been since you had -- were last receiving

11        treatment from Dr. Mimms?

12   A.   I don't recall.  That, I don't recall.

13   Q.   So you went in hoping to speak with a friendly

14        pharmacist at CVS at the Greenfield store?

15   A.   Yes.

16   Q.   Okay.  And he wasn't there that night?

17   A.   No.

18   Q.   Okay.  Do you recall who was there that you spoke

19        with?

20   A.   Anthony.

21   Q.   Anthony.

22   A.   Tony.

23   Q.   Tony, okay.  Was anybody there besides Tony?

24   A.   There was a security guard there.

25   Q.   Was there anybody -- were there any other
```

A-000055

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


ANTHONY MIMMS, M.D. and          )
MIMMS FUNCTIONAL                 )
REHABILITATION, P.C.,            )
                                 )
            Plaintiffs           )
                                 )
        -v-                      ) CAUSE NO.
                                 ) 1:15-cv-00970-TWP-MJD
CVS PHARMACY, INC.,              )
                                 )
            Defendant            )


        The deposition upon oral examination of
ALEXIS FIELDS, a witness produced and sworn before
me, Marsha A. Traphagan, Notary Public in and for the
County of Marion, State of Indiana, taken on behalf
of the Plaintiffs at the offices of Jason D. May,
9201 North Meridian Street, Suite 220, Indianapolis,

Indiana, on May 17, 2016, pursuant to the Indiana

Rules of Trial Procedure.




            Marsha A. Traphagan

            8122 Folkstone Road

            Indianapolis, IN  46268

                (317) 872-4233

1    Q   Okay.  Did you advise ████████ that maybe she

2        better find another doctor?

3    A   No.

4    Q   At anytime since you've been employed with CVS,

5        have you been able to verify whether or not Dr.

6        Mimms was under investigation by the DEA?

7    A   No.

8    Q   At anytime since you've been employed with CVS,

9        have you ever tried to verify whether or not Dr.

10       Mimms was under investigation by the DEA?

11   A   No.

12   Q   Subsequent to that time where you told ████████

13       about the DEA and Dr. Mimms' office, have you

14       filled a prescription for Dr. Mimms for controlled

15       substances?

16   A   Yes.

17   Q   Do you know whether or not Dr. Mimms is with a new,

18       is still practicing medicine?

19   A   Yes.

20   Q   Have you been able to determine why Dr. Mimms

21       previous store closed?

22   A   No.

23   Q   Have you ever tried to determine why his previous

24       medical practice closed?

25   A   No.

Case: 17-1918    Document: 17-1    Filed: 07/19/2017    Pages: 247
Case 1:15-cv-00970-TWP-MJD   Document 99-10   Filed 07/18/16   Page 4 of 4 PageID #: 1946

Page 41

1   A   Yes.

2   Q   Okay.  What was your basis for connecting the

3       closure of Dr. Mimms' office to a DEA

4       investigation?

5           MR. GARLOUGH:  Objection.  Asked and answered

6       three separate times.

7   A   What ███████████ told me about a doctor's office

8       disappearing with no, not providing any

9       information, and that's why I made the comment.

10  Q   Okay.  And at the time when you made that comment,

11      your testimony is you had no facts to support that

12      statement?

13          MR. GARLOUGH:  Objection.  Mischaracterizes

14      the testimony.

15  Q   Well, I will ask it a different way.  At the time

16      you made the statement, did you have any factual

17      information to support Dr. Mimms' office being

18      under investigation?

19  A   No.

20          MR. MAY:  I have no further questions.

21          MR. GARLOUGH:  Just a couple of follow-up

22      questions.

23

24  RECROSS-EXAMINATION

25

# **Exhibit 8**

A-000060

March 14, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CIVIL ACTION NO.: 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.,)
                           )
        Plaintiff,         )
                           )
    vs.                    )
                           )
CVS PHARMACY, INC.,        )
                           )
        Defendant.         )


     The deposition upon oral examination of ▮▮▮▮
▮▮▮▮ a witness produced and sworn before me,
Linda C. Callahan, a Court Reporter and Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendant in the
offices of Barnes & Thornburg LLP, 11 South
Meridian Street, 2nd Floor Conference Center,
Indianapolis, Marion County, Indiana, on the 14th
day of March, 2016, commencing at 3:50 p.m.,
pursuant to the Federal Rules of Civil Procedure,
and by Notice of the parties and subpoena of the
witness as to time and place thereof.


STRATOS LEGAL SERVICES, LP
4295 San Felipe, Suite 125
Houston, Texas  77027
(713) 482-2180

A-000061


March 14, 2016

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3    FOR THE PLAINTIFF:
      LAW OFFICES OF JASON D. MAY, LLC
 4    BY:   JASON D. MAY, ESQ.
      92301 N. Meridian Street
 5    Suite 220
      Indianapolis, IN  46260
 6    jason.may@jasonmaylaw.com

 7

 8    FOR THE DEFENDANT:
      FOLEY & LARDNER LLP
 9    BY:   JONATHAN W. GARLOUGH, ESQ.
      321 N. Clark Street
10    Suite 2800
      Chicago, IL  60654-5313
11    jgarlough@foley.com

12

13    ALSO PRESENT VIA VIDEO CONFERENCE:
      Hilary B. Dudley, Esq.
14    CVS Health
      Legal Department
15

16

          I-N-D-E-X   O-F   E-X-A-M-I-N-A-T-I-O-N
17
                                          PAGE
18

19    BY MR. GARLOUGH:                 3, 125
      BY MR. MAY:                      100, 134
20

21

22

23

24

25
```

A-000062



March 14, 2016

Page 9

1   A.   No.  Not that I'm aware of.

2   Q.   But you still continue to see Dr. Mimms?

3   A.   Yes.

4   Q.   And did you actually receive an injection today?

5   A.   No.

6                 **(Exhibit No. 14 was marked for**

7        **identification.)**

8   Q.   Other than Dr. Ferrell and Dr. -- well, let's

9        backtrack a little bit.  Ms. ███████ you're looking

10       at a document marked as Exhibit 14.  Do you          03:58

11       recognize this document?

12  A.   Yes.

13  Q.   You've seen this before?

14  A.   Yes.

15  Q.   I'd like to focus your attention to the first

16       page.  Do you see your name in the upper, I guess,

17       mid to left-hand corner?

18  A.   Yes.

19  Q.   And is that your address?

20  A.   Yes, it is.                                           03:59

21  Q.   And if you focus your attention to the second

22       page, please, labeled "Subpoena to testify at a

23       deposition in a civil action", do you see that?

24  A.   Yes.

25  Q.   And you are here today to testify pursuant to this



March 14, 2016

Page 58

1        the answer to the question, please.  Tell me about

2        the conversation that you had regarding Dr. Mimms.

3    **A.   I told Dr. Mimms that I went to CVS to fill my**

4        **prescription, and the head pharmacist at CVS in**

5        **Greenfield said he would not fill Dr. Mimms'**

6        **prescriptions, period.**

7    Q.   Okay.  Is the Greenfield store the same store that

8        you've identified as Pendleton Pike, or are those

9        two differences stores?

10   **A.   Greenfield store, the Greenfield CVS.**          05:22

11   Q.   Okay.  That's different than the Pendleton Pike

12       store?

13   **A.   Right.**

14   Q.   Okay.  You know, sometimes people use different

15       names and I just don't know.  Okay.  So in that

16       conversation, at least, you had told Dr. Mimms

17       that you had gone to the Greenfield store to fill

18       a prescription; correct?

19   **A.   Yes.**

20   Q.   And did Dr. Mimms tell you that there was anything   05:22

21       inappropriate about you going to the Greenfield

22       store as opposed to going to the Pendleton Pike

23       store to fill your prescription?

24   **A.   No, no.**

25   Q.   Okay.  We'll get to that conversation in a little



March 14, 2016

Page 76

1   A.   **Yes.  Basically, yes.**

2   Q.   Did you take notes?

3   A.   **No.**

4   Q.   Did you record that conversation?

5   A.   **No.**

6   Q.   So you just qualified your answer by saying

7        basically.  What I'm trying to understand is are

8        those the exact words she used or were --

9   A.   **The exact words.**

10  Q.   Let me finish my question.  Were those the exact    05:43

11       words she used or is that the general gist of what

12       she's telling you?

13  A.   **No.  She said, Dr. Mimms is under investigation**

14       **from the DEA.** ▆▆▆▆ **you better find you another**

15       **doctor.**

16  Q.   Are those the exact words she used?

17  A.   **Yes.**

18  Q.   Because they've changed three times now.

19  A.   **No, they've been the same.**

20  Q.   Is that -- the last version you just gave me, are    05:44

21       those the exact words?

22  A.   **Yes.**

23  Q.   At what point in the conversation did she tell you

24       that the store didn't have enough of her -- of

25       oxycodone in stock?

A-000065



March 14, 2016

Page 81

1   Q.   Since --

2   **A.   And concerned with the Greenfield store.**

3   Q.   Right.  Well, just to be clear, right, the

4        pharmacist at the Greenfield store told you that

5        they were not filling for Dr. Mimms?

6   **A.   At all.  Period.**

7   Q.   Right, I understand, but that's what I said;

8        correct?

9   **A.   Yes.**

10  Q.   The pharmacist at the Greenfield store didn't say    05:48

11       anything about a DEA investigation, did he?

12  **A.   No.**

13  Q.   He didn't say anything about you need to find a

14       new doctor, did he?

15  **A.   No.**

16  Q.   That was only at the Pendleton Pike store?

17  **A.   Correct.**

18  Q.   Okay.  So since this occurred, have you gone back

19       to the Pendleton Pike store?

20  **A.   Yes.**                                              05:48

21  Q.   You continue to fill prescriptions there?

22  **A.   Yes.**

23  Q.   Have you seen Alexis there since?

24  **A.   Yes.**

25  Q.   Have you presented any other prescriptions from

A-000066

March 14, 2016

Page 82

1          Dr. Mimms at that store?

2    A.    Yes.

3    Q.    They continue to fill for Dr. Mimms?

4    A.    Yes.

5    Q.    And in those times where you've presented the

6          prescriptions, has Alexis or anybody else at that

7          store said that Dr. Mimms was under DEA

8          investigation?

9    A.    No.

10   Q.    During those times where you presented a          05:49

11         prescription from Dr. Mimms subsequent to the

12         night we've just been -- or the afternoon we've

13         just been discussing, has anyone at the Pendleton

14         Pike store said anything to you to the effect of

15         you needed to find a new doctor?

16   A.    No.

17   Q.    It was just that one time at Pendleton Pike?

18   A.    Yes.

19   Q.    And at any of your visits to any CVS Pharmacy

20         store, other than the visit we've just been          05:49

21         discussing at the Pendleton Pike store, has anyone

22         said that Dr. Mimms was under DEA investigation or

23         that you needed to find a new doctor?

24   A.    Just the -- just the Pendleton Pike store.

25   Q.    The one time at Pendleton Pike store?

March 14, 2016

Page 112

| | | |
|---|---|---|
| 1 | | MR. GARLOUGH:  Objection; |
| 2 | | mischaracterizes her testimony. |
| 3 | Q. | Okay.  And the first pharmacist where your |
| 4 | | prescription wasn't filled, did the pharmacist |
| 5 | | start yelling? |
| 6 | **A.** | **Yes.** |
| 7 | Q. | Why do you think he was yelling? |
| 8 | | MR. GARLOUGH:  Objection; calls for |
| 9 | | speculation. |
| 10 | Q. | You can answer. | 06:37 |
| 11 | **A.** | **Because I was pressuring him and I was real upset** |
| 12 | | **and I wasn't taking no for an answer.  I wanted my** |
| 13 | | **prescription filled.** |
| 14 | Q. | Okay.  So you handed him your prescription? |
| 15 | **A.** | **Yes.** |
| 16 | Q. | If I don't get this right, please correct me; he |
| 17 | | says -- does he say CVS or I won't fill any |
| 18 | | prescriptions for Dr. Mimms? |
| 19 | **A.** | **I.** |
| 20 | Q. | Okay.  And did you respond to that with -- | 06:38 |
| 21 | **A.** | **What did you say back in response to that?** |
| 22 | Q. | I said, I need my prescription filled and I don't |
| 23 | | understand why you're not filling this |
| 24 | | prescription, I need my prescription filled.  He |
| 25 | | will not -- he said he was not going to fill Dr. |

A-000068



March 14, 2016

Page 113

1        Mimms' prescription, none of his prescriptions

2        will he fill.

3   Q.   Okay.  Now, I think that's --

4   **A.   No prescriptions of Dr. Mimms will be filled,**

5        **period.**

6   Q.   And did he raise his -- at that point, was that

7        when he raised his voice, or did he raise his

8        voice the first time?

9   **A.   Not the first time.  When I challenged him is when**

10       **he raised his voice, and I kept challenging him,**     06:39

11       **so that's why I put period, because that's when he**

12       **was really loud, when he told me, period.  All the**

13       **people look --**

14  Q.   Do you think he was saying it loud enough so that

15       all the other customers could hear it?

16  **A.   Oh, yes, yes.**

17  Q.   And why do you think he said it in that -- such a

18       fashion?

19               MR. MAY:  Objection; calls for

20       speculation.                                           06:39

21  **A.   I think he said it because he wanted to let them**

22       **know that he is not going to fill Dr. Mimms'**

23       **prescription, if anybody else was in that long**

24       **line, or to -- I don't really know why he said it**

25       **and why he said period and why he looked at me the**

March 14, 2016

Page 124

1        I wonder, have you been investigated by the DEA --

2    Q.   Did it change your opinion in any form or fashion

3         of Dr. Mimms as your pain manager specialist?

4    A.   I wonder.

5    Q.   But to answer my question, did you change -- did

6         what Alexis told you change your opinion of Dr.

7         Mimms in any way?

8    A.   No.

9    Q.   Do you think what Alexis told you, your

10        understanding of what she told you, was meant to      06:57

11        ruin or hurt his reputation?

12                   MR. GARLOUGH:  Objection; calls for

13        speculation.

14   A.   I don't know why she's telling people that unless

15        she's trying to hurt him.  That's something you

16        don't say.

17   Q.   With respect to -- you had an appointment today;

18        right?

19   A.   Yes.

20   Q.   Do you know where Dr. Mimms was today?             06:57

21   A.   It's his day off.  I had to ask.  I didn't know

22        that.

23   Q.   Okay.  And finally, you said, all my doctors know

24        what I'm taking, with respect to the medications

25        you're on.

A-000070

March 14, 2016

Page 132

1    Q.   I'm sorry, but this is --

2    **A.   I already answered that question.**

3    Q.   Then what is your answer again?

4    **A.   What's the question again?**

5    Q.   The question is as a patient, is it relevant to

6         you to know if your doctor is breaking the law?

7                   MR. MAY:  And again, I'll state my

8         objection for the record, that one calls for a

9         hypothetical, it calls for speculation.

10                  MR. GARLOUGH:  Nothing hypothetical    07:05

11        about it.

12   **A.   No, I would not like a doctor that's not going by**

13        **the law.**

14   Q.   So it would be relevant to you?

15   **A.   Yes, depending on what it was.**

16   Q.   Okay.  Fair enough.  People break the law in all

17        sorts of different ways?

18   **A.   Yes, they do.**

19                  MR. MAY:  And I'll object to that.

20   **A.   Yes, they do.**                                    07:05

21   Q.   Alexis -- just to be clear about what Alexis said,

22        did Alexis say that the DEA was going to prosecute

23        Dr. Mimms?

24   **A.   No.**

25   Q.   Did she say that Dr. Mimms was under investigation

Stratos Legal Services
800-971-1127

A-000071

# **Exhibit 9**



March 15, 2016

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

———————————————————— )
ANTHONY MIMMS, M.D.,    )
et al.,              )
                   )
    Plaintiffs,   )
                   )CASE NO.
           vs.    )1:15-cv-00970-TWP-MJD
                   )
CVS PHARMACY, INC.,   )
                   )
    Defendant.    )
———————————————————— )

Deposition of:   █████████

Pursuant to:    Subpoena

Date and Time:  Tuesday, March 15, 2016
               12:17 p.m.

Place:         ███████████████████████

Reporter:     Wendy Haehnle

A-000073



March 15, 2016

Page 2

```
 1    APPEARANCES OF COUNSEL:

 2

 3         For the plaintiffs:

 4              Jason D. May, Esq.
                     of
 5              Law Offices of Jason D. May, LLC
                9201 North Meridian Street
 6              Suite 220
                Indianapolis, Indiana  46260
 7              317.218.3859
                jason.may@jasonmaylaw.com
 8

 9

10         For the defendant:

11              Jonathan W. Garlough, Esq.
                     of
12              Foley & Lardner, LLP
                321 North Clark Street
13              Suite 2800
                Chicago, Illinois  60654-5313
14              312.832.4500
                jgarlough@foley.com
15

16

17                      - - -

18

19

20

21

22

23

24

25
```

A-000074



March 15, 2016

Page 3

1                    I N D E X

2

3                                              PAGE

4       EXAMINATION BY MR. GARLOUGH          4
        EXAMINATION BY MR. MAY               103
5       FURTHER EXAMINATION BY
                    MR. GARLOUGH             162
6       FURTHER EXAMINATION BY MR. MAY       170

7

8

9    EXHIBITS              MARKED   REFERENCED

10      DEPOSITION EXHIBIT  22      8          8
        DEPOSITION EXHIBIT  23      85         -
11      DEPOSITION EXHIBIT  24      138        138
        DEPOSITION EXHIBIT  25      153        -
12

13

14                    - - -

15

16

17

18

19

20

21

22

23

24

25

A-000075



March 15, 2016

Page 12

```
 1        Q.   And it was in regards to the
 2   subpoena?
 3        A.   Yes.
 4        Q.   Okay.  Well, do you have an
 5   understanding of why you're being deposed in this
 6   case?
 7        A.   Not really.
 8        Q.   Okay.  Have you ever spoken with Mr. --
 9   Dr. Mimms regarding this lawsuit?
10        A.   Yes.
11        Q.   So Dr. -- you're a patient of
12   Dr. Mimms?
13        A.   Yes.
14        Q.   You're currently a patient of
15   Dr. Mimms?
16        A.   Yes.
17        Q.   When's the last time you saw
18   Dr. Mimms?
19        A.   February.
20        Q.   Okay.  And I assume that was for
21   treatment, not socially?
22        A.   Yes.  Yes.
23        Q.   Okay.  And February 2016?
24        A.   Yes.
25        Q.   Okay.  Do you have an upcoming
```



March 15, 2016

Page 13

1  appointment with Dr. Mimms?

2      **A.    Yes, in May.**

3      Q.    So you see Dr. Mimms once every three

4  months?

5      **A.    Yes.**

6      Q.    Okay.  Do you have any understanding of

7  what this lawsuit's about?

8      **A.    Yes, I do.**

9      Q.    Okay.  What's your understanding?

10     **A.    That I had told him two-and-a-half,**

11 **three years ago that I went into CVS to fill my**

12 **prescription, and they had told me that they**

13 **would no longer fill for him.**

14         **So on my next appointment, after that**

15 **happened, I told Dr. Mimms what they had told me,**

16 **that they wouldn't fill for him anymore.**

17     Q.    Okay.  So I'd like to -- I'm going to

18 ask you, as you might imagine, some questions

19 about that.

20         But was that the only time you've

21 spoken with Dr. Mimms, about that conversation

22 you had with -- at CVS Pharmacy?

23     **A.    Yes.  Yes.**

24     Q.    After -- okay.  At the time you told

25 Dr. Mimms about this, was this at an appointment



March 15, 2016

Page 52

1           And even during the time you were
2    living here in Rushville, there's still occasions
3    where you filled prescriptions at other
4    pharmacies, right?
5           The Greenfield --
6      **A.  Not too much.**
7      Q.  But you have, right?  We just went
8    through --
9      **A.  Yeah.  What does that have to do**
10   **anything?**
11     Q.  You've filled prescriptions at the
12   Greenfield CVS Pharmacy in the past, right?
13     **A.  Yeah.**
14     Q.  Yeah.  Okay.
15           And has Dr. Mimms ever told you that
16   you weren't allowed to fill prescriptions at any
17   other pharmacy other than the Rushville
18   Pharmacy?
19     **A.  No, not that I recall.**
20     Q.  Any doctor at Rehab Associates ever
21   tell you you couldn't fill any prescription at
22   any pharmacy other than the Rushville Pharmacy?
23     **A.  No.**
24     Q.  So, at some point, you switched -- if I
25   have my notes right, you first, after stopping



March 15, 2016

Page 56

1    Q.   No.  I'm -- let me be more clear.

2         The -- the discussion we talked about

3    before, the -- your visit to the CVS Pharmacy

4    located in Rushville in which they wouldn't fill

5    your prescriptions written by Dr. Mimms, can you

6    recall when that visit occurred?

7    **A.   Again, no.  No, I can't.**

8    Q.   Was that 2014, 2015?

9    **A.   It wasn't 2015.**

10   Q.   Okay.  2014?

11   **A.   Maybe 2013.**

12   Q.   Can you tell me what time of year you

13   think it may have been?

14   **A.   No --**

15   Q.   Spring, summer, winter, fall?

16   **A.   -- I can't.**

17   Q.   Do you recall whether there was snow on

18   the ground or it was 80 degrees or anything like

19   that?

20   **A.   I don't think there was snow on the**

21   **ground.**

22   Q.   Okay.  Okay.  And on this visit, were

23   you presenting prescriptions written by just

24   Dr. Mimms or prescriptions written by multiple

25   doctors?



March 15, 2016

Page 67

```
 1          So you presented the prescriptions by

 2   Dr. Mimms to Dana.

 3          And tell me exactly what happened next,

 4   please.

 5       A.   I already did.

 6       Q.   Bear with me.

 7       A.   I gave her my prescriptions.  She said,

 8   we cannot fill for Dr. Mimms anymore because he

 9   went to jail.  He's a bad doctor.

10          And I said, no, he is a religious

11   doctor.  He -- he is planning to become a

12   preacher someday.  He is not a bad doctor -- and

13   he's not a bad doctor.

14          And then that's when the guy that was

15   working there butted in and said, oh, he's

16   just -- he's covering -- trying to cover up with

17   this religion.

18       Q.   Okay.

19       A.   And I took my prescriptions and I

20   left.

21       Q.   So when you presented your

22   prescriptions and Dana said, we're not filling

23   prescriptions for Dr. Mimms, did you ask why, and

24   then she told you, you know, something to the

25   effect of, Dr. Mimms had been in jail, or --
```


March 15, 2016

Page 68

1        A.    I didn't need to ask why.   She just

2    come out with it.

3        Q.    Okay.   So she said that before you

4    asked why?

5        A.    Yeah.

6        Q.    Okay.   And so that happened, maybe

7    2013, maybe 2014 --

8        A.    It wasn't 2014.

9        Q.    Okay.

10        A.    It was before that.

11        Q.    It was before 2014?

12        A.    Yeah.

13        Q.    Okay.   All right.   My question is -- so

14    that's, you know, three years ago.

15            Is that -- are you providing me sort of

16    the gist, like the -- the paraphrases, the

17    message of what she said, or are those her words

18    word for word, every single word you just said is

19    exactly what she said?

20        A.    Yeah.   That's pretty much exactly what

21    she said, from what I remember.

22        Q.    Okay.   So you just qualified that by

23    saying pretty much.   So I'm just trying to

24    understand --

25        A.    That -- I mean, I wrote it down, exact


March 15, 2016

Page 69

1    words, what was -- as far as my memory, at

2    Dr. Mimms' on a piece of paper.

3         Q.   You wrote it down at your next visit

4    with Dr. Mimms, right?

5         A.   Yes; and signed my name.

6         Q.   Right.

7              And that next visit occurred sometime

8    within three months of that visit --

9         A.   Yes.

10        Q.   -- right?

11             You can't recall whether it was the

12   next day or three months from now, but at some

13   point within those three months?

14        A.   It wasn't the next day, but --

15        Q.   Right.

16             So I'm just trying to understand if --

17   if what you're telling me is exactly what she

18   said or if it's just -- if it's --

19        A.   That's exactly what she told me.

20        Q.   Okay.  So word for word -- I want to

21   make sure I have it exactly word for word what

22   she said.

23             Could you tell me?

24        A.   Okay.  First, how many times am I going

25   to have to say the same thing over and over and


March 15, 2016

Page 70

1   over?  I mean, really?

2       Q.    Please?

3       A.    I mean, I've been -- done said it four

4   times.

5       Q.    I want to make sure I have it exactly

6   right so I won't have to ask you again.

7             Tell me word for word --

8       A.    You've wrote it down.  You should have

9   it exactly right.

10      Q.    Please bear with me.

11      A.    I took my prescription, I laid them in

12  front of Dana on the table -- on the counter.

13            She said, we cannot fill for Dr. Mimms

14  anymore, because he went to jail and he is a bad

15  doctor.

16      Q.    Okay.

17      A.    Exact words.

18            And then the guy pharmacist butted in

19  and said --

20      Q.    Okay.

21      A.    Well, then I told her that, no, he's

22  not a bad doctor.  He's a very religious man.  He

23  wants to become a preacher someday -- which he

24  does, because he talks about how he wants to

25  become a preacher.  And he's a very, very


March 15, 2016

1    wonderful singer, gospel singer.

2            And then that's when the man pharmacist

3    said, no, he's just hiding behind religion, using

4    it for an excuse.

5        Q.    And that's -- that's exactly what he

6    said?

7        A.    Yes.

8        Q.    Okay.  So you mentioned that Dr. Mimms

9    has talked about religion with you?

10       A.    Oh, he sings throughout his office.

11   He's a wonderful singer.  He sings gospel

12   throughout his office.

13       Q.    Okay.

14       A.    It's wonderful to hear him.

15       Q.    Does he -- have you talked in the past

16   about him wanting to leave being a doctor and

17   becoming a priest?  I'm just --

18       A.    I never said anything about leaving

19   being a doctor.

20            I'm just -- you know, he has very good

21   bedside manners, Dr. Mimms does, which is another

22   reason I like him.

23            He's not one of those doctors that, you

24   know, write you a prescription and push you out

25   the door.  He'll actually look you over, check


March 15, 2016

Page 97

```
 1      A.    No.

 2      Q.    So you think this is wrong?

 3      A.    Yes.

 4      Q.    Okay.  You continue to see Dr. Mimms

 5  today, right?

 6      A.    Yes.

 7      Q.    Okay.  The occurrence at CVS Pharmacy

 8  we've been discussing here in Rushville, did that

 9  affect your opinion of Dr. Mimms in any way?

10      A.    No.

11      Q.    Have you spoken with any of Dr. Mimms'

12  other patients regarding that visit to CVS

13  Pharmacy or what was said?

14      A.    No.

15      Q.    Did you do anything to perform research

16  to see if Dr. Mimms was in jail?

17      A.    No.

18      Q.    If your doctor was involved in illegal

19  activity, whether it's Dr. Mimms or some other

20  doctor, is that something that, as a patient, you

21  would want to know?

22          MR. MAY:  Objection.  Calls for

23      speculation.

24  BY MR. GARLOUGH:

25      Q.    You can answer the question.
```


March 15, 2016

Page 99

1    I'm concerned.  He's -- like I said, has very

2    good bedside manners, which means a lot to me for

3    a doctor.  I think it does anybody.

4              He's not pushy.  If I ask him about

5    something, he will check it out.

6              You know, he's even the one that found

7    my lupus.  You know, my family doctor didn't even

8    find it.  Dr. Mimms found it.

9              So, to me, I think he's a pretty good

10   doctor.

11      Q.   I understand that.  And I understand

12   that you like Dr. Mimms.

13              What I'm trying to -- what I'm asking

14   about is not specific to Dr. Mimms.

15              What I'm trying to understand is, from

16   a patient's perspective, would you find it useful

17   or relevant if --

18      A.   Do I think that patients should know

19   what's going on with their doctor?

20      Q.   Yeah.

21      A.   Yes.

22      Q.   Sure.

23              And so, if a pharmacist had information

24   that your doctor, any doctor, whoever, any doctor

25   that's treated you --


March 15, 2016

Page 100

1      **A.    Right.**

2      Q.    -- was engaged in illegal activity or

3    doing something illegal in their medical care,

4    would you want to know that?

5           MR. MAY:  Again, objection.  Calls for

6         speculation, and it's calling for a legal

7         conclusion.

8           You can answer.

9      **A.    I don't think a pharmacy should be**

10   **blurting that out to people.**

11   BY MR. GARLOUGH:

12     Q.    Okay.

13     **A.    I don't think it's their business to be**

14   **blurting someone's business out --**

15     Q.    Okay.

16     **A.    -- to the public --**

17     Q.    So --

18     **A.    -- or a patient.**

19     Q.    So, if a pharmacist knew that one of

20   your doctors was engaged in illegal medical

21   practice or doing something illegal in the

22   medical practice, you wouldn't want them to tell

23   you that?

24           MR. MAY:  Again, still the same

25         objection.


March 15, 2016

Page 101

1              You can answer.

2        A.    Well, there's so much he say/she say

3    anymore that you don't know who to believe.

4              So I would think that that would be

5    something that a doctor should be honest with the

6    patient about.

7    BY MR. GARLOUGH:

8        Q.    Okay.

9        A.    So I think it would be a -- I think the

10   doctor should tell the patient what actually

11   happened.

12       Q.    I don't disagree with that.

13             But my question is, would you -- would

14   you want to know?

15       A.    Well, yes, I'd want to know.

16       Q.    Would you want -- let's just -- if the

17   doctor didn't tell you, would you want somebody

18   else to tell you about it?

19       A.    Only -- yeah, if it was true.

20       Q.    Okay.

21       A.    But not the way they did.  They -- no.

22             I mean, they're rude and -- and not --

23   you know, not the way they did.

24       Q.    Okay.

25       A.    But then I also live in a town, a small

A-000088



March 15, 2016

Page 103

1          A.    There's a lot of misuse of drugs

2    nowadays.

3          Q.    And abuse of those drugs?

4          A.    Yes.   There's a lot of it.

5          Q.    And that's an issue of public

6    concern?

7          A.    Yes.   Yes, it is.

8          Q.    That's something that doctors are

9    concerned about --

10         A.    Well, yeah.

11         Q.    -- right?

12               And that's something that pharmacies

13   are concerned about?

14         A.    I suppose so.

15         Q.    And that's a public health issue that

16   you've seen in news coverage?

17         A.    Oh, you see it every day on the news.

18         Q.    And it's discussed by politicians?

19         A.    I don't know about politicians,

20   but it's -- I don't know a lot about politicians.

21         Q.    Fair enough.

22               MR. GARLOUGH:   Okay.  I don't have any

23         further questions, pending follow-up from

24         Jason.

25               MR. MAY:  I need to take a break.



March 15, 2016

Page 163

1       the door open.  It's a nice way to spend the

2       day.

3            THE WITNESS:  It is.

4            MR. GARLOUGH:  I've been stuck in

5       conference rooms for the past couple days.

6            THE WITNESS:  It's getting warm.

7            I'm glad to see all the sunshine,

8       though.  No more rain.

9            (Off the record.)

10           MR. MAY:  I have no further questions.

11           MR. GARLOUGH:  I've got a few

12       follow-ups and hopefully we'll get you

13       wrapped up.

14           (Off the record.)

15                FURTHER EXAMINATION

16  BY MR. GARLOUGH:

17      Q.   Mr. May asked you, what does it mean if

18  someone tells you that someone is a bad doctor.

19           And I have you saying, it doesn't mean

20  anything if they haven't done anything bad to me.

21           Do you remember that exchange with

22  Mr. May?

23      **A.   Oh, God.  I don't know.  I've said so**

24  **much that --**

25      Q.   Okay.



March 15, 2016

Page 164

1        A.    -- I'm getting confused now.

2        Q.    I'm just using that as a frame of

3   reference.

4              So you would agree with me that whether

5   someone is a good doctor or a bad doctor is

6   subjective, right?  It's a matter of opinion?

7        A.    Uh-huh.  Yes.

8        Q.    Yes?

9              Someone may be a good doctor for you

10  because you like certain things?

11       A.    Yes.

12       Q.    Another is a bad doctor to another

13  person?

14       A.    Yeah.

15       Q.    And when someone tells you that

16  Dr. Mimms is a bad doctor, that's their opinion,

17  right?

18       A.    Yes.

19       Q.    Okay.  Mr. May also asked you about you

20  having filled prescriptions at stores other --

21  other CVS stores, other than the CVS located here

22  in Rushville.

23              Do you recall that?

24       A.    Yes.

25       Q.    Thank you.

# **Exhibit 12**

A-000092

██████████
March 16, 2016

Page 1

         IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
                INDIANAPOLIS DIVISION
      CIVIL ACTION NO.: 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.,)
                           )
         Plaintiff,        )
                           )
    vs.                    )
                           )
CVS Pharmacy, INC.,        )
                           )
         Defendant.        )


    The deposition upon oral examination of ███████
████████  a witness produced and sworn before me,
Linda C. Callahan, a Court Reporter and Notary
Public in and for the County of Hamilton, State of
Indiana, taken on behalf of the Defendant in the
offices of Barnes & Thornburg LLP, 11 South
Meridian Street, 2nd Floor Conference Center,
Indianapolis, Marion County, Indiana, on the 16th
day of March, 2016, commencing at 5:00 p.m.,
pursuant to the Federal Rules of Civil Procedure,
and by Notice of the parties and subpoena of the
witness as to time and place thereof.




            STRATOS LEGAL SERVICES, LP
            4295 San Felipe, Suite 125
              Houston, Texas  77027
                 (713) 482-2180

A-000093

████████████

March 16, 2016

Page 2

```
 1                A-P-P-E-A-R-A-N-C-E-S

 2

   FOR THE PLAINTIFF:
 3 LAW OFFICES OF JASON D. MAY, LLC
   BY:  JASON D. MAY, ESQ.
 4 92301 N. Meridian Street
   Suite 220
 5 Indianapolis, IN  46260
   jason.may@jasonmaylaw.com
 6

   FOR THE DEFENDANT:
 7 FOLEY & LARDNER LLP
   BY:  JONATHAN W. GARLOUGH, ESQ.
 8 321 N. Clark Street
   Suite 2800
 9 Chicago, IL  60654-5313
   jgarlough@foley.com
10


11

   ALSO PRESENT VIA VIDEO CONFERENCE:
12 Hilary B. Dudley, Esq.
   CVS Health
13 Legal Department

14

15

16     I-N-D-E-X   O-F   E-X-A-M-I-N-A-T-I-O-N

17                               PAGE

18

   BY MR. GARLOUGH:              4, 127
19 BY MR. MAY:                   109

20

21

22

23

24

25
```

Stratos Legal Services
800-971-1127

A-000094

███████████

March 16, 2016

 1        been to that -- the New Palestine location, I'm

 2        not sure what the drive-through configuration is,

 3        how far was the car to the window?

 4   A.   Within arm's reach.

 5   Q.   Okay.  So you presented a -- presented a

 6        prescription through the door or the gate or

 7        something that you were able --

 8   A.   There's a drive-through window.

 9   Q.   All right.  So then what happened?

10   A.   We don't fill for Dr. Mimms.

11   Q.   Okay.

12   A.   She did not say narcotics, she did not say

13        Flexeril, she did not say Valium, she did not say

14        Penicillin, she did not say anything, other than

15        we do not fill prescriptions for Dr. Mimms.

16   Q.   And then what did you do in response?

17   A.   Thank you very much, and drove off with -- am I

18        going to sit there and argue with her?

19   Q.   Did you ask her why not?

20   A.   No.

21   Q.   That was the extent of your exchange with her?

22   A.   Yeah.  I mean --

23   Q.   Well, I just --

24   A.   Somebody -- I'm sitting at a window and somebody

25        is telling me no, and there's people sitting

A-000095

March 16, 2016

Page 69

```
 1        discussing one particular medication, I was

 2        discussing, like I said, Opana, MS Contin,

 3        OxyContin, oxycodone.  There's a new pill that --

 4        once every 24 hours.

 5   Q.   Did you explain to him why you were asking about

 6        those drugs?

 7   A.   Yeah.  We -- this is how the conversation began,

 8        I'm going to see my doctor.

 9   Q.   That's what I'm trying to get to, is I'm trying

10        to understand how -- let me first ask, did Dr.

11        Mimms come up in the conversation?

12   A.   Yes.

13   Q.   I'm trying to understand how Dr. Mimms came up in

14        that conversation, so can you explain to me how

15        the subject of Dr. Mimms came up in that

16        conversation?

17   A.   We were talking about the place getting robbed so

18        much, and one of the robbers actually jumped out

19        the drive-through window.

20   Q.   I assume Tony told you this?

21   A.   Yes.

22   Q.   It's not something you had seen?

23   A.   No, it's -- it's two guys talking.

24   Q.   Sure, okay.

25   A.   And whenever I told him, that's when he told me
```

A-000096

████████████
March 16, 2016

Page 70

1          that they don't fill for Dr. Mimms and compared

2          him to a pill mill.

3     Q.   You said compared him to a pill mill?

4     A.   Pill mill, because I actually asked him what a

5          pill mill was.

6     Q.   Okay.  So before we get to pill mill, how did he

7          compare him to a pill mill; do you recall how --

8          the words he used to compare him to a pill mill?

9     A.   We don't fill prescriptions for Dr. Mimms or any

10         other pill mills.

11    Q.   Are you paraphrasing or --

12    A.   That's pretty close to word for word.

13    Q.   And this would have been June 2014?

14    A.   Yeah.

15    Q.   Okay.  How long into the conversation did -- I

16         assume it was Tony who made this remark?

17    A.   Uh-huh.

18    Q.   That's a yes?

19    A.   Yes.  Sorry.

20    Q.   No problem.  How long into the conversation was

21         it that Tony made this remark?

22    A.   Well, we had been talking for more than a few

23         minutes.  I mean, I had asked him about several

24         different things in there.

25    Q.   More than half hour at this point?

A-000097

March 16, 2016

Page 71

```
 1   A.   Probably not a complete half hour, but it had

 2        been --

 3   Q.   20 minutes --

 4   A.   -- more than hello, how are you.

 5   Q.   Okay.  It was fairly deep into the conversation

 6        at that point?

 7   A.   Yes, but it was -- yeah --

 8   Q.   Okay.  So he said, CVS doesn't fill for Dr.

 9        Mimms; right?

10   A.   Or other pill mills.

11   Q.   Or other pill mills, okay.  And then what was

12        your response to that?

13   A.   I took offense to it.

14   Q.   Did you verbalize a response?

15   A.   That's when I -- here we are again; that's when I

16        asked about the pill mills.

17   Q.   Okay.  And what were the words that you said, the

18        best that you can recall?

19   A.   What is a pill mill.

20   Q.   Okay.  Do you recall what Tony's response to that

21        was?

22   A.   Basically that physicians who just parade

23        patients one after another through their office

24        writing prescriptions.  Some get kickbacks, some

25        give them -- they over-write the prescriptions
```

A-000098

████████████

March 16, 2016

Page 72

1      to -- because they get kickbacks or -- he didn't

2      go into great detail, but the impression that I

3      got from it, if my impression really matters at

4      this point, was that he had a very low opinion of

5      doctors in that position, and I feel like it was

6      wrapping Dr. Mimms in that without having

7      personal knowledge of Dr. Mimms.  Like I said, I

8      kind of took offense to it, because I'm piss

9      tested, blood tested, you know, I'm weighed,

10     blood pressure, oxygen, everything whenever I go

11     to his office, I'm signing agreements like this,

12     and how could a doctor be considered what he is

13     calling a pill mill?  I mean, if he was a pill

14     mill, I would think that he would be writing me

15     for three times what he would be.

16  Q.  I don't want to interrupt you.

17  A.  Go ahead.  It's kind of frustrating at this

18      point.

19  Q.  So it sounds like you understood that Tony was

20      expressing his opinion about Dr. Mimms?

21  A.  Exactly wrong.

22  Q.  Okay.

23  A.  How would he have an opinion of Dr. Mimms unless

24      he had heard something about Dr. Mimms or tried

25      to fill prescriptions for Dr. Mimms?  You asked

A-000099

March 16, 2016

1   Q.   The one we're --

2   A.   **The follow-up visit?**

3   Q.   Yes.

4   A.   **The one in Greenfield.**

5   Q.   Greenfield again, okay.  That's the same store

6        that you had your discussion with Tony?

7   A.   **Yes, and the navy gentleman.**

8   Q.   Right, okay.

9   A.   **And I wish to God I could remember his name.**

10  Q.   I do, too.

11  A.   **He's an asset to CVS.  The other guy is an idiot.**

12       **I'm sorry.  I said that out loud.**

13  Q.   He's not here.  It wouldn't change anything.

14       Okay.  So this follow-up visit, was it the

15       drive-through or walk --

16  A.   **Drive-through.  All I did was ask if they had**

17       **changed their policy, I didn't even hand them a**

18       **prescription, I just asked if they had changed**

19       **their policy, they said no, and that was pretty**

20       **much it.  There was no -- like I said, I'm not**

21       **going to set an argument through a drive-through.**

22       **I mean, I can do that at McDonalds about a pie.**

23  Q.   There was no reference to a DEA investigation?

24  A.   **No.**

25  Q.   No reference to pill mill on that visit?

March 16, 2016

1   Q.   Say to --

2   A.   **This is -- this is kind of a touchy subject with**

3        **me because they're getting 30 bucks a month out**

4        **of me and I can't even walk in the door and get**

5        **something filled, and that's not my fault.  I**

6        **don't believe in my heart of hearts that it's Dr.**

7        **Mimms' fault.  I don't know whose fault it is, so**

8        **who's going to reimburse me for all the money**

9        **I've spent.**

10  Q.   So to be clear, Dr. Mimms has never said you did

11       anything wrong by filling your prescriptions that

12       he's written at pharmacies other than CVS

13       Pharmacy?

14            MR. MAY:  Objection; asked and

15       answered.  You can answer.

16  A.   **What -- repeat it, please.**

17  Q.   Sure.  Just to be clear, Dr. Mimms has never said

18       that you did anything wrong by filling your

19       prescriptions at pharmacies other than CVS?

20  A.   **No, and we actually had a discussion about this**

21       **on our last visit, because I asked him if --**

22       **whenever I get a prescription filled, he --**

23       **they're on some kind of a program which tells**

24       **what pharmacy I get it filled at and when I get**

25       **it filled at, because whenever he writes me a**

March 16, 2016

Page 108

1    Q.    And he knows that you're not filling

2          prescriptions at CVS Pharmacy; correct?

3    A.    Yeah.

4    Q.    And he's never told you that you're doing

5          anything wrong by filling your prescription at

6          places other than CVS, has he?

7    A.    No.  I'm assuming that they're all legal

8          pharmacies.

9    Q.    Are you still a patient of Dr. Mimms?

10   A.    Yes.

11   Q.    Okay.  Anything that Tony or anybody else at CVS

12         said regarding Dr. Mimms to change your opinion

13         of Dr. Mimms?

14   A.    In the beginning, I questioned; I had doubts.  I

15         went in and looked at everything that I could

16         find online and looked at reviews to make sure,

17         because I had heard about doctors causing deaths,

18         and after my surgery, I woke up in respiratory

19         distress from the medications, and no, I don't

20         want to die by a pill, so yeah, I took -- I had

21         to take a look, I had to take a long look.  But

22         like I said, I've seen other people, and whenever

23         he's concerned about my life as a whole, it

24         changed -- it makes a big difference on my

25         outlook of him.

# **Exhibit 15**

A-000103

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
                         INDIANAPOLIS DIVISION
                CIVIL ACTION NO. 1:15-cv-00970-TWP-MJD


ANTHONY MIMMS, M.D., et al.,   )
                               )
            Plaintiffs,        )
                               )
vs.                            )
                               )
CVS PHARMACY, INC.,            )
                               )
            Defendant.         )
                               )

      _____


            The deposition upon oral examination of

      CLINT THOMAS, PharmD, a witness produced and

      sworn before me, Lisa C. Pierce, a Notary

      Public in and for the County of Hamilton, State

      of Indiana, taken on behalf of the Plaintiffs

      at the LAW OFFICES OF JASON D. MAY, LLC, 9201

      North Meridian Street, Suite 220, Indianapolis,

      Indiana, on May 10, 2016, commencing at the

      hour of 4:03 p.m., pursuant to Applicable Rules

      of Procedure, with written notice as to time

      and place thereof.



               Marsha Traphagan, Court Reporter
                    8122 Folkstone Road
                    Indianapolis, IN 46268
                       (317) 872-4233

```
1                    A P P E A R A N C E S

2

       FOR THE PLAINTIFFS:
3
       Jason D. May
4      LAW OFFICES OF JASON D. MAY, LLC
       9201 North Meridian Street
5      Suite 220
       Indianapolis, IN 46260
6      P: (317) 218-3859
       F: (888) 320-7409
7      E: jason.may@jasonmaylaw.com

8

9      FOR THE DEFENDANT:

10     Jonathan W. Garlough
       FOLEY & LARDNER LLP
11     321 North Clark Street
       Suite 2800
12     Chicago, IL 60654
       P: (312) 832-4500
13     E: jgarlough@foley.com

14

       Hilary B. Dudley
15     CVS HEALTH
       One CVS Drive
16     Mail Code 1160
       Woonsocket, RI 02895
17     P: (401) 770-5649
       F: (401) 216-0622
18     E: hilary.dudley@cvscaremark.com

19

20

21

22

23

24

25
```

1                I N D E X   O F   E X A M I N A T I O N

2

                                                    PAGES
3

     DIRECT EXAMINATION..................
4          Questions by Jason D. May                4

5

6

7                  I N D E X   O F   E X H I B I T S

8

                                                    PAGES
9

     Plaintiffs' Deposition Exhibits:
10       1 - E-mail Subject:  MD's in Indiana    62
         2 - Consumer Complaint..............    72
11       3 - Refusal to Fill Conversation Guide  104

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    diagnosis for a patient, we were told that he no

2    longer worked there.  And, of course, I asked why.

3    And they said that they couldn't give specifics.  But,

4    you know, there was controversy between the partners,

5    and he was no longer with the practice.

6        **Q.    Were you provided a diagnosis code in that**

7    **instance?**

8        A.    I cannot recall.

9        **Q.    Do you know if you filled that prescription?**

10       A.    I cannot recall.

11       **Q.    Do you know when that -- when you would --**

12   **when that call -- you would have placed that call?**

13       A.    Not exactly.  No, I don't.

14       **Q.    Did there come a time where Store 4633**

15   **decided to stop filling controlled substances for**

16   **Dr. Mimms?**

17       A.    Yes.

18       **Q.    When was that time?**

19       A.    I do not know an exact date again.

20       **Q.    Excuse me.**

21       A.    So --

22             MR. MAY:  You can mark this one.

23             (Exhibit 1 was marked for identification,

24              and the following proceedings were had:)

25             THE WITNESS:  Two -- two-and-a-half years

1          ago, approximately.

2          QUESTIONS BY MR. MAY:

3               Q.   Two years ago would be May of '14.   So half

4          would be right about Dec -- November, December of '13?

5               A.   Could have been somewhere around that

6          vicinity, but I can't give you an exact date.

7               Q.   I'm going to ask you to look at the bottom

8          half of what's been marked as Exhibit 1.   For the

9          record there are two e-mails.   This is produced to

10         counsel for the plaintiff as part of CVS's response to

11         Request For Production.

12              MR. GARLOUGH:   Remind you that you have the

13              right to review the entire document before you

14              answer any questions regarding it.

15              THE WITNESS:   Okay.

16         QUESTIONS BY MR. MAY:

17              Q.   I just want to draw your attention to the

18         bottom portion.   It appears to be an e-mail from Alex

19         Zweig.   Am I -- am I pronouncing that right?   Is it

20         Zweig or is it Zweig?

21              A.   Zweig.

22              Q.   Zweig, sorry.   To a Nicole Harrington dated

23         December 17th, 2013.

24              There's a sentence there -- the second

25         sentence, I believe it says, Store 4633 has decided

1    not fill scripts for Anthony Mimms on their own.

2         MR. GARLOUGH:  Object.  Mischaracterizes the

3    document.

4         MR. MAY:  Did I not read it correctly?  Is

5    that what the sentence says?

6         MR. GARLOUGH:  My apologies.  I thought you

7    were reading from the top.  That's correct.

8    QUESTIONS BY MR. MAY:

9         Q.   Looking at the timeframe on this e-mail, does

10   that kind of refresh your recollection as to when the

11   timeframe may have been that you decided -- or Store

12   4633 decided --

13        A.   I was going to say, I did not decide solely

14   that -- that this would happen.  But this sounds like

15   an appropriate timeframe.  You know, in my head I'm

16   thinking two-and-a-half, maybe three years back,

17   something like that.

18        Q.   Okay.

19        A.   So that -- that fits.

20        Q.   Okay.  So you kind of led me to my next

21   question.  Who participated in that decision to make

22   that -- that -- that -- this determination?

23        A.   Okay.

24        Q.   And, well, let me stick with that question

25   first.

1      A.    Who participated in this decision?

2      **Q.    Yes.**

3      A.    Okay.  I mean, it was brought to my attention

4      from one of my staff pharmacists, that she called to

5      get diagnosis, again, for a patient and was spoken to

6      very rudely by a nurse and said, Dr. Mimms is the

7      doctor, you know, and he's a pain specialist; fill the

8      prescription.

9      **Q.    Okay.**

10     A.    So --

11     **Q.    So -- you said a lot there.  Who was the**

12     **pharmacist that brought this to your attention?**

13     A.    My partner, Jen Wilkinson.

14     **Q.    Okay.  Did she say who she spoke to at**

15     **Dr. Mimms' office?**

16     A.    If she did I do not recall.

17     **Q.    Okay.  But she did I -- did she identify the**

18     **person as a -- as a female nurse of some sort?**

19     A.    She said "she."  So it was a female.  I do

20     not know if she was a nurse.

21     **Q.    Do you remember what that prescription --**

22     **prescription was for?**

23     A.    I do not.  She was the pharmacist that took

24     that.  This was me coming in later in the day.  And

25     she came to me and stated, you know, this is what

1    happened.  They won't give me a diagnosis.  I don't

2    feel comfortable filling, you know, this prescription

3    without having a diagnosis.

4         Q.    **When you say "diagnosis" you mean diagnosis**

5    **code?**

6         A.    Not necessarily a code but just a diagnosis

7    of what the treatment's for.  All the codes tell you

8    is -- you know, you can punch in the code, look up a

9    code, and it'll tell you what it is.  But, you know,

10   it's -- it's easier if the nurse or the doctor will

11   just tell you the diagnosis.

12        Q.    **Do you know if that prescription was filled?**

13        A.    I do not.  It was not filled by Jen

14   Wilkinson; I do know that 'cause she refused to fill

15   it.

16        Q.    **Okay.**

17        A.    Because she couldn't get the diagnosis.

18        Q.    **Okay.  Was this the first time --**

19        A.    No.

20        Q.    **-- that CVS had -- was this prior to this**

21   **decision not to fill Dr. Mimms' prescriptions, or was**

22   **this --**

23        A.    This is the catalyst step.

24        Q.    **So this -- this first -- this is the first**

25   **time --**

1    A.    This is not the first time we called to get

2    diagnosis and refused diagnosis.  It was just -- this,

3    like I said, was the catalyst because the nurse was

4    very rude.  I'm assuming she was a nurse; I'm sorry.

5    The female was very rude and told the pharmacist, you

6    know, to fill it because the doctor wrote it, and why

7    do we need a diagnosis?

8    **Q.    Okay.  So what happened after that?**

9    A.    What happened after that is she came to me.

10    **Q.    "She" being Jen Wilkinson?**

11    A.    Jen and discussed that.  Going back to our

12    corresponding responsibility, you know, she then

13    stated, If I can't get a diagnosis and, you know, if I

14    don't like the regimens that are being prescribed, and

15    they can't justify to me why they're prescribing

16    them --

17    **Q.    When you say "they" you're -- you --**

18    A.    Their office.

19    **Q.    This is what she told you.**

20    A.    Right, their office.

21    **Q.    Okay.**

22    A.    Dr. Mimms' staff.

23    **Q.    Okay.**

24    A.    That I don't feel comfortable filling those

25    prescriptions anymore.

1    Q.    Okay.  What, if anything -- what, if

2    anything, did you say?

3    A.    I said, I agree.  I have had the same

4    situations where I've called to get a diagnosis and I

5    have not received, you know, a diagnosis.  Or I've

6    questioned a regimen and then, you know, then talked

7    back to, like, why do you need to know that?

8    So Jen came to me.  I agreed with her.  I

9    then asked my other partners if they had encountered

10   anything of the same.  Everyone had.  So we then

11   collectively decided we will no longer fill

12   prescriptions for Dr. Mimms.

13   Q.    Was that decision under circumstances where

14   they don't give you a diagnosis code or under no

15   circumstances?

16   A.    This, like I said, was, I guess, the straw

17   that broke the camel's back.  Because --

18   Q.    And "this" you're referring to Jen

19   Wilkinson's issue?

20   A.    Correct.  Because, you know, the whole story,

21   honestly, is that Indiana is the number one abuse

22   state of pain medications or was.  I don't know if we

23   still currently are.  So we --

24   Q.    How do you -- how do you know that, by

25   chance?

A-000113

1      A.   How do I know that?

2      **Q.   Yeah.**

3           MR. GARLOUGH:  And I'll again remind the

4      witness not to divulge any information provided by

5      counsel.  But if you know that independent of

6      counsel --

7           THE WITNESS:  I mean, I had -- I had known

8      that independently.

9  QUESTIONS BY MR. MAY:

10      **Q.   How so?**

11      A.   Just Google search.  Okay?  So knowing that

12  Indiana is a high-abuse state, we as pharmacists need

13  to do a better job of protecting our patients and

14  watching, you know, and monitoring and making sure

15  that, you know, we are doing the best for our patients

16  so that, you know, we can help stop this abuse.

17           So with that said -- I don't want to phrase

18  this -- we had a reminder, okay, that we need to do a

19  better job as pharmacists of monitoring.

20      **Q.   When you say "reminder" what are you**

21  **referring to?**

22      A.   I can't divulge, you know, that kind of

23  information.

24           MR. GARLOUGH:  Instruct the witness not to

25      answer.

1           THE WITNESS:  Okay.

2   QUESTIONS BY MR. MAY:

3       Q.    So you were contacted by counsel is what

4   you're saying?

5           MR. GARLOUGH:  You can answer that question.

6           THE WITNESS:  Yes.

7           MR. MAY:  Okay.

8           THE WITNESS:  But not only counsel.

9           MR. GARLOUGH:  That's enough.

10          THE WITNESS:  Okay.

11  QUESTIONS BY MR. MAY:

12      Q.    What was the method of how you were

13  contacted?  Was it --

14          MR. GARLOUGH:  You don't need to answer that

15      question.  I'll instruct the witness not to

16      answer.

17  QUESTIONS BY MR. MAY:

18      Q.    With a phone call?

19          MR. GARLOUGH:  Instruct the witness not to

20      answer.

21  QUESTIONS BY MR. MAY:

22      Q.    Did you get an e-mail?

23          MR. GARLOUGH:  Same instruction.

24  QUESTIONS BY MR. MAY:

25      Q.    Okay.  Was that conversation or that

1    reminder, were there any other parties present besides

2    counsel?

3         A.    I don't know what -- what you're asking

4    there.

5         Q.    **When you said "we," who was the rest of we**

6    **besides counsel?**

7         A.    Pharmacists.

8         Q.    **Okay.  Were they all CVS pharmacists?**

9         A.    Were they all CVS pharmacists?

10        Q.    **Yes.**

11        A.    I assume.

12        Q.    **What's your basis for that assumption?**

13        A.    From the counsel.

14        Q.    **Okay.**

15        A.    But what I want --

16             MR. GARLOUGH:  Let him ask a question.

17             THE WITNESS:  Okay.

18    QUESTIONS BY MR. MAY:

19        Q.    **Other than what your counsel told you, what**

20    **-- what was discussed?**

21             MR. GARLOUGH:  A -- a meeting led by counsel?

22             MR. MAY:  Was -- okay.  So that's -- okay,

23    that's fine.  Thank you.

24    QUESTIONS BY MR. MAY:

25        Q.    **Are you aware that Dr. Mimms filed a**

A-000116

1      **complaint with the Indiana Attorney General's Office?**

2          A.    I am not.  The only thing I know is what I

3      Googled, you know, two or three days ago.

4              (Exhibit 2 was marked for identification,

5               and the following proceedings were had:)

6          MR. GARLOUGH:  We've been going 90 minutes

7      long.  Take a break if that's okay.  Started at

8      four; it's 5:34.

9          MR. MAY:  Yeah, but we're -- we're supposed

10     to end at six, correct?

11         MR. GARLOUGH:  Uh-huh.  Take a quick break.

12         MR. MAY:  Let me at least get through this

13     exhibit.  Because if you're cutting me off at six,

14     you want me to get done by six, I'd prefer not to

15     take a break.  Do you need to use the bathroom or

16     something like that?

17             THE WITNESS:  I could.

18         MR. MAY:  Okay.  Well, we'll take a short --

19     a short break just for the bathroom.

20         MR. GARLOUGH:  Thanks.

21             (Thereupon, after a brief recess,

22              the following proceedings were had:)

23         MR. MAY:  We'll go back on the record.

24     QUESTIONS BY MR. MAY:

25         **Q.    Before we go to what's been marked as**

1    **Exhibit 2, you referred to the situation with Jen**

2    **Wilkinson as a catalyst that broke the -- the straw**

3    **that broke the camel's back.  And you said you,**

4    **yourself, had experienced similar occurrences.  And**

5    **were those occurrences when you called to get a**

6    **diagnosis code?**

7         A.    Those would be when I would call, yes, to get

8    a diagnosis of what the patient -- the -- the problem

9    was so I could check, like, the normal practice or the

10   normal therapy of the drugs that were being

11   prescribed.

12        **Q.    Okay.**

13        A.    So, you know, if it couldn't be given to me,

14   then, in my opinion, it seemed less likely in the

15   usual course of practice.  Or I just -- you know, as

16   pharmacists we want to make sure that the patients are

17   getting the best, appropriate therapy.  It's not our

18   job to diagnose, so, you know, that's the doctor's

19   job.

20             But what our job is is to monitor and make

21   sure that these drug regimens are being given

22   accurately.  And then, like I said earlier, we want to

23   see a decrease as we go along with time compared to,

24   you know, maintaining or even increasing for injury or

25   rehab that should be getting better.

1     Q.    How many times did that occur where you

2     called and --

3     A.    Me personally or --

4     Q.    You.

5     A.    -- my pharmacy?

6     Q.    You personally.

7     A.    I cannot give you a concrete number.  I could

8     tell you it's more than one, you know.  But I couldn't

9     tell you if it was --

10    Q.    More than five?

11    A.    I would say not more than five, no.

12    Q.    Okay.  How many times are you aware of that

13    happening to Jen Wilkinson?

14    A.    I cannot give you a specific number.  I know

15    that it had happened multiple times.  Because she was

16    very upset, you know, that, again, she had called and

17    they had refused.

18    Q.    You said she was upset.  How did you know she

19    was upset?

20    A.    Well, for one, she came to me.  You know, I'm

21    her pharmacy manager.  So I'm, you know, who she comes

22    to.  And she came to me with it.  And, you know, she

23    showed emotion.  She showed that she was, you know,

24    upset by it.

25    Q.    You --

1       A.    And --

2       Q.    **When you say "upset" was she crying?**

3       A.    She was not crying, no.

4       Q.    **Was she mad?**

5       A.    I wouldn't say mad.  I'd say frustrated.

6       Q.    **What, if anything, did she say about the --**

7    **Dr. Mimms' office?**

8       A.    What I had told you.  That she called to get

9    a diagnosis.  Again, I do not know the specifics.

10   You've got to keep in mind this is at least

11   two-and-a-half years ago.

12      Q.    **Okay.**

13      A.    But just going best of my memory, that she

14   had called -- I kind of want to break aside from that.

15   Can I do that real quick?  We also called when a

16   prescription was early, as I had gone to earlier.  And

17   we got similar answers of, well, the doctor wrote it

18   so fill it.

19           So, you know, this time when she called, she

20   was frustrated that she couldn't get a diagnosis.

21   They wouldn't tell her what they were treating for.

22   Therefore she couldn't check to make sure, you know,

23   that this regimen was appropriate.

24      Q.    **Do you remember any of the patients that this**

25   **hap -- that this happened with?**

1          A.    I cannot give you specific patients' names;

2     I'm sorry.

3          Q.    **Okay.  Do you know that that -- this**

4     **happened -- that occurred with other pharmacists?**

5          A.    I do.

6          Q.    **Who were the other pharmacists?**

7          A.    I can -- I can't -- can't put words in

8     anybody's mouth.  I can solely tell you of my

9     experience and that time with Jen Wilkinson because

10    she told me about it.  But, you know, with our

11    collective decision to make that, and I can tell you

12    everyone felt the same.

13          But I don't know how many times they'd called

14    to get diagnosis.  I don't know how many times other

15    pharmacists called to, you know, see why something was

16    early.  I -- I can't give you a specific number.

17          Q.    **Okay.  So your answer -- just to make sure I**

18    **heard you correctly.  You said that all the**

19    **pharmacists, when you spoke about this issue --**

20          A.    Uh-huh.

21          Q.    **-- felt the same way.  But I think my**

22    **question was:  Can you tell me the other pharmacists**

23    **if those occurrences happened with them.  So --**

24          A.    Okay.

25          Q.    **-- no or --**

1          MR. GARLOUGH:  Objection to the form.  You

2     can answer it if you understand.

3          THE WITNESS:  So you're asking me:  Did the

4     other pharmacists experience the same thing that

5     Jen and I experienced?

6          MR. MAY:  Yes.

7          THE WITNESS:  I can say -- I can say that

8     they felt that way 'cause we all collectively

9     agreed that this should take place.  But I -- I

10    cannot speak for them.  I do not recall, you know,

11    a specific incident with either Chris Bills or

12    Jeff Aldridge that, you know, they called.

13    QUESTIONS BY MR. MAY:

14         **Q.   Did -- okay.  So you don't know if it**

15    **happened with them.  But you can say that they agreed**

16    **with the decision to stop filling Dr. Mimms'**

17    **prescriptions.**

18         A.   I can.

19         **Q.   Okay.**

20         A.   But --

21         **Q.   You were -- you were going to say something?**

22         A.   I just was gonna' say, you know, with that,

23    you know, all I can say is my -- my occurrences.  I

24    can't put words in someone else's mouth.

25         **Q.   Okay.**

1     A.    Especially not from two-and-a-half years ago.

2     Q.    Okay.  When did the meeting take place when

3     you all decided, as pharmacists, to stop filling

4     Dr. Mimms' prescriptions?

5     A.    Are you asking me for a specific date?

6     Q.    Yeah.  Do you recall?

7     A.    Do not recall.

8     Q.    Was it -- when in the day do you recall it

9     taking place?

10    A.    Well, I mean, it's not a specific, like, all

11    these pharmacists met.  It was, you know -- I told you

12    we work in threes.  So from that time period of seven

13    to nine, you would have three pharmacists there.

14          So it was not a conversation of, I'm not

15    filling -- I never said this is what I'm saying.  I

16    did -- never said, I'm not filling for Dr. Mimms; what

17    do you want to do?  It was, you know, I have called

18    their office, I have not got diagnosis codes, that

19    sort of thing.

20    Q.    Uh-huh.

21    A.    And I expressed that.  But --

22    Q.    Okay.

23    A.    -- we would work in threes.  So there was

24    never a time where all four of us, you know, had this

25    meeting and declared that, you know, we would not fill

1    for Dr. Mimms.

2        Q.    Okay.  So there wasn't -- there wasn't a

3    collective meeting.  But at some point everybody --

4        A.    Correct.

5        Q.    -- stated that they kind of agreed with

6    the --

7        A.    That is correct.

8        Q.    -- the initial decision made by, I'm

9    assuming, three of -- three of the pharmacists there?

10        A.    Well, like I told you, it started with, you

11    know, Jen coming to me and expressing her phone call

12    and her conversation.  I said that I'd experienced

13    similar and I felt the same way.  But then the next

14    person -- I can't tell you if it was Chris.  I

15    can't -- I don't know if it was Chris or Jeff.  I

16    don't know who I -- who I or Jen or both talked to.

17        Q.    Did you experience these -- did you

18    personally experience similar occurrences with other

19    prescribers as far as getting diagnosis codes?

20        A.    Yes.  I mean, we called different prescribers

21    to get diagnosis codes.  And, I mean, to my

22    recollection every -- every person that I, you know,

23    would talk to would take the time to at least call me

24    back and give me an explanation.

25        Q.    Okay.

1      think you spoke with Alex about Dr. Mimms?

2          A.    You just want, like, a ballpark figure?

3          Q.    Yes.

4          A.    Okay.  I mean, I would say somewhere, five,

5      you know, just rough -- rough number.  If it -- if it

6      was, you know, in any relation to Dr. Mimms, you know,

7      five, six times.

8          Q.    Okay.  Was that telephone? e-mail?  How --

9      how would you typically communicate?

10         A.    Yeah, telephone.

11         Q.    Okay.  And did you initiate the call or did

12     Mr. Zweig?

13         A.    I honestly couldn't tell you.  I mean, I'm

14     trying to be as honest as I can with you.  I -- I

15     don't know.  I don't know if he called me, I called

16     him.  I just -- you know, I know that I've talked to

17     him about it in the past.  That's all I can really

18     say.  I honestly don't know how many times.  I'm just

19     saying -- you wanted a ballpark number, so I gave you

20     a ballpark number.

21         Q.    Okay.  While you were working at the CVS

22     Store 4633, were you ever approached or contacted by

23     representatives of the DEA?

24         A.    While I worked at Store --

25         Q.    At that store.

1      A.    Yes.

2      **Q.    You were?**

3      A.    I was.

4      **Q.    When?**

5      A.    I don't have a timeframe for you.  I just --

6   I can tell you that they were in my store at least

7   three separate occasions that I can recall.

8      **Q.    Why were they in your store on three separate**

9   **occasions?**

10         THE WITNESS:  I'm looking to you, John.  Does

11      that --

12         MR. GARLOUGH:  If you have an independent

13      knowledge, you can answer it.  If what you know is

14      told -- told to you by counsel, then --

15         THE WITNESS:  Okay.

16         MR. GARLOUGH:  -- I'm instructing you not to

17      answer.

18         THE WITNESS:  Okay.  So I can tell you about

19      two times out of the three.  Okay?

20         MR. MAY:  Okay.

21         THE WITNESS:  The first time the DEA officer

22      came in, she came in and asked if there was

23      specific doctors that we had concerns about, you

24      know, that were maybe writing too many narcotics

25      or not in the usual course of practice.  Just any

1          doctors that, you know, we might have concerns

2          about.

3     QUESTIONS BY MR. MAY:

4          **Q.    Okay.  And did -- did you -- did you give her**

5     **a list of doctors?**

6          A.    I did.

7          **Q.    Where did that list of doctors come from?**

8          A.    I mean, again, I hate dragging Jen into this,

9     but Jen was there that day as well.  And we

10    collectively, you know, responded to her with a list

11    of doctors that we, you know, might have questioned or

12    felt that they were writing too many controlled

13    substances.

14         **Q.    How many doctors were on the list?**

15         A.    Cannot give you an exact number.

16         **Q.    More than five?**

17         A.    I would say, ballpark again, five to seven.

18         **Q.    Who came up with the -- was it just you and**

19    **Jen that came up with the list?**

20              MR. GARLOUGH:  Asked and answered.

21              THE WITNESS:  I'm sorry?

22              MR. GARLOUGH:  Asked and answered.  But you

23    can answer again if you understand.

24              THE WITNESS:  Yes.  Jen and I came up with

25    this list because the DEA agent asked us to.

1    QUESTIONS BY MR. MAY:

2        **Q.    Okay.  Did she give you any written materials**

3    **when she came to the store?**

4        A.    She gave me her card.

5        **Q.    A business card?**

6        A.    Correct.

7        **Q.    Did she give you anything else besides a**

8    **business card?**

9        A.    Not that I recall.

10        **Q.    Do you remember that DEA agent's name?**

11        A.    She's female.  Don't quote me on this, but I

12    want to say --

13            MR. GARLOUGH:  If you don't know, the

14        answer's you don't know.

15            THE WITNESS:  Okay.  I can't think of what

16        her name is.  I know what it start --

17            MR. GARLOUGH:  That's fine.

18            THE WITNESS:  -- starts with.

19            MR. GARLOUGH:  That's fine.

20    QUESTIONS BY MR. MAY:

21        **Q.    What does it start with?**

22        A.    M.  But I don't --

23        **Q.    Does Madeline Kuzma sound familiar?**

24        A.    What was it?

25        **Q.    Madeline Kuzma.**

 1          A.    Yes, I believe so.

 2          Q.    **I'll just show it to him and see.  Does**

 3    **that -- does that appear to be the name that you**

 4    **recall?**

 5                 MR. GARLOUGH:  Let the record reflect that

 6          you're showing the witness document marked CVS 5.

 7                 MR. MAY:  Yeah.  We don't have to mark it as

 8          an exhibit.

 9    QUESTIONS BY MR. MAY:

10          Q.    **Is that -- is that her?**

11          A.    Yes.

12          Q.    **Okay.**

13          A.    I believe so.

14          Q.    **Okay.  Did you -- did you retain a copy of**

15    **the list of the doctors that you gave to Madeline?**

16          A.    Not to my knowledge, no.

17          Q.    **Do you know if -- if -- if Jen Wilkinson did?**

18          A.    Again, I can't say for Jen.  But I would say

19    no.  I -- I -- but I don't a hundred percent know that

20    fact.

21          Q.    **Was this the -- was this the first time of**

22    **the two that the DEA came into your store or the**

23    **second?**

24                 MR. GARLOUGH:  Asked and answered.  You can

25          answer again.

1           THE WITNESS:  That was the first time.

2           MR. MAY:  Okay.

3     QUESTIONS BY MR. MAY:

4           **Q.    Did she say -- did -- did Madeline indicate**

5     **to you that she was performing an audit of some sort?**

6           A.    Madeline came to us with concerns.

7           **Q.    Is that what she said to you, "I have**

8     **concerns"?**

9           A.    I can't -- you're asking me about something,

10    again, that was close to three years ago.  I do not

11    know absolute specifics.  All I can do is give you my

12    best memory.

13          But what I recall is that she came to us and

14    asked us for specific doctors that we had concerns

15    about.  And I can tell you that majority of those

16    doctors she was familiar with and had already known

17    about.

18          **Q.    What's your basis for saying that?**

19          A.    Her body language, the head nodding, you

20    know, things like that.

21          **Q.    So walk me through kind of the mech -- the**

22    **mechanics of how you communicated.  Were you just --**

23    **were you all -- did you all sit down and meet for a**

24    **while, or were you just standing there --**

25          A.    No.

1      Q.    -- and you started naming names?  Or --

2      A.    No.

3      Q.    -- how did that take place?

4      A.    This was in the pharmacy.  Again, it was just

5  Jen and I.  And she came in.  She asked me first about

6  it 'cause I was the pharmacy manager.  I gave her a

7  couple, three names.  I -- I don't know a specific

8  number.  And then, you know, Jen -- she asked Jen.

9  And Jen agreed with those names.  And then

10  collectively, you know, we gave a few more.

11          And, like I said, she nonverbally head

12  nodded, things like that.  But, you know, she did

13  state, yes, I'm familiar with this doctor.  So --

14      Q.    Okay.  Was Dr. Mimms one of the names you

15  gave her?

16      A.    Yes.

17      Q.    Okay.  Was that the doctor she indicated that

18  she was familiar with or was it another one?

19      A.    I don't a hundred percent remember which

20  doctors it was.  But, you know, I -- I believe so.

21      Q.    Okay.

22      A.    I believe, yes, she was very familiar with

23  his name.

24      Q.    Okay.  How much time elapsed between the

25  second time she was in the store?

1          A.    If I had to guess I would say eight months to

2    a year.    Maybe six months to a year.

3          **Q.    Was it the same lady?**

4          A.    Same lady.

5          **Q.    Okay.**

6          A.    The first time she had someone with her; the

7    second time she did not.

8          **Q.    Who did she have with her?**

9          A.    I do not know.    But they took notes for her.

10         **Q.    Did that person identify themselves as being**

11   **from the DEA?**

12         A.    I -- I mean, it would have had to have been.

13   But I -- I don't recall.

14         **Q.    And you don't know -- do you know the name of**

15   **this other person?**

16         A.    I do not.

17         **Q.    First letter of they're name?**

18         A.    Nothing.

19         **Q.    Okay.**

20         A.    So -- I don't even remember, like you said,

21   their name.    I don't.

22         **Q.    How long did you meet for them in the first**

23   **visit?**

24         A.    First visit was probably around an hour and

25   15 minutes, hour-and-a-half.    They -- they were in

1      A.    The same thing that we've discussed earlier.

2    You know, multiple pain drugs.   No decreases in, you

3    know, quantities or frequencies.   Then the -- the, you

4    know, early fills.   Things like that.   Not getting

5    diagnosises (sic).   So all the same concerns.

6      **Q.    Did you tell Madeline Kuzma -- well,**

7    **scratch -- scratch that.   Was this before or after you**

8    **had made the decision to stop filling Dr. Mimms'**

9    **prescriptions?**

10      A.    This -- the first -- her first visit was

11    definitely before.

12      **Q.    Okay.   Do you know how -- how much before?**

13      A.    I don't.   Honestly I don't.

14      **Q.    Do you remember what season it was when she**

15    **came in?**

16      A.    I don't.

17      **Q.    Was the second visit after -- after you had**

18    **stopped filling Dr. Mimms' prescriptions?**

19      A.    Again, timeframe.   I -- I don't know this

20    whole timeframe.   I can't honestly answer.   I don't

21    know if it was before or after.   I believe it was

22    before.   But I don't a hundred percent know that.

23          MR. GARLOUGH:   You're asking about the second

24      visit?

25          MR. MAY:   The second visit I'm asking, yeah.

1    QUESTIONS BY MR. MAY:

2        **Q.    And at -- in either the first or second**

3    **visit, did she give -- well, strike that.**

4            **In the second visit did she give you any**

5    **paperwork or documents?**

6        A.    Not that she handed me.  But in the second

7    visit she wanted, like, specifics.  She asked me to go

8    pull specifics, and then she made copies and took them

9    with her.

10       **Q.    Okay.  Specific what?**

11       A.    Pers -- specific hardcopy, like,

12   prescriptions that different doctors had written.

13       **Q.    How many different doctors?**

14       A.    Again, I can't be sure.  I've -- if I had to

15   ballpark, I would say three, four.

16       **Q.    Okay.  Was Dr. Mimms one of those doctors?**

17       A.    Yes.

18       **Q.    Okay.  And you made copies of the**

19   **prescriptions and gave them to her and she left with**

20   **them?**

21       A.    Correct.  And then I put them back in their

22   correct spot.

23       **Q.    Okay.  How long was the second visit?**

24       A.    Not near as long as the first.  I mean, she

25   came in with, like, a point:  This is what I need.

1        I can't give you an actual timeframe.  I just

2    remember I was very busy.  I remember her coming in

3    telling me she needed this.  And she apologized for,

4    you know, interrupting me, what I was doing.  So I

5    remember being much quicker because I handed them to

6    her.  She cop -- you know, we made copies.  And then

7    she was out.

8        Q.    Do you know the approximate time or date and

9    time of the second visit?

10       A.    I don't.

11       Q.    Okay.  You referenced a third visit.  Was

12   that when she -- did she come to the store a third

13   time?

14            MR. GARLOUGH:  And, again, I'm going to

15       remind the witness not to answer any questions

16       that your sole knowledge comes from counsel.  If

17       you have an independent knowledge, you're welcome

18       to answer.

19            THE WITNESS:  Okay.  It was not Madeline the

20       third time.  That's all I can say.

21   QUESTIONS BY MR. MAY:

22       Q.    Okay.  I don't want to get into the substance

23   of -- of your -- your conversations with counsel.  But

24   you're telling me another DEA agent, not -- not

25   Madeline, walked into your store a third time.

A-000135

1      Q.    Take a moment and review it.

2            MR. GARLOUGH:  I'll advise you that there's

3      four pages to the document.  So make sure you take

4      a look at --

5            THE WITNESS:  Okay.

6            MR. GARLOUGH:  -- all four pages before you

7      answer any questions.

8            THE WITNESS:  Thank you.

9      QUESTIONS BY MR. MAY:

10           Q.    With respect to the first two, I just have

11     some very general questions about it.  I'll represent

12     that those are CVS production documents, I believe

13     it's 9 through 12?

14           A.    Yes.

15           Q.    Mr. Thomas, have you ever seen the first two

16     pages of those documents before?

17           A.    Yes, I have.

18           Q.    Where have you seen them?

19           A.    At work, CVS.

20           Q.    See them online?  Were they handed to you?

21     Hardcopy format?

22           A.    I mean, again, you're asking me to remember

23     something.  I -- I remember seeing them.  I don't know

24     if it was, you know, e-mail or hardcopy like this.  I

25     would state e-mail if -- but I -- I -- honestly, I'm

1      prescriber's under investigation, you know.  So that's

2      what I'm referring to.  Have I used, like, phrases,

3      you know, or words of that?  Yes.  But I've never,

4      like, said that, not to a customer.

5          **Q.    Okay.  What's your understanding of what a**

6      **pill mill is?**

7              MR. GARLOUGH:  You're asking his own personal

8          understanding?

9              MR. MAY:  His -- his personal understanding.

10             THE WITNESS:  A pill mill is a doctor that

11         writes, you know, controlled medications,

12         basically, not for a legitimate purpose.  They're,

13         in my opinion, doing it for a personal gain.

14     QUESTIONS BY MR. MAY:

15         **Q.    What would that personal gain be?**

16         A.    Whether it be money compensation or some

17     other sort of compensation, you know, from their

18     patients.

19         **Q.    Okay.  Is it your understanding that**

20     **operating a pill mill is illegal?**

21             MR. GARLOUGH:  Objection, calls for a legal

22         conclusion.

23             MR. MAY:  You can answer that question.

24             THE WITNESS:  Is it illegal to run a pill

25         mill?

# Exhibit 23

A-000138

███████████████████
March 14, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CIVIL ACTION NO.: 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.,)
                           )
         Plaintiff,        )
                           )
    vs.                    )
                           )
CVS PHARMACY, INC.,        )
                           )
         Defendant.        )


     The deposition upon oral examination of
██████████████████ a witness produced and
sworn before me, Linda C. Callahan, a Court
Reporter and Notary Public in and for the County
of Hamilton, State of Indiana, taken on behalf of
the Defendant in the offices of Barnes & Thornburg
LLP, 11 South Meridian Street, 2nd Floor
Conference Center, Indianapolis, Marion County,
Indiana, on the 14th day of March, 2016,
commencing at 8:15 a.m., pursuant to the Federal
Rules of Civil Procedure, and by Notice of the
parties and subpoena of the witness as to time and
place thereof.




STRATOS LEGAL SERVICES, LP
4295 San Felipe, Suite 125
Houston, Texas  77027
(713) 482-2180

March 14, 2016

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

     FOR THE PLAINTIFF:
 3   LAW OFFICES OF JASON D. MAY, LLC
     BY:  JASON D. MAY, ESQ.
 4   92301 N. Meridian Street
     Suite 220
 5   Indianapolis, IN  46260
     jason.may@jasonmaylaw.com
 6

     FOR THE DEFENDANT:
 7   FOLEY & LARDNER LLP
     BY:  JONATHAN W. GARLOUGH, ESQ.
 8   321 N. Clark Street
     Suite 2800
 9   Chicago, IL  60654-5313
     jgarlough@foley.com
10

     ALSO PRESENT VIA VIDEO CONFERENCE:
11   Hilary B. Dudley, Esq.
     CVS Health
12   Legal Department

13

14      I-N-D-E-X   O-F   E-X-A-M-I-N-A-T-I-O-N

15                                   PAGE

16

     BY MR. GARLOUGH:              4, 154
17   BY MR. MAY:                   140, 163

18

19

20

21

22

23

24

25
```

Stratos Legal Services
800-971-1127

March 14, 2016

1    ▮▮▮▮▮▮▮▮▮▮▮▮

2    the witness herein, having been first duly sworn

3    to tell the truth, the whole truth, and nothing

4    but the truth relating to said matter, was

5    examined and testified as follows:

6

7    DIRECT EXAMINATION,

8         QUESTIONS BY MR. GARLOUGH:

9              MR. GARLOUGH:  Good morning, ▮▮▮▮▮

10   my name is Jonathan Garlough, I'm an attorney for    08:17

11   CVS Pharmacy in this case.

12   Q.   I understand, we were talking before this

13        deposition, that your name is no longer ▮▮▮▮

14   ▮▮▮▮ is that correct?

15   A.   Right.  It's ▮▮▮▮

16   Q.   Would you mind spelling that for the court

17        reporter?

18   A.   ▮▮▮▮▮▮

19   Q.   Okay.  ▮▮▮▮  have you ever been deposed before?

20   A.   No.

21              MR. GARLOUGH:  So I'd like to go over

22   some ground rules with you, just so that we're all

23   on the same page while we go through the

24   deposition today, okay?

25              THE WITNESS:  Okay.

Stratos Legal Services
800-971-1127

March 14, 2016

1   A.   When they -- CVS refused to fill my prescription,

2        and when I inquired as to why they refused to

3        fill my prescription, I was told that Dr. Mimms

4        had been arrested, and if he wasn't, he was about

5        to be and that I needed to find a new doctor, and

6        I found that very upsetting, and that's a quote.

7   Q.   Is there anything else that you meant by incurred?

8   A.   No.

9   Q.   Other than your conversation with Mr. May, have

10       you discussed your deposition today or this case     08:30

11       with anybody else?

12  A.   When this happened back in March of last year.

13  Q.   Okay.

14  A.   My brother originally tried to fill my

15       prescription for me because I couldn't -- was

16       going to be out for a couple of days.  He's the

17       one, my brother, ███████████ was told that it

18       could not be filled, that my doctor was under

19       investigation, and so he called me and told me

20       this, and a couple days later, I went to my CVS     08:31

21       and I was told what I just quoted you.  And the

22       next day, I had an appointment with Dr. Mimms,

23       and I thought I would find out then what was

24       going on.  So I talked to my brother about it

25       when this happened.

A-000142



March 14, 2016

Page 110

1    you walked in?

2  **A.   Yeah, I always walked -- yeah, I tried to walk in**

3     **there.**

4  Q.   Was there a line in front of you or --

5  **A.   No.**

6  Q.   So you went there, you presented your prescription

7     for Percocet.

8  **A.   That's correct.**

9  Q.   And then what happened?

10 **A.   I was told they couldn't fill it.**                    10:45

11 Q.   All right.  Did they go back to see a list or do

12    anything, or did it happen right away?

13 **A.   At that time, I just remember the second**

14    **gentleman walking over, so I don't know if he**

15    **motioned over or if he heard the conversation**

16    **that we were having.**

17 Q.   Okay.  So the person you presented the

18    prescription to --

19 **A.   To.**

20 Q.   -- was that the same person who told you that they  10:45

21    couldn't fill the prescription?

22 **A.   Yes.**

23 Q.   And what did he say?

24 **A.   He said he could not fill Dr. Mimms'**

25    **prescription, and that's when the other gentleman**

March 14, 2016

Page 111

1       **walked over.**

2     Q.   Okay.  And then what happened, did you say

3          something in response?

4     **A.   I said, why not.**

5     Q.   Okay.  And what happened next?

6     **A.   What happened next was I was told that Dr. Mimms**

7          **had been arrested or was about to be arrested.**

8     Q.   And the person told you that?

9     **A.   One of the two, either -- one of those two -- two**

10        **men.**                                        10:46

11    Q.   You can't recall --

12    **A.   Which one is which, I can't.  I can picture them**

13        **but I can't --**

14    Q.   Okay.  Can you describe to me the person you

15        presented the prescription to, please.

16    **A.   He had dark hair, lean, but then they both are**

17        **lean built.  They're both similar built, for that**

18        **matter.**

19    Q.   Caucasian, African-American?

20    **A.   Caucasian.**                                 10:46

21    Q.   Okay.  And again, to focus your attention, this is

22        the person you presented your Percocet

23        prescription to, okay?

24    **A.   Right, but I -- I can't separate the two.  They**

25        **were both standing there.  I can't -- it's been a**

███████████████████████

March 14, 2016

Page 114

1  A.   ████████████████

2  Q.   Okay, thank you.  Anybody other than ██████?

3  A.   No.

4  Q.   No other patient that you could see?

5  A.   The store is never busy.

6  Q.   Okay.  So you presented your prescription to the

7       pharmacist, and he told you we can't fill for Dr.

8       Mimms.  You said, why not, and what did they say?

9  A.   They told me that Dr. Mimms had been arrested or

10      was about to be arrested if he wasn't already.      10:49

11 Q.   Did they they explain that further?

12 A.   I said why, and they says, same as everyone else,

13      you have a prescription.

14 Q.   Okay.  Did you understand what they meant by

15      everyone else?

16 A.   Yeah, because it was all in the news.  It seemed

17      like there had been several doctors in that --

18      maybe that month or two-month period that was in

19      the news.

20 Q.   So you were familiar, this is an ongoing story?    10:49

21 A.   Yeah, the -- this was happening, it seems like --

22      if I remember, it seems like there was two or

23      three doctors, like just, boom, boom, boom, the

24      first of the year that had been arrested.

25 Q.   And they told you that he was arrested or soon to

A-000145

March 14, 2016

Page 120

1    manufacturer which is why it's a different color

2    or a different shape, so I have had those

3    conversations.

4    Q.    You understand that part of the role of the

5          pharmacist is to provide counseling and

6          instruction on how to use a prescriptions?

7    A.    That's correct.

8    Q.    Okay.  And when you had those conversations with

9          the pharmacist, you were relying on their advice

10         and counseling on medication usage?                10:56

11   A.    That's correct.

12   Q.    And that's a -- there's a relationship there

13         between you and your pharmacist over the subject

14         matter of the prescription drugs you're taking;

15         right?

16   A.    That's correct.

17   Q.    And you look to the pharmacist to provide advice

18         on how to use that --

19   A.    I trust them --

20   Q.    Right.                                             10:56

21   A.    -- to know what -- that I have the right, proper

22         drugs and that's exactly what was prescribed, and

23         I will question if the bottle says something

24         different than what I was told at the doctor's

25         office.

A-000146

March 14, 2016

Page 121

1   Q.   Okay.

2   A.   I have always -- yes.

3   Q.   Okay.  And you're right, that's -- I think the way

4        you put it was really well, was really

5        appropriate, it's a relationship, trust as it

6        relates to filling prescriptions?

7   A.   That's correct.

8   Q.   You rely on them to --

9   A.   I rely on them, trust them.

10  Q.   Okay.  So after you attempted to fill your         10:57

11       prescription for Percocet and did fill your

12       prescriptions for the other drugs identified in

13       Exhibit 5, you had an appointment with Dr. Mimms

14       the next day?

15  A.   That's correct.

16  Q.   Did you tell Dr. Mimms about what happened during

17       that visit?

18  A.   I did.

19  Q.   What did you say to Dr. Mimms?

20  A.   I told him word for word what I was told.          10:57

21  Q.   When you say what you were told --

22  A.   What I was told by CVS.

23  Q.   Okay.  Let me back up.  Did you tell him what your

24       brother told you?

25  A.   I don't remember.  Yes, I think I did, actually.

March 14, 2016

Page 124

1    **basically they were telling me I needed to find a**

2    **new doctor, so they were taking his patients,**

3    **telling me to go elsewhere, and I found that a**

4    **very, very uncomfortable situation.**

5    Q.   You continue to see Dr. Mimms; is that correct?

6    **A.   That's correct.**

7    Q.   Have you gone to see any other pain medication

8         doctors --

9    **A.   No.**

10   Q.   -- since March of 2015?                          11:01

11   **A.   No.**

12   Q.   So you're still seeing Dr. Mimms?

13   **A.   That's correct.**

14   Q.   Do you know whether your contract with Dr. Mimms

15        requires you to see Dr. Mimms and only Dr. Mimms?

16   **A.   I know that I can't go to another doctor for**

17        **narcotic medication, but whether I can only see**

18        **him as a pain doctor, I -- I don't know.**

19   Q.   Yeah, you're right.  You know, I didn't ask that

20        very well.  Let me try to ask that better.  If you  11:01

21        wanted to today, and you wanted to see a different

22        pain medication doctor for whatever reason, you

23        didn't like the smell in Mr. Mimms' office, you

24        didn't like the paint on his outside walls,

25        whatever --

A-000148

March 14, 2016

Page 125

1   A.    Uh-huh.

2   Q.    -- you could do that; right?

3   A.    Change doctors?  Yes.

4   Q.    You would have to presumably inform Dr. Mimms so

5         that you could get your controlled substance

6         prescriptions from a new doctor, but you could do

7         that; right?

8   A.    Correct.

9   Q.    So in March of 2015 -- after March of 2015, after

10        March 4th of 2015, in your conversation with the      11:02

11        CVS pharmacist or technician, if you wanted to,

12        you could have gone and seen another doctor;

13        right?

14  A.    That's correct.

15  Q.    You chose to stay with Dr. Mimms?

16  A.    That's correct.

17  Q.    All right.  Did you ever talk with your brother

18        David after your conversation with CVS on

19        March 4th about that incident?

20  A.    He wanted to know what I found out.                    11:02

21  Q.    David wanted to know?

22  A.    Yeah.  He was curious.

23  Q.    Okay.  So he called you, you called him?

24  A.    He was at my house every day, so it was just in

25        general conversation.

March 14, 2016

Page 129

```
 1       has been arrested or you need to see a new doctor

 2       or anything like that?

 3  A.   No.

 4  Q.   So March 4th, that's the only time we're talking

 5       about?

 6  A.   That's correct.

 7  Q.   Okay.  Did the pharmacist, on March 4, 2015, say

 8       that Dr. Mimms was under investigation?

 9  A.   He said that he had been arrested or was about to

10       be arrested.                                        11:13

11  Q.   Okay.

12  A.   And when I asked him what for, he said, for the

13       controlled substances, was -- had been under

14       investigation, I believe he used the word

15       investigation, actually, that the -- for

16       controlled substances.

17  Q.   Okay.  You just recalled that now?

18  A.   Yeah, it seems like that's -- that is the word

19       that he used, but after he told me he had been

20       arrested or was about to be arrested.             11:13

21  Q.   Okay.  Did you tell Dr. Mimms that the pharmacist

22       or technician had said Dr. Mimms was under

23       investigation?

24  A.   I don't think so.  I think I was more concerned

25       with the fact that he was arrested or was about
```

Stratos Legal Services
800-971-1127

A-000150

March 14, 2016

Page 132

1    Q.    Thank you.  Showing you a document marked as

2           Exhibit 9.  Does -- I'll represent to you that

3           this is a business card presented to a CVS store.

4           Does looking at this card and this name refresh

5           your recollection?

6    **A.**    **No.**

7    Q.    Is it safe to say that the CVS statements made to

8           you regarding Dr. Mimms haven't changed your

9           opinion about him?

10   **A.**    **About what, about who?**                   11:17

11   Q.    About Dr. Mimms.

12   **A.**    **No.  My thought is that his office was open, and**

13          **it's been a year.  I don't see a reason to**

14          **change.**

15   Q.    Okay.  Just to be clear, what I asked you was

16          whether the statements that the pharmacist or

17          technician made regarding Dr. Mimms on the 4th

18          have changed your opinion of Dr. Mimms.

19   **A.**    **No.**

20   Q.    And it's safe to say that because -- this is       11:18

21          inherent to something you told me already -- that

22          the statements by the pharmacist or the technician

23          regarding Dr. Mimms on March 4th, as far as you

24          know, haven't changed the opinion of anybody else

25          regarding Dr. Mimms?

A-000151

███████████████████████

March 14, 2016

Page 147

1   A.   Seems like one wears glasses but not necessarily

2        all the time, so he may have contacts.  I've been

3        trying to think about it.

4   Q.   Okay.  When as you were being asked questions

5        about your reliance on the pharmacies -- the

6        pharmacist or the technicians to discuss your

7        medications with you, would it be fair to say you

8        rely or you placed a greater reliance on your

9        doctors who prescribed you the medicines or the

10       pharmacists who fill the prescription?              11:48

11  A.   Both.

12  Q.   Okay.

13  A.   I have to -- okay.  Because of everything I have

14       been through, I have had to have a complete trust

15       in my doctors and my team of doctors working

16       together.  The same goes with my pharmacist and

17       the drugs, to make sure I don't have an

18       interaction.  At one point -- from 2003 to 2010,

19       at one point, I was on as many as 26

20       prescriptions.  I had to have faith in the         11:49

21       pharmacist to make sure that the interactions

22       were not there with those drugs.

23  Q.   And as it pertains to your pain, is it fair to say

24       your pain spikes if you're not on a

25       properly-regimented pain medication; is that

A-000152

# **Exhibit 24**

A-000153

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANTHONY MIMMS, M.D. and     )
MIMMS FUNCTIONAL            )
REHABILITATION, P.C.,       )
                            )
            Plaintiffs      )
                            )
        -v-                 ) CAUSE NO.
                            ) 1:15-cv-00970-TWP-MJD
CVS PHARMACY, INC.,         )
                            )
            Defendant       )


        The deposition upon oral examination of
ALEXIS FIELDS, a witness produced and sworn before
me, Marsha A. Traphagan, Notary Public in and for the
County of Marion, State of Indiana, taken on behalf
of the Plaintiffs at the offices of Jason D. May,
9201 North Meridian Street, Suite 220, Indianapolis,

Indiana, on May 17, 2016, pursuant to the Indiana

Rules of Trial Procedure.




            Marsha A. Traphagan

            8122 Folkstone Road

        Indianapolis, IN  46268

            (317) 872-4233

A-000154

```
            A P P E A R A N C E S
            - - - - - - - - - - -


    FOR THE PLAINTIFFS:
         Jason D. May
         Attorney At Law
         9201 North Meridian Street
         Suite 220
         Indianapolis, IN  47260


    FOR THE DEFENDANT:
         FOLEY & LARDNER
         Jonathan W. Garlough
         321 North Clark Street
         Suite 2800
         Chicago, IL  60654
             and
         Attorney At Law
         Hilary B. Dudley
         One CVS Drive
         Woonsocket, RI  02895
```

```
                      I N D E X
                      - - - - -
                                                   Page
                                                   ----
DIRECT EXAMINATION
        Questions By:  Mr. May                       4

CROSS-EXAMINATION
        Questions By:  Mr. Garlough                 35

REDIRECT EXAMINATION
        Questions By:  Mr. May                      39

RECROSS-EXAMINATION
        Questions By:  Mr. Garlough                 41

REDIRECT EXAMINATION FURTHER
        Questions By:  Mr. May                      43


Plaintiffs' Exhibit(s) Fields 1                     19
        Talking Points
```

1    Q  Have you ever been told by anyone that Dr. Anthony

2       Mimms is under investigation by the DEA?

3    A  Yes.

4    Q  Okay.  Who told you that?

5    A  I don't remember.

6    Q  Were you told while you were at work?

7    A  Yes.

8    Q  Were you ever told that as a result of Dr. Anthony

9       Mimms being under DEA investigation that CVS would

10      not fill his prescriptions for controlled

11      substances?

12   A  No.

13   Q  Is it your understanding, and I'm asking your

14      opinion, that a doctor who was under DEA

15      investigation is a bad doctor?

16         MR. GARLOUGH:  Object to the form.

17   A  No.

18   Q  Why not?

19   A  Because if he was bad, he wouldn't be filling

20      prescriptions.  Well, be able to write

21      prescriptions.

22   Q  With respect to Dr. Anthony Mimms, have you ever

23      advised any patient that he prescribes for that he

24      was under DEA investigation?

25   A  Well, what do you mean, like --

1    Q   Did you ever tell one of Dr. Mimms' patients he was

2        under DEA investigation?

3    A   Yes.

4    Q   Do you know who that patient was?

5    A   ███████████

6    Q   Why did you tell ████████████    Dr. Mimms was under

7        DEA investigation?

8    A   Well, when she came in for her prescription, she

9        was upset, and she was upset because she went

10       somewhere, I guess went to where his office used to

11       be, and she told me he just closed up.  She said

12       she didn't have a notice, and she went to every

13       pharmacy down there, and nobody would fill for him.

14       And I said, well -- I just said, maybe because he

15       is under investigation from the information that

16       she gave me, but I still filled her prescription

17       and, you know, that was it.

18   Q   Okay.  When was this?

19   A   I don't remember.  I just -- I know it.  There

20       wasn't no snow and I know it was cold.

21   Q   Was this after you came back from maternity leave?

22   A   No, while I was pregnant.

23   Q   Okay.  So before you left in April?

24   A   Yes.

25   Q   Okay.

1    MR. GARLOUGH:  April?

2    MR. MAY:  2013.  Sorry.

3    MR. GARLOUGH:  Okay.

4  Q  Okay.  Did Ms. ████ tell you why his store was --

5     strike that.  Did Ms. █████ tell you where Dr.

6     Mimms' office was located?

7  A  No.  She just said she went somewhere where his

8     office was, and she just came up here because she

9     had a hard time filling her prescription, and his

10    office wasn't open anymore, and she was just

11    frustrated about that and I -- you know, I said I'd

12    take care of her, fill her prescription.

13 Q  Do you know where she originally tried to fill her

14    prescription?

15 A  No.

16 Q  Do you know if it was another CVS location?

17 A  No.

18 Q  Did you receive a phone call from another CVS

19    location with respect to Judith Mason's

20    prescriptions?

21 A  No.

22 Q  Did Ms. ██████ tell you why Dr. Mimms' store was

23    closed?

24 A  No.  She told me she didn't know.  She said it was

25    like out of nowhere.  That is the impression she

1     gave me.

2    **Q**  **Okay.  So I guess my question is, why did you**

3        **correlate her telling you his store was closed to**

4        **Dr. Mimms being under DEA investigation?**

5    A  I never heard of a, anybody just closing up a place

6        without notifying their patients, because she never

7        told me -- I asked her, did she know anything about

8        it, and she said no.

9    **Q**  **So, again, what was your basis for connecting a DEA**

10       **investigation to those facts?**

11      **MR. GARLOUGH:**  Objection.  Asked and answered.

12   A  Because she said that they closed up for no reason,

13       like it disappeared.

14   **Q**  **So I'm still trying to get how you get DEA**

15      **investigation out of that, is what I'm trying to**

16      **figure out.**

17      **MR. GARLOUGH:**  Object to the form.  Objection.

18      Asked and answered.

19   A  If a doctor just up and disappears for no reason,

20      what would you think?

21   **Q**  **I'm sorry, I'm asking.  The way this works is I**

22      **have to ask you the questions.**

23   A  I'm just like she -- if you go see a pain

24      specialist all the time, and you never have a

25      problem, and he up and disappears, so that's why I

1    said that because she was like upset because she

2    said she never had a problem or anything, and she

3    said that nobody didn't notify her or anything, so

4    I just said that, just like I was throwing out

5    there maybe that could be it, maybe not, like.

6  **Q  Did you say maybe not?**

7  A  I told her probably, like I said, that he probably,

8     probably because he was under investigation.  I

9     told her I don't know.

10 **Q  Did you tell her where you had heard --**

11 A  No.

12 **Q  -- that he was under investigation?**

13 A  No.

14 **Q  Do you recall if you had heard Dr. Mimms was under**

15    **investigation that day or sometime prior to Judith**

16    **Mason coming in to fill a prescription?**

17        **MR. GARLOUGH:**  Objection.  Foundation.  I

18    don't think it's been established that she heard

19    before the conversation with Ms. █████████

20 A  I heard before Ms. ██████ came in.

21 **Q  Okay.  Did you hear it from another CVS employee?**

22 A  Yes.

23 **Q  Okay.  Do you know the name of that employee?**

24        **MR. GARLOUGH:**  Objection.  Asked and answered.

25 A  I don't remember.

1   Q   And were you saying that for the purpose of harming

2       Dr. Mimms' reputation?

3   A   No.

4       **MR. MAY:**   Objection.  Asked and answered.

5   Q   Why did you say it?

6   A   Because when she told me -- because she told me

7       that his office just basically disappeared to her.

8   Q   Were you trying to comfort Ms. █████████

9   A   Yes.

10  Q   Were you trying to come up with a hypothesis as to

11      why his office possibly could have closed?

12      **MR. MAY:**   Objection.  Asked and answered.

13  A   Yes.

14  Q   Do you recall Mr. May asking you if a doctor was a

15      bad doctor because they were under DEA

16      investigation?

17  A   Yes.

18  Q   The record will reflect what you said, but do you

19      recall -- well, is it your view that a doctor would

20      be a bad doctor if they could not write

21      prescriptions?

22  A   Yes.

23  Q   Okay.  So earlier doctor or, excuse me, Mr. May

24      asked you if a doctor was a bad doctor if they were

25      under investigation, and you provided two different

# Exhibit 17

A-000163

March 14, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CIVIL ACTION NO.: 1:15-cv-00970-TWP-MJD

ANTHONY MIMMS, M.D. et al.,)
                           )
        Plaintiff,         )
                           )
    vs.                    )
                           )
CVS PHARMACY, INC.,        )
                           )
        Defendant.         )


    The deposition upon oral examination of
███████████████████████, a witness produced and
sworn before me, Linda C. Callahan, a Court
Reporter and Notary Public in and for the County
of Hamilton, State of Indiana, taken on behalf of
the Defendant in the offices of Barnes & Thornburg
LLP, 11 South Meridian Street, 2nd Floor
Conference Center, Indianapolis, Marion County,
Indiana, on the 14th day of March, 2016,
commencing at 8:15 a.m., pursuant to the Federal
Rules of Civil Procedure, and by Notice of the
parties and subpoena of the witness as to time and
place thereof.




            STRATOS LEGAL SERVICES, LP
            4295 San Felipe, Suite 125
             Houston, Texas  77027
                (713) 482-2180

A-000164

March 14, 2016

Page 103

1   A.   **No.  I actually had a standing appointment on the**

2        **5th.**

3   Q.   Okay.  Did you attempt to present your

4        prescriptions to any pharmacy between the time

5        your brother called you and the 5th?

6   A.   **I did.**

7   Q.   Where did you go?

8   A.   **I went to my CVS in McCordsville.**

9   Q.   Is that the McCordsville address that we looked at

10       before?                                          10:37

11  A.   **That's correct.**

12  Q.   Okay.  And when did you do that?

13  A.   **On the 4th.**

14  Q.   On the 4th.  March 4, 2015?

15  A.   **That's correct.**

16  Q.   Okay.  And when did you go, nighttime,

17       daytime, morning?

18  A.   **I normally am not out at night, so it would have**

19       **been sometime in the afternoon.**

20  Q.   Do you have a recollection of it being in the      10:37

21       afternoon, or are you guessing based on your sort

22       of schedule?

23  A.   **Very rarely am I out at night, especially in the**

24       **winter, and I am not out in the mornings, so you**

25       **are an exception to the rule.  I normally don't**

A-000165

March 14, 2016

Page 106

1    A.    Yeah, yes.

2    Q.    So you went in, you think that afternoon, and what

3          did you do?

4    A.    I went in and went to the counter to drop off my

5          pain medication prescription.

6    Q.    This is the pharmacy counter?

7    A.    This is -- the pharmacy counter is divided

8          between pick-up and drop-off.  I went to the

9          drop-off counter first, which is what I always

10         do --                                          10:40

11   Q.    Right, I'm with you.

12   A.    -- to drop off the new prescription for the

13         Percocet, and that's when I had my discussion

14         with the pharmacy -- with the technician or --

15   Q.    Okay, all right.  So do you know whether you spoke

16         with a pharmacist or a technician?

17   A.    I'm not sure -- I always dealt with two of the

18         gentlemen behind the counter.  Whether they were

19         a pharmacist or a technician, I'm not sure.

20   Q.    And do you recall their names, the gentlemen that  10:41

21         you --

22   A.    I want to say -- I don't want to be wrong, but I

23         think one was Ryan, and I want to say Eric, but I

24         don't know that that's right.

25   Q.    Okay.  These are folks that you saw normally?

A-000166

March 14, 2016

Page 107

1   A.   Yes.

2   Q.   And I should have asked you this before, I

3        apologize; how frequently did you go to fill your

4        prescriptions, you personally?

5   A.   I did most, I did most of them.

6   Q.   Right.

7   Q.   It was on occasion, if I was having a bad time

8        getting out that --

9   Q.   If you're snowed in?

10  A.   Someone else would pick -- correct, pick them up.   10:42

11  Q.   Right.

12  A.   If they were coming to my house, they would pick

13       them up.

14  Q.   But how frequently was that, once a week?

15  A.   That they did that?

16  Q.   No, no, for you.  I'm just trying to figure out

17       how often you're going to CVS; once a week, once a

18       month, three times a week?

19  A.   Because the insurance will not release medication

20       but like every 30 days, so I may be there three     10:42

21       times a month, it could have been five times a

22       month, depending on that -- if made them wait, so

23       I would pick up three or four at a time or --

24  Q.   So you're seeing a pharmacist fairly regularly?

25  A.   On a regular basis.

A-000167

March 14, 2016

Page 108

1    Q.    And were you on a first-name basis with any of

2          those folks?

3    A.    **Not at McCordsville.**

4    Q.    That was your home base; right?

5    A.    **That's where I ended up at the end, yeah, at**

6          **McCordsville.**

7    Q.    At this time period we're talking about, March of

8          2015, that's your home base?

9    A.    **Yes.**

10   Q.    How long had that been your home base pharmacy?        10:43

11   A.    **About a year.**

12   Q.    Okay.  So a rough net, right; if you're going

13         three times a week and say 50 weeks a year, 150

14         visits?

15   A.    **You recognize the face.  I -- about the only time**

16         **I heard their names or thought of it was if they**

17         **had to call me.  And Ryan rings a bell, and I**

18         **can't -- I can't tell you for sure what the other**

19         **guy's name was.  I want to say Eric, but it could**

20         **have been anything.  I can't remember.**                10:43

21   Q.    Okay.  And were you on a first-name basis with

22         them so they'd recognize your face and call you by

23         name, or --

24   A.    **No.  They always requested full name and date of**

25         **birth.  Very businesslike, very professional,**

Stratos Legal Services
800-971-1127

A-000168

# Exhibit 22

A-000169

**From:** Garlough, Jonathan W.
**Sent:** Tuesday, May 31, 2016 4:00 PM
**To:** 'Stephanie M. Payne'
**Cc:** Griffith, Robert H.; Wong, Licyau; jason.may@jasonmaylaw.com; 'Rachel Guest'
**Subject:** RE: Mimms Discovery Matters

Stephanie and Jason:

We write in response to your email of May 12, 2016, inquiring as to various additional materials never previously requested by Plaintiffs, along with the deposition of additional witnesses not previously requested. As you know, discovery in this case ended on May 18. This case has now been ongoing for nearly a year, and your requests for additional discovery materials, raised formally for the first time a mere three days before the close of discovery, are both improper and unreasonable. CVS responded to Plaintiffs' Interrogatories and Requests for Production on January 8, 2016, <u>more than four months ago</u>. Yet, your May 12th email below is the first time you have taken issue with <u>any</u> of CVS's responses. As explained further below, none of the issues raised in your email have any merit, and the documents Plaintiffs now belatedly seek were not called for by Plaintiffs' prior requests.

Additionally, while you claim you require additional discovery because of new information purportedly learned during the recent depositions of CVS's witnesses last week, it was your decision to schedule such depositions on the eve of discovery closure. You had every opportunity to take these depositions months ago, and you will recall that we repeatedly asked you to finalize and proceed with your deposition schedule.

Nevertheless, despite the improprieties and flaws in your untimely demands, in the interests of moving this case swiftly towards resolution and in the spirit of cooperation, we will endeavor to produce certain additional materials to you as described more fully below. However, discovery has already been extended once, and dispositive motions are due to be filed on June 13. Beyond what is provided below, and what we have stated previously, we will not agree to make any further productions, nor make any additional witnesses available for deposition, and will oppose any requests for additional extensions of time. Plaintiffs have had ample time to conduct discovery of their claims in this case, and it is beyond past time for discovery to end.

<u>Discovery "Deficiencies" Issues</u>

**Request for Production of Documents No. 4**:
CVS stated that, subject to its objections, it would "produce any non-privileged internal communications regarding the alleged false and/or defamatory statements referenced in Plaintiffs' Complaint and any non-privileged internal communications regarding the allegation in Plaintiffs' complaint that CVS has failed and/or refused to fill prescriptions for Plaintiffs' patients, to the extent any such internal communications exist." Your assertion that CVS needs to also produce "internal communications regarding the alleged false and/or

A-000170

defamatory statements referenced in Plaintiffs' Complaint" ignores our prior discovery responses, as we specifically stated that we would, and did in fact, produce these documents.

**Request for Production No. 12**:
You have asked us to confirm that CVS does not have in its possession any non-privileged recordings of Joseph Grimes' interview with Dr. Mimms. We can confirm that we do not have any such recording and that, to the best of our knowledge, no such recording was ever created.

**Request for Production of Documents No. 14**:
These documents have already been produced. CVS is not required by the Rules of Civil Procedure to identify specific documents by bates number, nor has Plaintiffs done so in their discovery responses to CVS's requests.

**Request for Production of Documents No. 15**:
Plaintiffs' request sought "Documents relating to your failure and/or refusal to fill/refill prescription(s) written by Plaintiffs." CVS responded that, subject to its objections, it would "produce non-privileged communications relating to decisions by individual CVS pharmacists to refuse to fill or refill prescriptions for controlled substances written by Plaintiffs…, to the extent such communications exist…" CVS has in fact produced all such documents. CVS is not required by the Rules of Civil Procedure to identify specific documents by bates number, nor has Plaintiffs done so in their discovery responses to CVS's requests.

**Request for Production of Documents No. 17**:
To the extent any such documents exist, they have been produced. CVS is not required by the Rules of Civil Procedure to identify specific documents by bates number, nor has Plaintiffs done so in their discovery responses to CVS's requests.

**Request for Production of Documents No. 18**:
CVS objected to this request and stands on its objections. First, as we stated in our responses, CVS does not maintain photographs for all of its employees in their files. To the extent that there are photographs of managing pharmacists posted at various retail stores, Plaintiffs are as equally as able as CVS to travel to various store locations and photograph the pictures that Plaintiffs request. CVS does not maintain .jpg or other files storing such pictures, and thus they are not readily accessible to CVS or its counsel. Further as we explained in our response to Request 18, the information sought is, in reality, a disguised interrogatory that is improper under Rule 34. Notwithstanding these objections, CVS will agree to produce records for the stores at issue where a specific date can be determined but the alleged CVS speaker has not been identified.

**Request for Production of Documents No. 20**:
CVS objected to this request and stands on its objections. As stated above, although CVS served its objections in January, Plaintiffs never raised any concerns with or disputes with CVS's position. Discovery is now closed. Moreover, while you claim that this document was "crafted to not be overly burdensome," CVS is a Fortune 10 corporation with substantial and varied operations across the country. If Plaintiffs believe "there are, in fact, regulations/rules/standards/procedures which are relevant to this matter," Plaintiffs should have identified the specific issues they intended to focus on, and limited their request to specific information pertaining to policies and procedures relevant to Plaintiffs' claims. Instead, Plaintiffs' request for information pertaining to "each and every CVS regulation, rule, standard, procedure, and protocol in effect as of January 1, 2012" is plainly overbroad and unduly burdensome. Nevertheless, again in the interests of moving this case forward, CVS will produce policy documents pertaining to corresponding responsibility, the filling (or refusal to fill) of controlled substances, and communications with patients regarding filling or not filling prescriptions, to the extent such materials have not previously been produced, and task manager prompts relating to these topics.

**Request for Production of Documents No. 24:**

A-000171

As CVS clearly stated in its response, whether or not a qualified privilege applies to this case is a legal conclusion. It is improper to request documents about a legal conclusion and CVS is not required to provide a response.

**Request for Production of Documents No. 25**:
We are puzzled by your stated concern with our response to this request. Your accusation that CVS has "not produc[ed] a single document" clearly conflicts with CVS's response as well as the documents CVS has produced. CVS's response was that, subject to its objections, "it will," and it did in fact, "produce non-privileged documents responsive to this request." These documents include, but are not limited to, the business cards left by DEA and Indiana Attorney General investigators at CVS stores while conducting an investigation into Dr. Mimms' practices, and the documents produced to CVS by Dr. Mimms' former employer, RAI, which further documents the DEA's investigation into Dr. Mimms.

**Request for Patient Notes**:
CVS's Patient Notes are not responsive to any of Plaintiffs' document requests. The requests simply seek "internal communications" regarding Plaintiffs' allegations. Plaintiffs' document requests defines "communication" as "transmission of data or other information to another Person." CVS's Patient Notes are not *transmitted* to any other person. Additionally, as CVS has stated in its discovery responses, CVS operates hundreds of pharmacies in Indiana and evaluated hundreds of millions prescriptions each year. It is impossible to accurately identify every prescription that is not filled and the information requested in this interrogatory for each such prescription. It would be equally impossible to identify each and every patient note associated with a prescription an individual CVS pharmacist or store decided to not fill. Despite these objections, and despite your client never having actually asked for the information in discovery, CVS will make a reasonable search of its database for any such notes relating to Dr. Mimms up through the date of the filing of the complaint.

**Interrogatory No. 2**:
As CVS stated in its response to this interrogatory, CVS operates hundreds of pharmacies in Indiana and evaluated hundreds of millions prescriptions each year. It is impossible to accurately identify every prescription that is not filled and the information requested in this interrogatory for each such prescription. CVS has made witnesses available from each of the stores at issue in this case, and Plaintiffs have had ample opportunity to explore what and how pharmacists have exercised their corresponding responsibility in declining to fill prescriptions for controlled substances written by Dr. Mimms.

**Email from Leah Bills to Alex Zweig**:
You stated that you do not think CVS has produced all documents responsive to Plaintiffs' document requests because Alex Zweig testified that he received an e-mail from Leah Bills about Dr. Mimms. This document was already produced by CVS to you on <u>February 19, 2016</u> with the bates number CVS00059.

**Additional Documents**:
In addition to the requests identified above, you have asked CVS to produce "printouts of algorithmic data contained in Excel concerning Dr. Mimms, any interview question sheet utilized during the telephonic 'interview' with Dr. Mimms and any notes made during such telephone conference, an unredacted version of CVS 000026, the Corresponding Responsibility Newsletters for November, 2013 through the present, printouts of the patient profiles for all witnesses that have been identified by Plaintiffs in this matter, documents wherein CVS employees acknowledged receiving and/or reading their corresponding responsibility statutes and/or CVS policies, and documents known to CVS employees as "red flag" documents that would relate to Dr. Mimms and the witnesses identified in this matter."

Again, such requests—coming at the close of discovery – are too late and improper. However, in the spirit of cooperation, and without waiving our objections to your improper and untimely requests, in addition to the materials identified above, we will provide you shortly with the algorithm spreadsheet, Mr. Grimes' interview

summary, CVS's employee code of conduct, policies or guidelines relating to pharmacists' exercise of their corresponding responsibility, including potential red flags that may trigger such exercise, the workload manager task that was referred to as the corresponding responsibility newsletter, the corresponding responsibility acknowledgements for Marya Doerr, Clint Thomas, Leah Bills, Amber Myers, James Hornaday, Christian Krenk and Ben Railsback, and a red flags checklist.  We will not agree to produce an unredacted copy of CVS00026, as the redacted information is irrelevant.

**Additional Depositions**:
Additionally, you requested to depose three new witnesses.  Despite your untimely request, we have already made Jen Wilkinson available for oral deposition.  We also previously advised you that we would agree to make Patti Freemen available for deposition upon written questions, conditioned upon you first providing us the questions you intend to ask to ensure that the scope of inquiry is appropriate, limited and relevant to the issues of this case, given the late request for a deposition (while you had promised to provide us with such written questions for our review, to date, none have been forwarded).  Beyond Ms. Freeman, we will not agree to any further depositions at this juncture as we are well past the discovery close and any such further requests are untimely and inappropriate.

I trust that this resolves all of the issues raised in your May 12 email.  I want to reiterate that we believe this case needs to move forward and discovery needs to end.  Accordingly, we will not agree to any further extensions of the discovery schedule.

Best,

Jon

# Exhibit 24

A-000174



March 15, 2016

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

————————————————————
                                    )
ANTHONY MIMMS, M.D.,                )
et al.,                             )
                                    )
        Plaintiffs,                 )
                                    )CASE NO.
            vs.                     )1:15-cv-00970-TWP-MJD
                                    )
CVS PHARMACY, INC.,                 )
                                    )
        Defendant.                  )
————————————————————)


        Deposition of:    ██████████

        Pursuant to:      Subpoena

        Date and Time:    Tuesday, March 15, 2016
                          12:17 p.m.

        Place:            ████████████████████████
                          ████████████████████████

        Reporter:         Wendy Haehnle

A-000175



March 15, 2016

Page 15

```
 1        A.    Yes.  I wrote down on a piece of paper
 2   in his office -- he asked me if I would write
 3   down what they said on a piece of paper and sign
 4   my name.
 5             And I told him yes, and I did.
 6        Q.    And just to be clear, your writing that
 7   down at his office, that occurred at that visit
 8   that you had after the visit to CVS Pharmacy?
 9        A.    Yes.
10        Q.    So you didn't go in like the very next
11   day --
12        A.    No.
13        Q.    -- and write something down?
14        A.    No.
15        Q.    It was sometime within a three-month
16   period?
17        A.    Yes.
18        Q.    But you just can't recall when that
19   three-month period was?
20        A.    No.
21        Q.    Okay.  I mean, I understand it was
22   two-and-a-half, three years ago.  So if you can't
23   recall, you can't recall.  I understand that.
24             Okay.  Can you tell me what you told
25   Dr. Mimms?
```

March 15, 2016

Page 16

1      A.   I told him exactly what they had told

2  me.

3           I went in to fill my prescription.  I

4  gave it to a girl named -- a lady named Dana that

5  works in the pharmacy, at CVS Pharmacy.  And she

6  said we can -- we no longer fill prescriptions

7  for him because he has been in jail and is a bad

8  doctor.

9           And I said, no, he is changing offices,

10 and, no, he is not a bad doctor.

11          And then there was another male

12 pharmacist there -- and I had told her -- I said,

13 this is a very religious man.  I said, he even

14 wants to become a preacher someday -- because he

15 does.

16          And the male pharmacist butted in and

17 said, no, he uses the -- the preaching thing and

18 the religion thing as a cover-up.

19          And that was all that was said.

20          I turned around and left.

21    Q.   Okay.  Do you recall the name of the

22 male pharmacist you just described?

23    A.   I can't really say for positively sure,

24 because he's not from Rushville.  I think he -- I

25 know they have one that comes from Greensburg, or

A-000177



March 15, 2016

Page 18

1    Asian, Hispanic?

2         A.    **American.**

3         Q.    Is that caucasian?

4         A.    **Oh, yeah.  Caucasian, yeah.**

5         Q.    Okay.  What color hair did he have?

6         A.    **Dark, dark brown?**

7         Q.    What color eyes?

8         A.    **I have no clue.**

9         Q.    Okay.  Did he have any facial hair?

10        A.    **I don't think so.**

11              **I didn't pay that much -- close**

12   **attention to him, you know, to know his eye color**

13   **or anything like that.**

14        Q.    Okay.  Did he have a distinctive accent

15   or anything about his voice?

16        A.    **No.**

17        Q.    Could you give me an approximation of

18   his age?

19        A.    **Maybe in his 30s, maybe early to**

20   **mid-30s.**

21        Q.    Okay.  And you mentioned somebody named

22   Dana.

23        A.    **Uh-huh.  Yes.**

24        Q.    Now, which CVS Pharmacy store are we

25   talking about here?



March 15, 2016

Page 19

 1     A.    The one in Rushville, Indiana.

 2     Q.    Was that your normal -- your normal CVS

 3  store that you went to?

 4     A.    Yes.

 5     Q.    Was that store located at 101 West

 6  Rush?  Does that sound right to you?

 7     A.    101 West Rush?   I've never heard of a

 8  street named West Rush here.

 9     Q.    Rush Street?

10     A.    Not that I know of.

11           It's on Main Street.  It's on the

12  corner of Main Street and First Street.

13     Q.    Okay.  What time of day did the visit

14  occur?

15     A.    Late afternoon, I think it was.  I

16  don't -- I can't be real sure about the time, but

17  I think it was late afternoon.

18     Q.    Okay.

19     A.    I know it was in the daytime.

20     Q.    Okay.  And you mentioned a person named

21  Dana.

22     A.    Yes.

23     Q.    Had you seen Dana before?

24     A.    Yes.  She regularly works back in that

25  pharmacy department.

A-000179



March 15, 2016

Page 20

1    Q.   Do you recall whether she was a

2  technician or pharmacist?

3    **A.   She was a technician.**

4    Q.   And how can you tell?

5    **A.   Because there's only one real**

6  **pharmacist in that store.**

7    Q.   And do you recall that pharmacist's

8  name?

9    **A.   Her name is Amber.**

10   Q.   Okay.  So you came into the store --

11 bless you -- came into the store, and I assume

12 you were attempting to present a prescription to

13 be filled.

14   **A.   Yes.**

15   Q.   Did you have more than one prescription

16 with you?

17   **A.   Yes.**

18   Q.   Okay.  So do you recall what

19 prescription you were presenting to be filled?

20   **A.   No.**

21   Q.   You don't know what it was for?

22   **A.   No.**

23   Q.   Was it --

24   **A.   I don't know which one it was, but it**

25 **was from Dr. Mimms, though.**

A-000180



March 15, 2016

Page 64

1    front of you?

2        **A.   No.  But there was people behind me.**

3        Q.   Now, as I understand it, the

4    pharmacies -- the CVS pharmacies, at least, have

5    different setups.  Often, they'll have like a

6    drop-off line and a pickup line.

7            Does the Rushville store have that kind

8    of --

9        **A.   Yes.**

10       Q.   -- setup?

11           Okay.  So I presume that you went into

12   the drop-off line first?

13       **A.   Where was I standing?**

14           **Yes.  I -- there wasn't anybody in**

15   **front of me, there was a man behind me, and there**

16   **was somebody sitting down.**

17           **I just walked up to wherever Dana was**

18   **standing, like we always did.  We handed them to**

19   **her.**

20           **I don't know if we was right there at**

21   **the regular -- I think we was at the regular**

22   **desk, actually.**

23       Q.   Okay.  You're saying we.  Why did you

24   mean -- why are you using the term we?

25       **A.   Her and -- and me, the pharmacist**

A-000181



March 15, 2016

Page 65

1   assistant.

2          That's where she was standing.  So I

3   just walked up to her --

4      Q.   Okay.

5      A.   -- and handed her my prescriptions.

6      Q.   All right.  Are you -- okay.  I just

7   want to make sure that I understood you

8   correctly, that you weren't there with anybody

9   else, you were doing it by yourself?

10     A.   Yes.

11     Q.   Okay.  So you presented your

12  prescriptions from Dr. Mimms.

13          Did you have any prescriptions from --

14  written by any other doctors that you were

15  bringing in that day?

16     A.   No.

17     Q.   So you presented your prescription by

18  Dr. Mimms to --

19     A.   Dana.

20     Q.   -- Dana.  Thank you.

21          What's Dana look like?

22     A.   She's short, kind of small.  She's in

23  her 50s probably.  Well, I know she's in her 50s.

24          Last time I seen her, she was short

25  hair.

A-000182

March 15, 2016

1     Q.    Short hair?  Thank you.

2           Caucasian, African American, Hispanic?

3     **A.    Caucasian.**

4     Q.    Okay.  And pale like me, dark

5  skinned?

6     **A.    Just normal.  I don't --**

7     Q.    Okay.

8     **A.    -- have a habit of just looking at**

9  **people's skin to see --**

10    Q.    Okay.  I'm just trying to be able to --

11    **A.    -- how light or dark it is.**

12    Q.    -- if I'd be able to look at a

13 picture -- if I could figure out who --

14    **A.    Oh.**

15    Q.    -- it might be.

16          Is she a slender woman, heavy-set, any

17 sense -- anything -- anything distinctive?  Sort

18 of medium build?

19    **A.    Yeah.**

20    Q.    Okay.  So you had seen Dana before?

21 You met her before?

22    **A.    Oh, yeah.  She's worked there for a**

23 **long time.**

24    Q.    Okay.  So you knew her from -- from the

25 past?

A-000183

March 15, 2016

Page 67

 1          So you presented the prescriptions by

 2    Dr. Mimms to Dana.

 3          And tell me exactly what happened next,

 4    please.

 5      A.    I already did.

 6      Q.    Bear with me.

 7      A.    I gave her my prescriptions.  She said,

 8    we cannot fill for Dr. Mimms anymore because he

 9    went to jail.  He's a bad doctor.

10          And I said, no, he is a religious

11    doctor.  He -- he is planning to become a

12    preacher someday.  He is not a bad doctor -- and

13    he's not a bad doctor.

14          And then that's when the guy that was

15    working there butted in and said, oh, he's

16    just -- he's covering -- trying to cover up with

17    this religion.

18      Q.    Okay.

19      A.    And I took my prescriptions and I

20    left.

21      Q.    So when you presented your

22    prescriptions and Dana said, we're not filling

23    prescriptions for Dr. Mimms, did you ask why, and

24    then she told you, you know, something to the

25    effect of, Dr. Mimms had been in jail, or --

A-000184

March 15, 2016

Page 68

1      A.    I didn't need to ask why.  She just
2  come out with it.
3      Q.    Okay.  So she said that before you
4  asked why?
5      A.    Yeah.
6      Q.    Okay.  And so that happened, maybe
7  2013, maybe 2014 --
8      A.    It wasn't 2014.
9      Q.    Okay.
10      A.    It was before that.
11      Q.    It was before 2014?
12      A.    Yeah.
13      Q.    Okay.  All right.  My question is -- so
14  that's, you know, three years ago.
15          Is that -- are you providing me sort of
16  the gist, like the -- the paraphrases, the
17  message of what she said, or are those her words
18  word for word, every single word you just said is
19  exactly what she said?
20      A.    Yeah.  That's pretty much exactly what
21  she said, from what I remember.
22      Q.    Okay.  So you just qualified that by
23  saying pretty much.  So I'm just trying to
24  understand --
25      A.    That -- I mean, I wrote it down, exact

A-000185

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTHONY MIMMS, M.D. and | ) | |
| MIMMS FUNCTIONAL REHABILITATION, P.C. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Cause No. 1:15-cv-00970-TWP-MJD |
| vs. | ) | |
| | ) | |
| CVS PHARMACY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF ANTHONY MIMMS, M.D.'S
## MOTION FOR AN ORDER IN LIMINE

Comes now Plaintiff Anthony Mimms, M.D., by counsel, pursuant to Rule 403 of the Federal rules of Evidence and hereby files its moves this Court for an Order in Limine. The purpose of this Motion is to provide the Court and Jury with a clear view of the claims and defenses asserted. Plaintiff hereby requests that the Court issue an order excluding any and all evidence, testimony or argument or references to such evidence, testimony or argument that is irrelevant to any issue of fact in this case and will only serve to confuse or mislead the jury, and/or evidence that has prejudicial value that outweighs the probative value thereof, such as any and all evidence, testimony or argument relating to:

1. Any matter related to Plaintiff's personal relationships, including alleged instances of marital infidelity;

2. Any alleged claims of sexual harassment or inappropriate conversations with patients against Plaintiff;

3. Any testimony or evidence associated with criminal proceedings, investigations or charges of any party other than Plaintiff;

A-000186

4.      Any governmental or regulatory investigation or action associated directly or indirectly with RAI;

5.      Any patient complaints or statements made concerning Plaintiff prior to or during his employment with Rehabilitation Associates of Indiana, P.C. ("RAI");

6.      Any medical information or records associated with any patient of Plaintiff prior to or during his employment with RAI;

7.      Any information pertaining to the death of any patients of Plaintiff or any entity by which Plaintiff has been employed.

(collectively "Prejudicial Information").  The Motion is based upon the grounds that the Prejudicial Information is irrelevant, constitutes improper character evidence, and/or will create a substantial danger of undue prejudice to the Plaintiff, is made under the provisions of Evid. R. 401, 402, and 403 and is based on the arguments set forth in this Motion, the pleadings and memoranda on file in this action, and upon any such argument and evidence as may be presented prior to or at the hearing of this matter.

In support of this Motion, Plaintiff sets forth the following arguments:

**I.      PRELIMINARY STATEMENT**

This case arises out of defamatory statements made by Defendant's employees to patients of Plaintiff from late 2013 through 2015 which impute misconduct on the part of Plaintiff in his profession as a medical doctor and prescriber of medication.  This Motion seeks to preclude the Defendant from therefore attempting to present any evidence or testimony related to the Prejudicial Information as it is unduly prejudicial, irrelevant, constitutes improper character evidence and is clearly inadmissible under the laws of this State.

A-000187

## II.   THIS COURT MAY EXCLUDE EVIDENCE IN ADVANCE OF TRIAL BY WAY OF AN IN LIMINE MOTION

The Court has the inherent power to grant a motion in limine "to exclude or admit evidence in the furtherance of its fundamental constitutional purpose which is the administration of justice." Burrus v. Silhavy, 155 Ind. App. 558, 563, 293 N.E.2d 794, 63 A.L.R.3d 304 (1973). See also Allied Property and Cas. Ins. Co. v. Good, 919 N.E.2d 144 (Ind. Ct. App. 2009) ("A ruling on a motion in limine is not final on the admissibility of evidence and instead is designed to prevent mention of prejudicial material to the jury before the trial court has had the opportunity to consider its admissibility."); Schumm v. State, 866 N.E.2d 781, 791 (Ind. Ct. App. 2007), opinion corrected on reh'g on other grounds, 868 N.E.2d 1202 (Ind. Ct. App. 2007) ("Although a motion in limine serves to protect against unfairly prejudicial evidence being placed before the jury, the ultimate determination of evidence's admissibility 'is made by the trial court in the context of the trial itself.'") quoting Earlywine v. State, 847 N.E.2d 1011, 1013 (Ind. Ct. App. 2006).

## III.   THE PREJUDICIAL INFORMATION IS NOT RELEVANT TO ANY ISSUE IN THIS CASE

Ind. Evid. R. 402 states that "[r]elevant evidence is admissible, unless any of the following provides otherwise: (a) the United States Constitution; (b) the Indiana constitution; (c) a statute not in conflict with these rules; (d) these rules; or (e) other rules applicable in the courts of this state. Irrelevant evidence is not admissible." Ind. Evid. R. 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." See Swann v. State, 789 N.E.2d 1020, 1024 (Ind. Ct. App. 2003) (relevant evidence is that which "tends to prove or disprove a material fact in the case."); Truden v. Jacquay, 480 N.E.2d 974, 978 (Ind. Ct. App. 1985) ("[T]o the extent practicable, irrelevant evidence should be excluded.").

A-000188

Prejudicial Information may be properly excluded where not relevant to matters at issue. See Evid. R. 402; Truden v. Jacquay, 480 N.E.2d 974, 978 (Ind. Ct. App. 1985) ("[T]o the extent practicable, irrelevant evidence should be excluded."); see also Davidson v. Bailey, 826 N.E.2d 80, 87 (Ind. Ct. App. 2005) (evidence of plaintiff's prior DUI convictions not relevant to personal injury claims, where plaintiff was a passenger in vehicle struck by defendant); see also Swann v. State, 789 N.E.2d 1020, 1024 (Ind. Ct. App. 2003) (trial court properly excluded evidence of defendant's prior false confession, relevant to "no issue other than character").

The Prejudicial Information set forth in items 1 and 2 above is in no way relevant to the determination of any issue of fact in this case because Plaintiff's personal relationships and claims of sexual harassment and inappropriate behavior are not related to the defamatory statements made by Defendant and only serve to negatively portray Plaintiff, thereby prejudicing the jury against Plaintiff.

The Prejudicial Information set forth in items 3, 4, 5, 6, and 7 above concerning third party criminal activity or investigations and similar investigations of any entity, patient complaints and statements concerning Plaintiff, patient medical records and correspondence between Plaintiff and his former employer RAI, is not relevant to the issues of this case because they pertain to matters that occurred prior to the time the defamatory statements were made and also only serve to confuse and mislead the jury as to the nature of this case as a defamation case and not a case against Plaintiff for prescribing improperly.

4

A-000189

**IV.   EVIDENCE OF PLAINTIFF'S MARITAL INFIDELITY, SEXUAL HARRASSMENT CLAIMS AND CLAIMS OF INAPPROPRIATE CONVERSATION IS INADMISSIBLE CHARACTER EVIDENCE IN UNRELATED MATTERS**

Ind. Evid. R. 404(a) provides that but for three limited exceptions,

- "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Ortiz v. State, 741 N.E.2d 1203, 1208 (Ind. 2001) (evidence of prior conviction for criminal recklessness inadmissible as improper character evidence when offered to show only propensity for violence).

Introduction of evidence of Plaintiff's alleged marital indiscretions, sexual harassment or inappropriate conversations with patients would only serve to paint Plaintiff in a negative light by intimating that Plaintiff may make poor choices or use poor judgment in his personal life. Such evidence may cause the jury to conclude that it is in Plaintiff's character to be of immoral character; therefore, he must have acted in conformity with that character in this situation and is therefore acting immorally against the Defendant corporation by bringing suit against them for defamation. This is precisely the type of situation that the evidence rules were designed to avoid.

The use of such evidence is an improper use of character evidence. See Henson v. State, 530 N.E.2d 768, 769–70 (Ind. Ct. App. 1988) (evidence concerning defendant's adultery inadmissible character evidence on collateral matter). See also Witte v. State, 516 N.E.2d 2, 4–5 (Ind. 1987) (trial court limited cross-examination of witnesses to exclude evidence of social and mental history where sole purpose was to impugn character and impeach credibility); Mateo v. State, 981 N.E.2d 59 (Ind. Ct. App. 2012) (witness's gang affiliation not admissible to demonstrate propensity to commit violent criminal acts).

A-000190

## V.    CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court enter an order excluding introduction of any Prejudicial Evidence by Defendant, its agents, servants, employees or witnesses and instructing Defendant's counsel to advise their witnesses of such exclusion.

Respectfully submitted,

LAW OFFICE OF JASON D. MAY, LLC

_s/ Jason D. May_
Jason D. May, Atty No. 27434-49
9201 N. Meridian Street, Suite 220
Indianapolis, IN  46260
Telephone: (317) 218-3859
Jason.May@JasonMayLaw.com
_Attorney for Plaintiffs_

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2017, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Robert H. Griffith (pro hac vice)
Jonathan W. Garlough, Attorney #30329-45
Foley & Lardner, LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60654-5313
E-mail: rgriffith@foley.com
        jgarlough@foley.com

Andrew W. Hull
Alice McKenzie Morical
Amanda L.B. Mulroony
Hoover Hull Turner, LLP
111 Monument Cir # 4400
Indianapolis, IN 46204
E-mails: awhull@hooverhullturner.com
        amorical@hooverhullturner.com
        amulroony@hooverhullturner.com

_s/ Jason D. May_
Jason D. May

6

A-000191

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANTHONY MIMMS, M.D., and MIMMS FUNCTIONAL REHABILITATION, P.C., <br><br> Plaintiffs, <br><br> v. <br><br> CVS PHARMACY, INC., <br><br> Defendant. | Case No. 1:15-cv-00970-TWP-MJD |

## **DEFENDANT CVS PHARMACY, INC.'S MOTIONS *IN LIMINE***

Defendant, CVS Pharmacy, Inc. ("CVS"), by counsel, as more specifically set forth in Motions *in Limine* 1 to 15 herein (the "Motions"), respectfully request the Court to enter orders *in limine* directing the parties, attorneys and witnesses regarding certain evidence, references, displays or presentations to the jury, until the trial court has ruled upon admissibility in the context of trial.

# I.  TABLE OF MOTIONS *IN LIMINE*

Motion *In Limine* No. 1:  Any Statements for Which Plaintiff Has Not Identified A Potential Speaker ................................................................................. 4

Motion *In Limine* No. 2:  Alleged Defamatory Statements Not Identified by Witness Deposition Testimony .......................................................................... 9

Motion *In Limine* No. 3:  Only Alleged Speaker Subjective Intent for State of Mind Evidence .......................................................................................... 11

Motion *In Limine* No. 4:  Any Statement or Inference Relating to (a) Any Alleged Failure by CVS to Identify an Alleged Speaker or (b) Any Alleged Failure or Refusal to Comply with Any Discovery Requests ....................................... 15

Motion *In Limine* No. 5:  Any Reference to Statements Purportedly Made to Any of Plaintiff's Patients Who Are Not Called To Testify, and Other Hearsay Statements ........................................................................................ 18

Motion *In Limine* No. 6:  The Application of the Qualified Privilege, In General, and to Alleged Statements by Pharmacists .............................................. 20

Motion *In Limine* No. 7:  Any Reference to Punitive Damages ................................... 24

Motion *In Limine* No. 8:  Any Reference to CVS's Corporate Parent or Other Reference to Wealth or "Deep Pockets" of CVS .......................................... 25

Motion *In Limine* No. 9:  Any Reference to Law Enforcement Settlements or Civil Penalties Paid by CVS .......................................................................... 26

Motion *In Limine* No. 10:  Any Reference to the Court's Orders on Summary Judgment and Statement to David Seeman ................................................. 27

Motion *In Limine* No. 11:  Any Reference to Any Other Cases Involving CVS .......... 29

Motion *In Limine* No. 12:  Witnesses Named on CVS's Witness Lists But Not Called at Trial .......................................................................................... 30

Motion *In Limine* No. 13:  CVS's Participation in Settlement Negotiations and of Conduct or  Statements Made in Those Negotiations ............................... 31

Motion *In Limine* No. 14:  CVS's Liability Insurance ................................................... 31

Motion *In Limine* No. 15:  Any Mention that CVS Filed Motions *in Limine* and the Court's Rulings Thereon ....................................................................... 33

CERTIFICATE OF SERVICE ................................................................................ 35

A-000193

## II. LEGAL STANDARD

Trial courts issue rulings on motions *in limine* to guide the parties on what evidence it will (or will not) admit later in trial. *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir.2013). Motions *in limine* serve a gatekeeping function by allowing the judge "to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). The grant of a motion *in limine* "is preliminary in nature and subject to change . . . based upon the court's exposure to the evidence at trial." *Fitzpatrick v. City of Fort Wayne*, 259 F.R.D. 357, 361 (N.D. Ind. 2009) (quotation omitted). "Federal district courts have the power to exclude evidence *in limine* pursuant to their authority to manage trials." *Fitzpatrick*, 259 F.R.D. at 361 (quotation omitted).

"A motion *in limine* serves to exclude irrelevant or otherwise inadmissible evidence that may prejudice or confuse a jury, rather than requiring a party to rely on sustained objections and curative instructions at trial." *Chicago Premium Yogurt, Inc. v. Yogurt Ventures, U.S.A. Inc.*, No. 91 C 0209, 1992 WL 3705, at *1 (N.D. Ill. Jan. 2, 1992). Evidence is relevant if it has a tendency to make the existence of any material fact more probable or less probable. Fed. R. Evid. 401. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.

A-000194

### III.    MOTIONS *IN LIMINE*

### Motion *In Limine* No. 1:
### Any Statements for Which Plaintiff Has Not Identified A Potential Speaker

Plaintiff and Plaintiff's counsel should not be permitted to reference, introduce evidence relating to, or otherwise seek damages for any statement for which Plaintiff has not identified the alleged speaker. Absent an identified speaker, Plaintiff will not be able to offer evidence of actual malice – which under Indiana law requires evidence of the speaker's actual state of mind when making the alleged statement – and thus cannot satisfy a necessary element of a defamation claim. Accordingly, any reference to such statements are not relevant, would unfairly prejudice CVS, and would mislead the jury and confuse the issues.[1]

To prevail on his claim for defamation, Mimms must establish the following four elements with respect to each alleged defamatory statement: (1) a communication with defamatory imputation, (2) made with malice, (3) that was published, and (4) the plaintiff suffered damages as a result.  *Newman v. Jewish Cmty. Ctr. Ass'n of Indianapolis, Inc.*, 875 N.E.2d 729, 739 (Ind. Ct. App. 2007); *see also* Jan. 3, 2017 Entry on Pending Motions, Dkt. 143 at 9 ("Order") (identifying same elements).

As to six of ten alleged defamatory statements, Mimms – with the benefit of cooperative patient witnesses and years of discovery – can prove no more than that,

---

[1] CVS's Motion for Partial Reconsideration of the Court's Order on the Parties' Motions for Summary Judgment ("Motion to Reconsider") (Dkt. 150, 154) is pending. CVS argues in the Motion to Reconsider that Mimms has not offered evidence of actual malice sufficient to overcome summary judgment. This Motion in Limine is offered to address the defamation claims if the Motion to Reconsider is denied, and if the Court allows the question of actual malice to proceed to the jury.

A-000195

on some unknown date, some unknown person purportedly published a defamatory

statement about him.  *See* Br. in Supp. of Mot. for Partial Reconsideration at 9-16.

This is simply not enough. In order to maintain a claim for defamation, a

plaintiff must specifically identify the speaker of the alleged defamatory statement.

*Newman*, 875 N.E.2d at 735–36 ("Contained within the Supreme Court's holding

that a plaintiff must identify the alleged defamatory statements in his complaint is

the implication that the plaintiff must also identify the speaker of those

statements."). *See also Lefrock v. Walgreens Co.*, 77 F. Supp. 3d 1199, 1201 (M.D.

Fla. 2015) ("[S]pecific information must be provided to support these elements such

as the identity of the speaker, the identity of the persons spoken to, the substance of

the statements, and a time frame when the statements were made."); *Belle v. Cty.

of Cook*, No. 01 C 7473, 2005 U.S. Dist. LEXIS 7406, at *3 (N.D. Ill. Jan. 25, 2005)

("To the extent that Belle cannot remember when an alleged conversation took place

or where he was when the conversation allegedly occurred, or who said what, his

testimony as to the alleged conversations is inadmissible and thus is irrelevant[.]").

There are only four alleged defamatory statements where Mimms has offered

some evidence sufficient to identify a potential alleged speaker:

(1)     Mimms claims that on or around June 26, 2014, a CVS pharmacist
        named Tony "compared [Mimms] to a pill mill" when Mimms' patient
        T.M. solicited information from the pharmacist relating to his
        prescription medications. [T.M. Dep. 61:20-24, 66:13-22, 69:1-70:12,
        attached hereto as Exhibit 1]. Dr. Mimms has included a "Anthony
        Gamm" on his final witness. *See* Plaintiff's Final Witness and Exhibit
        List (Dkt. 92) (July 1, 2016).

(2)     Mimms claims that on or around October 3, 2014, a CVS pharmacy
        technician named Alexis told Mimms' patient J.M. that "Dr. Mimms
        was under investigation with the DEA." [J.M. Dep. 70:8-20, 71:18-23,

A-000196

and 94:18-23, attached hereto as Exhibit 2]. CVS employed a technician named Alexis Fields, who was deposed by Mimms' counsel and has acknowledged making a similar statement to Mason [Fields Dep. 25:1-17, attached hereto as Exhibit 3].

(3)     Mimms claims that in October 2014, a CVS pharmacy technician named Dana told Mimms' patient K.P. that CVS would not fill a prescription because Mimms "has been to jail." [K.P. Dep. 14:9-13, 19:20-20:6, 65:17-66:3, and 67:1-9, attached hereto as Exhibit 4]. CVS employs a pharmacy technician named Dana Flynn who worked at the location at issue, and Ms. Flynn denies making the statement. [Declaration of Dana Flynn, ¶ 3, attached hereto as Exhibit 5].

(4)     Mimms claims that on March 4, 2015, either a CVS pharmacist or a pharmacy technician who was male, Caucasian, with dark hair and lean build told D.B. that Mimms had been "arrested for controlled substances, and if he wasn't, he's about to be." [D.B. Dep. 17:1-6, 103:8-14, 106:7-19, and 111:6-20, attached hereto as Exhibit 6]. Pharmacist Mike Salazar and pharmacy technician Ryan Durham both meet the description and worked at the location on the date provided by Doyle-Blanton. Both deny making the statement. [Declaration of Michael Salazar ¶ 4 and Declaration of Ryan Durham ¶ 5, attached hereto as Exhibits 7 and 8, respectively]

(These four alleged statements are sometimes collectively referred to as the "Alleged Potential Speaker Identified Statements.").

Mimms has <u>not</u> identified any speaker who purportedly published <u>six</u> of the ten alleged defamatory statements, as evidenced by the depositions of Mimms's patients to whom the statements were purportedly published. These witnesses provided inadequate descriptions, wide and varying date ranges as to the occurrence of the alleged statement, and/or non-existent store locations:

(1)     C.M. alleges that on an unspecified date in "maybe" 2013 at the Greenfield CVS, a tall, thin male pharmacist with dark hair, about 35 years old, informed her that CVS was not filling Mimms's prescriptions for controlled substances because "he was being investigated by the DEA." [C.M. Dep. 28:8-11 and 28:21-30:21, attached hereto as Exhibit 9].

A-000197

(2)    C.M. and W.M. allege that in "maybe" 2013, with a "rough estimate" between April and June,[2] a pharmacy manager at the Greenfield CVS named "Richard" informed them CVS was not filling prescriptions for controlled substances written by Mimms because "he was being investigated by the DEA." [C.M. Dep. 29:2-6, 34:4-13, 35:3-10, 36:25-37:2, 37:12-38:2, and 72:4-13, attached hereto as Exhibit 9; W.M. Dep. 58:21-59:1, 61:7-13, and 91:5-12, attached hereto as Exhibit 10]. The only pharmacy employee named Richard at the subject store retired in 2012. [Wilkinson Dep. 9:7-19, attached hereto as Exhibit 11].

(3)    D.S. alleges that in approximately March 2015 around 7:00 p.m. at the CVS located at 21st and Post Road, a young Caucasian woman in her late twenties said CVS was not filling Mimms's prescriptions for controlled substances because Mimms's "license was kind of revoked." (sometimes referred to herein as the "S. Statement") [D.S. Dep. 27:4-17, 30:19-25, 32:9-33:4, 33:1, 36:5-16, 36:25-37:25, and 40:8-11, attached hereto as Exhibit 12];

(4)    J.S. alleges that in 2013[3] someone named "Jason" at a non-existent CVS location said CVS was not filling Mimms's prescriptions for controlled substances because Mimms was "under DEA investigation." [J.S. Dep. 61:9-12, 67:19-69:20, and 74:5-12, attached hereto as Exhibit 13]. There is no CVS location at Washington and Post Road. [Zweig Affirmation at ¶ 5, attached hereto as Exhibit 14].

(5)    J.S. alleges that on the same day in 2013 a "kind of chunky" female pharmacy technician weighing about 190 pounds, 5'6" tall, early-to-mid thirties, with brown hair, at a different CVS location, said that CVS was not filling Mimms's prescriptions for controlled substances because he is one of the doctors "on the list" that are "being investigated by the DEA." [J.S. Dep. 61:9-12, 76:17-77:6, 78:9-23, and 79:6-80:3, attached hereto as Exhibit 13];

(6)    D.Sm. alleges that in August 2015 a "kind of chunky" Caucasian pharmacy technician with black hair in her 40s or 50s said that CVS

---

[2] C.M. testified that the conversation with "Richard" occurred later the same day as the conversation with the thin, male pharmacist with dark hair [C.M. Dep. 34:4-13], and W.M. estimates that this occurred between April and June 2013. [W.M. Dep. 91:5-12].

[3] J.S. alleges that he heard these statements sometime in 2013, on the same day that his father's prescriptions were rejected. [J.S. Dep. 59:15-17, attached hereto as Exhibit 13]. D.Sm. testified initially that the alleged statement made to him occurred "about two—two, three years ago," subsequently testified that he heard the statements "[s]omewhere in the 14th [i.e., 2014]," and finally settled on August 2015 as his best recollection of when the statements occurred.  [D.Sm. Dep. 58:6-9, 95:23-96:23, 101:10-20, attached hereto as Exhibit 15].

A-000198

was not filling Mimms's prescriptions for controlled substances because Mimms was "on a list" and "some [of them] are being investigated by the DEA." [D.Sm. Dep. 50:4-19, 58:6-9, 62:14-24, 65:23, 70:20-71:14, 95:23-96:23, and 101:10-20, attached hereto as Exhibit 15].

(Collectively, these six statements are sometimes referred to as the "Unidentified Speaker Statements.").

Indiana's actual malice standard – applicable to all alleged defamatory statements in this matter –demonstrates why Mimms cannot possibly prevail on the Unidentified Speaker Statements, and should be barred from referencing, introducing evidence relating to, or otherwise seek damages for any statement for which he has not identified the alleged speaker. Because Mimms is required to prove that each alleged CVS representative acted with actual malice in making the alleged statements at issue, Mimms must prove that each speaker made an alleged statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Brewington v. State*, 7 N.E.3d 946, 959 (Ind. 2014).

Indiana law is clear that actual malice is a *subjective* rather than *objective* standard. *Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 799 (S.D. Ind. 2011) (Pratt, J.) ("it is well-settled that 'reckless conduct is *not* measured by whether a reasonably prudent man would have published, or would have investigated before publishing." (quoting *Poyser v. Peerless*, 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002) (emphasis supplied)). The purported speaker's actual state of mind when making the alleged statements is thus "critical" evidence in the malice

analysis. *Shine v. Loomis*, 836 N.E.2d 952, 959 (Ind. Ct. App. 2005); Mem. in Supp. of Mot. for Partial Reconsideration at 3-9.

Because neither Mimms nor any witness has identified the purported speaker for the Unidentified Speaker Statements, there necessarily cannot be any record evidence whatsoever of the speaker's state of mind concerning the alleged statement, defeating a necessary element that Mimms must establish to prevail on liability as to those statements.

Accordingly, any reference to the Unidentified Speaker Statements are not relevant, would unfairly prejudice CVS, and would mislead the jury and confuse the issues, namely, which statements are properly the subject of evaluation for purposes of determining any liability against CVS.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff and Plaintiff's counsel from all reference, evidence relating thereto, or otherwise seeking damages for any statement for which Plaintiff has not identified the alleged speaker.


## Motion *In Limine* No. 2:
## Alleged Defamatory Statements Not Identified by Witness Deposition Testimony

Plaintiff and Plaintiff's counsel should not be permitted to attribute to CVS any alleged defamatory statement other than the alleged defamatory statements identified by witnesses' deposition testimony.

A-000200

Specifically, Mimms may not, at trial, expand the scope of the statements at issue outside of the four Alleged Potential Speaker Identified Statements.[4]

At this stage of the litigation, Mimms should not be permitted to inject more statements into the dispute, or to generally refer to any existence of "other" statements allegedly made by CVS.[5] To do so would place CVS on "unfair footing" and unfairly prejudice its defense. *See Trail v. Boys & Girls Clubs of Nw. Indiana*, 845 N.E.2d 130, 137 (Ind. 2006).[6]

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff and Plaintiff's counsel from attributing to CVS any alleged defamatory statement other than the four statements identified by witnesses in depositions to which an alleged speaker has been identified, as set forth above.[7]

---

[4] To the extent this Court denies CVS's Motion *in Limine* No. 1, Mimms should be precluded from proceeding with any statements outside of the four Alleged Potential Speaker Identified Statements <u>and</u> the six Unidentified Speaker Statements.

[5] For example, Mimms testified that "countless [patients] have relayed CVS defamatory statements" but he only "recorded" some. [Mimms Dep. 270:1-3, attached hereto as Exhibit 16].

[6] Indeed, Indiana requires that a defamation plaintiff set forth with specificity the alleged statements at the outset of the litigation. *See Miller v. Cent. Indiana Cmty. Found., Inc.*, 11 N.E.3d 944, 956 (Ind. Ct. App. 2014), *reh'g denied, trans. denied*, 26 N.E.3d 612 (Ind. 2015) (citing *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136-37 (Ind. 2006)); *Town of W. Terre Haute, Indiana v. Roach*, 52 N.E.3d 4, 10 (Ind. Ct. App. 2016).

[7] In the event the Court denies CVS's Motion *in Limine* No. 1, CVS requests that those six Unidentified Speaker Statements be incorporated into the Court's Order granting Motion *in Limine* No. 2.

A-000201

### Motion *In Limine* No. 3:
### Only Alleged Speaker Subjective Intent for State of Mind Evidence

Plaintiff and Plaintiff's counsel should not be permitted to offer evidence or elicit testimony regarding the knowledge or mental state of anyone other than the speakers of alleged defamatory statements for the purpose of attempting to impute actual malice to that speaker, or to elicit testimony asking a witness to offer conclusions regarding the alleged speaker's state of mind.[8] To permit otherwise would improperly permit the jury to consider evidence immaterial to the alleged speaker's subjective state of mind, serve as improper and unhelpful legal conclusions, and/or be contrary to law and unfairly prejudicial to CVS. Fed. R. Evid. 403; Fed. R. Evid. 701(b).

The Court previously determined that each CVS representative is subject to the actual malice standard as to the alleged statements at issue. *See* Entry on Pending Motions, Dkt. 143 at 15. This requires evidence that each CVS representative knowingly made a false statement or made a statement with reckless disregard of its truth or falsity, and requires each alleged CVS representative to have "subjectively doubted" the truth of the statement attributed to them – even if motivated by "ill will." *Brewington v. State*, 7 N.E.3d 946, 960-62

---

[8] As argued in CVS's pending Motion to Reconsider, Mimms has not offer sufficient evidence of actual malice to proceed as to any alleged defamatory statement. However, to the extent the Court disagrees and allows any statement to proceed to trial, Mimms should be precluded from offering evidence or eliciting testimony regarding the mental state of anyone other than the speakers of alleged defamatory statements for the purpose of attempting to impute actual malice to that speaker.

A-000202

(Ind. 2014); *Poyser v. Peerless*, 775 N.E.2d 1101, 1107 (Ind. Ct. App. 2002).[9] Thus,

the plaintiff "must designate sufficient evidence to permit the conclusion that the

***defendant in fact*** entertained serious doubts as to the truth of his publication."

*Poyser*, 775 N.E.2d at 1107 (quotations omitted) (emphasis added). *See* Mem. in

Supp. of Mot. for Partial Reconsideration at 3-9. Therefore, only the "actual malice"

or "ill will" of the speakers who published the alleged defamatory statements may

be considered as evidence of actual malice in order to determine whether a speaker

subjectively doubted what was allegedly said.[10]

Similarly, Plaintiff and Plaintiff's counsel should not be permitted to ask

witnesses – *e.g.* those who are alleged to have heard a statement – whether such

statement was made "recklessly," or otherwise elicit testimony regarding a witness'

conclusion regarding a speaker's state of mind. Such testimony amounts to an

improper, inadmissible legal conclusion, and also improperly seeks an "objective"

rather than "subjective" standard regarding the alleged speaker's state of mind

which are considered "unhelpful" pursuant to Fed. R. Evid. 701(b).[11] *See, e.g.*

---

[9] While evidence of "ill will" does not establish actual malice, *id.*, it may be offered to attempt to show actual malice. *Cochran v. Indianapolis Newspapers, Inc.*, 372 N.E.2d 1211, 1220 (Ind. Ct. App. 1978).

[10] *See also New York Times v. Sullivan*, 376 U.S. 254, 287 (1964) ("the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement"); *Holbrook v. Harman Auto., Inc.*, 58 F.3d 222, 226 (6th Cir. 1995) ("Because Loepp was the Harman employee responsible for the publication of the allegedly defamatory statements, we focus solely on his state of mind" and not that of his subordinates).

[11] On at least one occasion, Plaintiff's counsel asked a witness in deposition whether a statement was made "recklessly." [*See* C. Miller Dep. 96:10-14 ("Is it your opinions that for someone to make that statement having not verified it as to whether it's true or not, making that statement reckless?"), attached hereto as Exhibit 9].

A-000203

*United States v. Locke*, 643 F.3d 235, 240 (7th Cir. 2011) ("'We have held repeatedly that lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by 701(b).'" (quoting *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009)); *Harris v. Quadracci*, 856 F. Supp. 513, 518 (E.D. Wis. 1994), *aff'd*, 48 F.3d 247 (7th Cir. 1995) (concluding that expert affidavit opining that a statement was published "with a reckless disregard for the truth and that the alleged speaker "failed to adequately investigate" the truth to the statements could not be used to establish reckless disregard for the truth and was generally "not probative of actual malice" and "not helpful when determining actual malice against a subjective standard.").

Accordingly, only the knowledge and mental state of an alleged speaker is relevant to the actual malice inquiry, and it is improper for Mimms to attempt to impute knowledge or state of mind evidence of either (a) individuals who are not alleged to be speakers, or (b) CVS's collective knowledge as a corporation. It is also improper for Mimms to solicit opinions regarding the state of mind of an alleged speaker. Allowing such evidence, testimony, or lines of questions would be contrary to law, unhelpful and/or confusing to the jurors, and unfairly prejudicial to CVS. Fed. R. Evid. 403; Fed. R. Evid. 701(b).

\* \* \*

Strictly in the alternative, and only in the event that the Court denies the relief requested above and intends to permit Mimms to impute knowledge or state of mind evidence to an alleged speaker based on the knowledge or state of mind of

A-000204

other individuals or CVS's collective corporate knowledge, CVS alternatively requests an order *in limine* establishing that it will likewise be permitted to impute all knowledge or information available to CVS as a corporate entity – *e.g.* DEA visits to CVS stores, statements by pharmacists that Mimms was under investigation, and testimony by pharmacists and technicians regarding their relationships with patients – to any alleged defamatory speaker. In other words, Mimms should not be permitted to offer evidence of, *inter alia*, policies, non-speakers' alleged failures to investigate or absence of knowledge of CVS investigations for purposes of establishing actual malice, unless CVS is permitted to impute *all* knowledge or information available to CVS as part of the actual malice inquiry. If Mimms is permitted to impute subjective intent relating to the actual malice inquiry, then CVS should likewise be permitted to impute lack of subjective intent relating to the actual malice inquiry.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff and Plaintiff's counsel from offering any evidence or eliciting testimony regarding the subjective knowledge or mental state of anyone other than the alleged speaker of an alleged defamatory statement for the purpose of attempting to establish actual malice, and from eliciting testimony asking a witness to offer conclusions regarding the alleged speaker's state of mind.

Strictly in the alternative, and in the event the Court denies the relief requested above, CVS respectfully requests that the Court enter an order *in limine*

A-000205

establishing that if Mimms is permitted to impute knowledge or information

available to non-speakers or CVS as a corporate entity as part of the actual malice

inquiry, then it is likewise permissible for CVS to impute all knowledge or

information available to CVS as a corporate entity for the purpose of refuting actual

malice.

**Motion *In Limine* No. 4:**
**Any Statement or Inference Relating to (a) Any Alleged Failure by CVS to Identify**
**an Alleged Speaker or (b) Any Alleged Failure or Refusal to Comply with Any**
**Discovery Requests**

Defendant moves the Court to preclude any statements or inferences on the

part of Plaintiff or Plaintiff's counsel regarding (a) any alleged failure by CVS to

identify any speaker of an alleged defamatory statement or (b) any alleged failure or

refusal to comply with any discovery requests. Any statement or inference of this

nature is irrelevant to the underlying claims and defenses in this case and is unduly

prejudicial to CVS. Fed. R. Evid. 401, 403.

Mimms asserts that six alleged defamatory statements were uttered by

unidentified pharmacists or technicians. Following depositions of the individuals to

whom those respective statements were allegedly made, Mimms still has been

unable to identify the alleged speakers.

CVS has cooperated in discovery with Mimms and has not be subject to any

motions to compel, nor have any sanctions been sought or awarded against CVS

relating to any discovery issues. Mimms never served a document request or

interrogatory asking CVS to identify the pharmacy employees who worked at

specific stores on specific dates. Nonetheless, CVS produced records for the stores at

15

issue where a specific date could be determined but the alleged CVS speaker has not been identified.  Specifically, CVS produced time cards to Mimms for the stores and dates specifically identified by Mimms' witnesses, which listed the name of pharmacy department employees during the relevant time period. Accordingly, Mimms should not be able to impute any wrongdoing related to any failure to identify certain alleged speakers or any failure or refusal to comply with discovery requests.

If Mimms thought that CVS's document production was insufficient, it was incumbent upon him to seek an order from the Court compelling production. At trial, he should not be permitted to suggest or ask the jury to infer that CVS is blameworthy for any failure to identify an alleged speaker or to produce documents. *See, e.g., Lauth v. Covance, Inc.*, 155 F. Supp. 3d 855, 873 (S.D. Ind. 2016) (plaintiff "could have sought assistance from the Court, either informally by contacting the Magistrate Judge assigned to the case or formally by filing a motion to compel. . . Instead he impermissibly brings a potential discovery dispute into the summary judgment motion context"); *Pruet v. Fayette Reg'l Health Sys.*, No. 1:12-cv-635-WTL-DML, 2013 U.S. Dist. LEXIS 132359, at *4 (S.D. Ind. Sep. 17, 2013) ("To the extent that the Defendant's objections to those discovery requests were unreasonable, the Court would have ordered Defendant to produce additional documents and imposed sanctions for its unreasonable behavior, had the matter been brought to the Court's attention in a timely manner. It was not.").

A-000207

Further, there are no facts supporting any "missing witness" adverse inference instruction. *See, e.g.*, Seventh Circuit Pattern Jury Instr. Civil 1.19 – Adverse Inference from Missing Witness (2005 rev.) and Committee Comments (discussing limited circumstances where adverse inference from missing witness may be applicable). Indeed, the comments to the jury instruction make clear that reference or inference related to a "missing" witnesses should not occur unless and until the Court determines that such an instruction is appropriate. *See id.* Similarly, there has been absolutely no suggestion – nor are there any facts to support – any spoliation or destruction of evidence warranting an adverse inference instruction as to documentary evidence. *See* Seventh Circuit Pattern Jury Instr. Civil 1.20 – Spoliation/Destruction of Evidence (2005 rev.) and Committee Comments (discussing requirement that bad faith or intentional destruction be shown to support a missing or destroyed evidence instruction).

Accordingly, allowing any statements or inferences regarding (a) any alleged failure by CVS to identify any speaker of an alleged defamatory statement or (b) any alleged failure or refusal to comply with any discovery requests would raise an inference of wrongdoing by CVS that is unduly prejudicial to CVS and should be precluded.  Fed. R. Evid. 403.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff or Plaintiff's counsel from making any statements or inferences regarding (a) any alleged failure by CVS to

A-000208

identify any speaker of an alleged defamatory statement or (b) any alleged failure or refusal to comply with any discovery requests.

## Motion *In Limine* No. 5:
## Any Reference to Statements Purportedly Made to Any of Plaintiff's Patients Who Are Not Called To Testify, and Other Hearsay Statements

Any reference to the anticipated testimony of any witness who is absent, unavailable, or not otherwise called to testify at trial must be excluded pursuant to Fed. R. Evid. 802. Specifically, Plaintiff and Plaintiff's counsel should be prohibited from referencing defamatory statements purportedly made to any of Mimms' patients or other witnesses who are not called to testify at trial.

Related to this, certain deposition testimony suggests that Mimms may try to offer inadmissible hearsay evidence of alleged defamatory statement publication attributed to CVS:

- C.M. testifies that a fellow Mimms patient, S.D., told C.M. that S.D. had been told by CVS that Mimms was "being investigated by the DEA." [C.M. Dep. 59:16-61:5, attached hereto as Exhibit 9];

- C.M. testifies that "multiple people" sitting in the waiting room at the RAI office "all said they heard . . . from CVS" that Mimms "was being investigated by the DEA." [C.M. Dep. 43:4-45:19, attached hereto as Exhibit 9]; and

- D.B. testifies at to what she recalls her brother, D.S., telling her that CVS representatives said to him in connection with having her prescription filled, including that D.S. told her that a CVS representative said that her doctor "had been arrested." [D.B. Dep. 17:14-25, 95:15-96:23, attached hereto as Exhibit 6].

(These statements are collectively defined as "Hearsay Testimony.")

A-000209

The Hearsay Testimony described above all reflects inadmissible hearsay within hearsay that fails to conform with an exception to the hearsay rule. Fed. R. Evid. 805 (requiring that "each part of the combined [hearsay within hearsay] statements" conforms with an exception to the hearsay rule); *see also McGivern v. City of Indianapolis*, No. IP 02-461-C H/K, 2003 WL 21989996, at *2 (S.D. Ind. Aug. 11, 2003) (Hamilton, J.) (finding that a plaintiff's testimony "about a statement made to him by [one person] who was supposedly quoting [an agent of the defendant]" was inadmissible hearsay within hearsay).

Furthermore, allowing such impermissible Hearsay Testimony – or any reference to defamatory statements purportedly made to any of Mimms' patients or other witnesses who are not called to testify at trial – would not be relevant and/or would confuse the issues, mislead the jurors as to what statements are at issue, and be unfairly prejudicial to CVS. Fed. R. Evid. 401, 403.[12]

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff and Plaintiff's counsel from stating, referencing, or otherwise discussing (a) the anticipated testimony of any witness who is absent, unavailable, or not otherwise called to testify at trial, (b) defamatory statements purportedly made to any of Mimms' patients or other witnesses who are not called to testify at trial, and (c) the Hearsay Testimony described above.

---

[12] Additionally, for the reasons set forth within CVS's Motion in Limine Nos. 1 and 2, Mimms should not be permitted to expand the scope of alleged defamatory statements or publications at trial.

A-000210

### Motion *In Limine* No. 6:
### The Application of the Qualified Privilege, In General, and to Alleged Statements by Pharmacists

Defendant respectfully requests an order *in limine* establishing that CVS can offer evidence regarding the qualified privilege defense (including lack of abuse of the privilege) as to all alleged defamatory statements, and not just those alleged to have been stated by pharmacists. Alternatively, CVS requests an order *in limine* establishing that the qualified privilege defense is applicable to any statements alleged to have been made by a pharmacist, and that CVS be permitted to offer evidence related thereto accordingly.[13]

A qualified privilege rebuts the element of malice when the alleged defamatory remarks are "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992) (quotation omitted). Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law. *Bals*, 600 N.E.2d at 1356 (citing *Lawson v. Howmet Aluminum Corp.*, 449 N.E.2d 1172, 1175 (Ind. Ct. App. 1983).

The Court should find – or at least let a jury determine whether – a common interest privilege applies to all of the statements alleged to have been made by

---

[13] As argued in CVS's pending Motion to Reconsider, a qualified privilege applies to all alleged statements, and Mimms did not sufficiently rebut the qualified privilege as a matter of law. Dkt. 154 at 16-21. To the extent the Court denies the Motion to Reconsider, CVS requests that the Court grant an order in limine confirming the application of the defense to all, or at least some, statements as further discussed herein.

A-000211

pharmacy technicians. Indiana law expressly recognizes a qualified privilege based solely on a social or moral duty – not strictly a legal duty. *Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1233 (Ind. Ct. App. 2005) (finding qualified privilege based on a moral and social duty for girl scout volunteer's defamatory statement about another volunteer to craft store employee); *Pierce v. Bank One-Franklin, NA*, 618 N.E.2d 16 (Ind. Ct. App. 1993) (finding qualified privilege without discussion of legal duty but instead noting that a bank loan officer and a Farmers Home Administration (FmHA) officer "had a common interest in the outcome the loan application" and the related finances of the applicant in a conversation about the possibility of financing a loan). *See* Mem. in Supp. of Mot. for Partial Reconsideration at 16-19. For example, in *Cortez,* the court held: "Neither party has suggested Meier had a legal duty to report Cortez's alleged behavior to Nicholson, but the facts suggest she had a moral and social duty to send the email." *Cortez,* 827 N.E.2d at 1233.

Here, all alleged statements were made between pharmacists or pharmacist technicians and customers in the context of discussing the customers' prescriptions, and were made pursuant to a social or moral duty to ensure CVS customers could continue to have prescriptions filled for controlled substances. Consequently, the Court should either determine (a) that a qualified privilege applies to all alleged statements as a matter of law, leaving the jury to determine whether there has been abuse of the qualified privilege or (b) allow the jury to determine both whether a qualified privilege exists and whether there was abuse of the qualified privilege. *See*

A-000212

Indiana Model Civil Jury Instruction Nos. 2737 – Qualified Privilege (2015 Ed.) (structuring pattern instruction so that a Judge may either instruct the jury that a qualified privilege exists or allow the jury to determine whether defendant has proven circumstances establishing the existence of a qualified privilege, and then requiring the plaintiff to prove that the privilege was abused).

Alternatively, the Court appears to have previously concluded that a qualified privilege applies to statements made by *pharmacists* on account of an underlying legal duty relating to the subject matter of the alleged defamatory statements. *See* Entry on Pending Motions, Dkt. 143 at 19-20 (the "Order") ("Dr. Mimms contends that CVS's [qualified privilege] argument fails because the law that CVS relies on regards only licensed pharmacists. . . . The Court finds that qualified privilege does not apply to pharmacy technicians."). That same Order appears to conclude that all statements were made by pharmacy technicians. *See id.* ("Indiana laws regarding licensed pharmacist and pharmacy technicians are different. . . . The case law and statutes that CVS relies on refers only to licensed pharmacists. . . . Accordingly, CVS is not entitled to summary judgment motion on this affirmative defense.").

However, there are at least six alleged defamatory statements where a pharmacist has been alleged to have made the statement, or potentially meets the description of the alleged speaker provided by the witness:[14]

---

[14] Four of the six alleged statements – to the Ms, to D.S., and to D.Sm. – are Unidentified Speaker Statements subject to CVS's Motion *in Limine* No. 1, and should not be referred to or considered by the jury for the reasons stated therein.

A-000213

(1) Mimms claims that on June 26, 2014, a CVS pharmacist named Tony "compared [Mimms] to a pill mill" when Mimms's patient T.M. solicited information from the pharmacist relating to his prescription medications. [T.M. Dep. 61:20-24, 66:13-22, 69:1-70:12, attached hereto as Exhibit 1].

(2) Mimms alleges that on an unspecified date in "maybe" 2013 at the Greenfield CVS, a tall, thin male pharmacist with dark hair, about 35 years old, informed C.M. that CVS was not filling Mimms's prescriptions for controlled substances because "he was being investigated by the DEA." [C.M. Dep. 28:8-11 and 28:21-30:21, attached hereto as Exhibit 9]

(3) Mimms alleges that in "maybe" 2013, with a "rough estimate" between April and June, a pharmacy manager named "Richard" informed Mimms's patients C.M. and W.M. that CVS was not filing prescriptions of Mimms's because "he was being investigated by the DEA." [C.M. Dep. 29:2-6, 34:4-13, 35:3-10, 36:25-37:2, 37:12-38:2, and 72:4-13, attached hereto as Exhibit 9; W.M. Dep. 58:21-59:1, 61:7-13, and 91:5-12, attached hereto as Exhibit 10].

(4) Mimms alleges that in approximately March 2015 around 7:00 p.m. at the CVS located at 21st and Post Road, a young Caucasian woman in her late twenties told D.S. that CVS was not filling Mimms's prescriptions for controlled substances because Mimms's "license was kind of revoked." [D.S. Dep. 27:4-17, 30:19-25, 32:9-33:4, 33:1, 36:5-16, 36:25-37:25, and 40:8-11, attached hereto as Exhibit 12];[15]

(5) Mimms claims that on March 4, 2015, either a CVS pharmacist or a pharmacy technician who was male, Caucasian, with dark hair and lean build told D.B. that Mimms had been "arrested for controlled substances, and if he wasn't, he's about to be." [D.B. Dep. 17:1-6, 103:8-14, 106:7-19, and 111:6-20, attached hereto as Exhibit 6]. Two CVS employees – a pharmacist and a technician – both were working that day and meet the physical description provided by D.B.. Both deny making the statement. [Declaration of Michael Salazar ¶ 4 and Declaration of Ryan Durham ¶ 5, attached hereto as Exhibits 7 and 8, respectively].

(6) Mimms alleges that in August 2015 a "kind of chunky" Caucasian pharmacy technician with black hair in her 40s or 50s told D.Sm. that CVS was not filling Mimms's prescriptions for controlled substances because Mimms was "on a list" and "some [of them] are being investigated by the DEA." [D.Sm. Dep. 50:45-6, 58:6-9, 62:14-24, 65:23, 70:20-71:14,

---

[15] D.S. is unsure whether the woman was a pharmacist or technician, and his belief that the woman may have been a technician is merely based on the observation that she was a younger woman, as compared to an "older gentleman" he also observed in the store. [D.S. Dep. 36:5-16].

A-000214

95:23-96:23, and 101:10-20, attached hereto as Exhibit 15]. CVS has a female pharmacist on its witness list from this store that may meet this general description. To the extent this pharmacist meets this description, it may qualify as a pharmacist statement.

Alternatively, CVS requests an order *in limine* establishing that the qualified privilege defense is applicable to any statements alleged to have been made by a pharmacist, so that CVS can offer evidence regarding the qualified privilege defense and lack of abuse of the privilege.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests an order *in limine* establishing that CVS can offer evidence regarding the qualified privilege defense (including lack of abuse of the privilege) as to all alleged defamatory statements, and not just those alleged to have been stated by pharmacists; or alternatively, that the qualified privilege defense is applicable to any statements alleged to have been made by a pharmacist, and that CVS be permitted evidence related thereto accordingly.

## Motion *In Limine* No. 7: ## Any Reference to Punitive Damages

CVS seeks an order *in limine* to prohibit Plaintiff and Plaintiff's counsel from making any reference to punitive damages.

First, Mimms did not seek punitive damages from CVS as part of its complaint. *See 1st Source Bank v. Rea*, 559 N.E.2d 381, 388–89 (Ind. Ct. App. 1990) (reversing award of punitive damages where punitive damages were not sought in the operative pleading).

24

Second, Mimms has testified that his alleged damages are damages to his reputation. [Mimms Dep. 281:22-282:10, attached hereto as Exhibit 16].

Accordingly, Mimms should be precluded from referring to punitive damages because it is not relevant to his claims. Fed. R. Evid. 401. Further, any references would serve only to confuse the issues and mislead the jury regarding the damages actually claimed by Mimms. Accordingly, Plaintiff and Plaintiff's counsel should also be precluded from making any reference to punitive damages because the probative value of such evidence is substantially outweighed by the danger of confusion of issues and misleading the jury. Fed. R. Evid. 403.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff and Plaintiff's counsel from referencing or otherwise discussing punitive damages in front of the jury.

## Motion *In Limine* No. 8:
## Any Reference to CVS's Corporate Parent or Other Reference to Wealth or "Deep Pockets" of CVS

Plaintiff and Plaintiff's counsel should not be permitted to reference or otherwise refer to the wealth or "deep pockets" of CVS or the comparative wealth between the parties.

CVS anticipates that Mimms may refer to or attempt to introduce evidence concerning the size or wealth of CVS Pharmacy, Inc. in the presence of the jury to establish a more substantial, non-local "deep pocket" or otherwise evoke sympathies regarding the comparative wealth between the parties. CVS's size, wealth, or ability

A-000216

to pay a verdict or judgment is not an element of defamation. Further, Plaintiff has not alleged that they are seeking punitive damages against CVS, so no basis exists for the jury to render a verdict (on either liability or damages) due to CVS's size or financial position. Finally, such evidence would be highly prejudicial to CVS and should be excluded pursuant to Fed. R. Evid. 401 and 403. *See Adams Labs., Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985) (references to the comparative size and financial wealth of the parties was improper, prejudicial appeal to the sympathy of jurors and was a cause for reversal).

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding all reference by Plaintiff or Plaintiff's counsel to the wealth or "deep pockets" of CVS and/or the comparative wealth between the parties.

### Motion *In Limine* No. 9:
### Any Reference to Law Enforcement Settlements or Civil Penalties Paid by CVS

CVS seeks an order barring from Plaintiff or Plaintiff's counsel from stating, referencing, or otherwise discussing any settlements, memorandum of understanding, or related agreements by and between CVS and any federal, state or local law enforcement agency, and any civil penalties paid by CVS as a result of law enforcement investigation.

Relevant evidence is evidence having "any tendency to make a fact more or less probable than it would be without the evidence [and] the fact is of consequence in determining the action." Here, the existence and content of any settlements by and between CVS and any federal, state or local law enforcement agency, or any

26

A-000217

civil penalties paid by CVS, are not relevant to any material issue in this case. Fed. R. Evid. 401.

Further, any testimony, evidence, argument or references by Plaintiff to any settlements, memorandum of understanding, or related agreements by and between CVS and any federal, state, or local law enforcement agency or any civil damages award against CVS would serve only to suggest that CVS committed some bad act and, in turn, would prejudice CVS. Accordingly, Plaintiff should also be precluded from making any such references because they are unfairly prejudicial. Fed. R. Evid. 403.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* prohibiting Plaintiff and Plaintiff's counsel from stating, referencing, or otherwise discussing at the trial in this matter the existence or content of any settlements, memorandum of understanding, or related agreements by and between CVS and any federal, state, or local law enforcement agency, and any civil penalties paid by CVS as a result of law enforcement investigation.

## Motion *In Limine* No. 10:
## Any Reference to the Court's Orders on Summary Judgment and Statement to D.S.

Defendant seeks an order barring Plaintiff and Plaintiff's counsel from referencing the fact that CVS sought summary judgment, was denied in part, and that the Court has already determined liability with respect to the alleged

A-000218

statement made to D.S. ("S. Statement").[16] The denial of summary judgment, and the grant of summary judgment with respect to the S. Statement – e.g. that this Court believed that there were issues of fact precluding it from entering judgment as a matter of law in favor of CVS, and that liability had been proven by Mimms as a matter of law with respect to the S. Statement – is not relevant to the jurors' determination as to whether the evidence supports a finding of liability against Defendant as to the remaining allegations of defamation. *See* Fed. R. Evid. 401.

Further, such evidence or reference would be unfairly prejudicial, confusing or misleading and therefore should be barred under Fed. R. Evid. 403, even if, *arguendo*, it was relevant. "Unfair prejudice" within the meaning of Rule 403 is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note. Allowing reference to the jury regarding the summary judgment order and liability determination as to the S. Statement would present just such an "undue tendency to suggest a decision on an improper basis" – *i.e.* jurors could mistakenly conclude that because summary judgment was granted with respect to the S. Statement, that the Court has held that CVS has committed a wrongful act and it therefore must be liable for any remaining alleged statements.  As such, any evidence or reference to the fact that summary judgment was sought and denied, the summary judgment order, and the Court's finding of liability as to the S. Statement should be barred at the trial of this matter. *See Agrigenetics, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, No.

---

[16] CVS has sought reconsideration of the Court's ruling as to the D.S. statement in its pending Motion to Reconsider.

A-000219

1:08-CV-00802, 2010 WL 5250378, at *1 (S.D. Ind. Dec. 16, 2010) (Pratt, J.)

(concluding that the jury should not "be shown the Court's summary judgment

order or even told about the entry's existence" in order to minimize prejudice and

ensure a fair trial).

To that end, CVS requests that the Court enter an order directing that no

mention of the Court's finding of liability as to the S. Statement be made in the

presence of jurors – in jury instructions, in stipulations, in opening or closing

statements, during the course of trial, or otherwise. As reflected in CVS's proffered

verdict forms, CVS requests that the jurors be presented with the S. Statement *only*

at the time it is asked to evaluate damages, if any, for that statement, in addition to

damages, if any, for any other statement(s) for which the jury determines liability.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the

Court to enter an order *in limine* precluding all reference or evidence relating to the

fact that summary judgment was sought by Defendant and denied, the summary

judgment order, and that the Court has determined as a matter of law that CVS is

liable for the S. Statement.


## Motion *In Limine* No. 11:
## Any Reference to Any Other Cases Involving CVS

Plaintiff or Plaintiff's counsel should not be permitted to reference or offer

evidence relating to any other allegations, claims or lawsuits filed or pending

against CVS. Fed. R. Evid. 401 and 403. Evidence concerning other cases in which

CVS is a party (whether or not they involve claims of defamation or otherwise) are

A-000220

not relevant to the case at bar. That CVS may be involved in other lawsuits does not make it any more or less likely that the alleged CVS pharmacists or technicians at certain locations uttered defamatory statements about Mimms with actual malice. Additionally, evidence regarding other cases in which CVS is a party would be unduly prejudicial to CVS because it could lead the jury to believe that because CVS is facing other lawsuits, it must have committed wrongful acts against Mimms, resulting in a decision based on improper bias rather than facts.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding Plaintiff and Plaintiff's counsel from all reference or evidence relating to any other allegations, claims or lawsuits filed or pending against CVS.

## Motion *In Limine* No. 12:
## Witnesses Named on CVS's Witness Lists But Not Called at Trial

Plaintiff and Plaintiff's counsel should not be permitted to reference that witnesses were named on CVS's witness lists but not called at trial. It is anticipated that CVS may not call at trial every witness named on its witness list. Plaintiff or his counsel should not be permitted to refer to the fact that witnesses were named on CVS's witness lists but not called at trial, as this may have the effect of creating negative inferences in the minds of jurors. Such references would have little probative value and would be highly unfairly prejudicial to CVS's case. The Court should therefore not permit such references. Fed. R. Evid. 403.

A-000221

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding all references that witnesses were named on CVS's witness lists but not called at trial.

## Motion *In Limine* No. 13:
## CVS's Participation in Settlement Negotiations and of Conduct or Statements Made in Those Negotiations

Evidence that CVS participated in settlement negotiations and of conduct or statements made in those negotiations should be precluded. Fed. R. Evid. 408. Such evidence is irrelevant, would unfairly prejudice JA, and would mislead the jury and confuse the issues as settlement discussions focus on the conduct of counsel rather than that of the parties. Fed. R. Evid. 403.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding all evidence that Defendant participated in settlement negotiations and of conduct or statements made in those negotiations.

## Motion *In Limine* No. 14:
## CVS's Liability Insurance

Plaintiff and Plaintiff's counsel should not be permitted to offer any evidence, testimony or make any reference that CVS is or may be covered by liability insurance.

A-000222

"Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully." Fed. R. Evid. 411. Indeed, "knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds. Fed. R. Evid. 411 advisory committee's note.

Such evidence of insurance is generally inadmissible because the presence or absence of liability insurance is simply not probative of any fact in issue, and is generally considered irrelevant and prejudicial. *See Stephens v. City of Lawrence*, No. 113CV01503TWPDML, 2015 WL 9165592, at *1 (S.D. Ind. Dec. 16, 2015) (Pratt, J.) (granting motion in limine to exclude evidence, testimony and attorney arguments regarding insurance, noting that such evidence is "irrelevant and prejudicial" and "'frequently distracts jury from essential issues which it is to resolve.'" (quoting *Braun v. Lorillard, Inc.*, 1996 U.S. Dist. LEXIS 205, at *3, 1996 WL 14033 (N.D. Ill. Jan. 10, 1996))).

CVS further requests that Plaintiff and his counsel be instructed to refrain from making veiled references or inferences of insurance, such as referring to the Defendant as "the named Defendant" or "the defense interests," which suggests that there is some other, Unnamed Defendant in this case or that there are persons with interest in the outcome of the case who are not actually the Defendant. For these same reasons, any documents offered into evidence that may include insurance-related information should be redacted such that the jury is not inadvertently exposed to CVS's liability insurance.

A-000223

WHEREFORE, Defendants, CVS Pharmacy, Inc., respectfully request the Court to enter an order *in limine* precluding all evidence, testimony and any reference that CVS is or may be covered by liability insurance.

### Motion *In Limine* No. 15:
### Any Mention that CVS Filed Motions *in Limine* and the Court's Rulings Thereon

Any mention that CVS filed these motions *in limine* and the Court's rulings thereon should be precluded. CVS also requests that the Court order Plaintiff's counsel to instruct Plaintiff and Plaintiff's witnesses, inclusive of experts and any other person acting on their behalf, to comply with all aspects of the Court's Order *in Limine*. CVS further requests that the Court order Plaintiff's counsel and Plaintiff's witnesses, inclusive of experts and any other persons acting on their behalf, not to refer to any of the matters contained in CVS's Motions *in Limine* in any respect whatsoever without first obtaining permission from the Court outside the presence or hearing of the jury.

WHEREFORE, Defendant, CVS Pharmacy, Inc., respectfully requests the Court to enter an order *in limine* precluding any mention that CVS filed these motions *in limine* and the Court's rulings thereon.

Respectfully submitted,

*s/ Andrew W. Hull*
Andrew W. Hull (11218-49)
awhull@hooverhullturner.com

A-000224

Alice M. Morical (#18418-49)
amorical@hooverhullturner.com
Amanda L.B. Mulroony (#30051-49)
amulroony@hooverhullturner.com
HOOVER HULL TURNER LLP
111 Monument Circle, Suite 4400
P.O. Box 44989
Indianapolis, IN  46244-0989
Tel: (317) 822-4400
Fax: (317) 822-0234

Robert H. Griffith (*pro hac vice*)
rgriffith@foley.com
Jonathan W. Garlough (#30329-45)
jgarlough@foley.com
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL  60654-5313
Tel: (312) 832-5702
Fax: (312) 832-4700

A-000225

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2017, a copy of the foregoing was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_s/ Andrew W. Hull_____

868920

A-000226

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTHONY MIMMS, M.D. and | ) | |
| MIMMS FUNCTIONAL REHABILITATION, P.C. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Cause No. 1:15-cv-00970-TWP-MJD |
| vs. | ) | |
| | ) | |
| CVS PHARMACY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT CVS PHARMACY, INC.'S MOTION IN LIMINE**

Plaintiff, by counsel, submits this brief opposing Defendant's Motions in Limine.  CVS's Motion in Limine attempts to exclude evidence on matters already the subject of the Court's entry of summary judgment, which matters (and Plaintiff's opposition thereto) have already been fully briefed.  Therefore, Plaintiff incorporates all motions for summary judgment, objections and surreplies thereto in this Objection to CVS's Motion in Limine.

## CVS'S MOTION IN LIMINE GENERALLY

Plaintiff objects to Defendant's Motions in Limine 1-15 in general, as follows:

Deciding whether a communication is defamatory or not was a question of law for the court, "unless the communication is susceptible to either a defamatory or nondefamatory interpretation—in which case the matter may be submitted to the jury." Kelley v. Tanoos. 865 N.E.2d 593,596 (Ind. 2007).

The Court has already ruled[1] that the following constitute defamation *per se*: (1) "Dr. Mimms' license has been suspended or revoked;" (2) "Dr. Mimms has been arrested, and if he hasn't been, he soon would be, therefore, find a new doctor;" (3) "CVS no longer fills prescriptions for Dr. Mimms because Dr. Mimms has been to jail, and is a bad doctor;" and (4) "Dr. Mimms is under DEA investigation" amount to communications with defamatory imputation.  Because these statements have been found to be defamatory *per se*, Indiana law demands that Plaintiff is entitled to presumed damages as a natural and probable consequence of the *per se* defamation due to the damage to Plaintiff's professional reputation.  For this reason, the jury may award a substantial sum for this presumed harm, even without proof of actual harm. *Id.*  Also, upon proper proof, Plaintiff is entitled to special damages, generally pecuniary in nature, as a consequence of the

---

[1] Mimms v. CVS Pharmacy, Inc., No. 115CV00970TWPMJD, 2017 WL 25456, at *6 (S.D. Ind. Jan. 3, 2017)

A-000228

defamation.  Rambo v. Cohen, 587 N.E.2d 140, 145-146 (Ind. Ct. App. 1992).  The Court should, therefore, not grant any attempt by CVS to exclude evidence concerning damages or concerning statements already ruled to be defamatory by this Court.

Further, on the issue of malice, any evidence which would logically tend to solve the question, and which is not otherwise objectionable, is admissible.  Miller v. Cook, 124 Ind. 101, 24 N.E. 577 (1890); Cochran v. Indianapolis Newspapers, Inc., 175 Ind. App. 548, 372 N.E.2d 1211 (1978).  While malice is inferred from the uttering of false and slanderous words, without legal excuse (i.e. no qualified immunity), it is always proper for the plaintiff to give evidence of express malice (Burton v. Beasley, 88 Ind. 401, 1882 WL 6629 (1882) and the evidence in this case will show malice at the time of publication.  (Peterson v. Hutchinson, 30 Ind. 38, 1868 WL 2889 (1868); Justice v. Kirlin, 17 Ind. 588, 1862 WL 1934 (1862)).

In addition, the Indiana Supreme Court adopted Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc., 162 Ind.App. 671, 321 N.E.2d 580 (1974), cert. denied, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976), which establishes an actual malice standard in matters of public or general concern for private individual plaintiffs Journal-Gazette Co. v. Bandido's, Inc., 712 N.E.2d 446, 452 (Ind. 1999).  It makes no difference whether the allegedly defamed plaintiff was a public or private individual" in proving malice.  Id. at 451–52.

What Plaintiff will prevail on, is the fact that, while ill will is not an element of the legal definition of "actual malice," it is nevertheless relevant and admissible as evidence in determining whether a defendant possessed a state of mind highly conducive to a reckless disregard of falsity. Cochran v. Indianapolis Newspapers, Inc., 175 Ind. App. 548, 372 N.E.2d 1211 (1978).

A-000229

Since "reckless disregard" may be shown in many ways besides those mentioned in Shine v. Loomis, 836 N.E.2d 952, 959 (Ind. Ct. App. 2005) [2], Plaintiff's evidence of the repetitiveness of the defamatory statements made by CVS, and the sheer pervasiveness throughout the Central Indiana region will also be admissible to show express or actual malice on the part of CVS. Meyer v. Bohlfing, 44 Ind. 238, 1873 WL 5349 (1873); Burson v. Edwards, 1 Ind. 164, 1848 WL 2830 (1848). The defendant's actual state of mind in this defamation action is a critical factor in the analysis of whether a statement was made with reckless disregard for the truth, and therefore, whether it was made with actual malice. Shine, at 952. CVS, as a corporation, is required to "act through [its] officers, employees or agents. Any act or omission of an officer, employee, or agent acting within the scope of that person's authority is considered in law to be the act of the corporation." Underwood v. Gale Tschuor Co., 799 N.E.2d 1122, 1128 (Ind. Ct. App. 2003). Plaintiff's evidence, including, but not limited to, CVS's own protocols forbade employees to make the exact defamatory statements that were made, and the fact that the corporation as a whole interviewed him, researched him, and took no action against him following their early 2014 conference call about his controlled substances prescriptions, will show that in going against the knowledge of the truth the company as a whole had (in making the defamatory statements), they were, in fact, acting "with a high degree of awareness of [the statement's] probable falsity." Shine, at 959.

These standards gave the Court a solid foundation to determine that CVS acted with actual malice when stating: Dr. Mimms is a "pill mill" and a "pill pusher," "Dr. Mimms' is under investigation by the DEA," and "Dr. Mimms has been…or will be arrested" because CVS's own

---

[2] "…reckless disregard *may* be shown by proof that the false publication was made with a "high degree of awareness of [the statement's] probable falsity." *Id.*

A-000230

policy warns against making those "disparaging comments."  The Court further determined that the statement "Dr. Mimms' license has been suspended or revoked" was made with actual malice. Any attempt to exclude evidence concerning any of the statements already determined to be defamatory or that prove to show malice on the part of CVS and/or its employees, especially statements of witnesses to CVS' employees' violation of corporate policy in making said statements, including without limitation, Motions in Limine 1-15, should be denied.

Plaintiff also more specifically objects to certain of Defendant's Motions in Limine, as follows:

### MOTION IN LIMINE NO. 2

A motion in limine is not the appropriate manner to deal with the subject "Alleged Defamatory Statements Not Identified by Witness Deposition Testimony".  Instead, during a trial, Defendant is free to utilize Fed. R. Evid. 607 to attack a witnesses' credibility with regard to what they testified to during deposition versus what they are testifying to under oath, as well as objections under Fed. R. Evid. 801 (to the extent no exceptions apply under Fed. R. Evid. 803). The jurors will already be instructed on how to evaluate the credibility of a witness pursuant to Seventh Circuit Pattern Jury Instr. Civil 1.13 (Seventh Circuit Committee on Pattern Civil Jury Instructions, Federal Civil Jury Instructions of the Seventh Circuit (2015)) and Defendant's arguments fall short of being prejudicial questions or statements which require a protective order to prevent them from being presented to the jury before the trial court has an opportunity to rule on their admissibility in the context of trial.  Taylor v. State, 496 N.E.2d 561 (Ind. 1986)

A-000231

Further, to the extent that this numbered Motion is intended to include exclusion of a witness who did not actually testify by deposition, Plaintiff would object.  This specifically includes, but is not limited to, witnesses such as Betsy Winters, who has been on Plaintiff's previous witness lists, but who did not testify by deposition.  Defendant has had the opportunity to depose Ms. Winters, but chose not to do so.  Any attempt to exclude such testimony would prejudice Plaintiff, and would not be prejudicial to Defendant.  Therefore, the Court should deny this Motion in Limine.

### MOTION IN LIMINE NO. 3

Plaintiff objects to this numbered Motion to the extent that Defendant is attempting to exclude testimony of witnesses to the defamatory statements about the speaker's temperament and body language, as they observed it at the time the statement was made.  Questions regarding the speaker's demeanor are absolutely probative as to the malice of the speaker, as discussed in the general objections herein above.  Excluding any such testimony would be unfairly prejudicial to Plaintiff's case and is relevant, therefore, it should be allowed.

### MOTION IN LIMINE NO. 6

Indiana law is absolutely clear, despite CVS's arguments to the contrary – qualified immunity is only applicable to licensed pharmacists.  The employees that made defamatory statements were primarily pharmacy technicians, and pharmacy technicians do not have the same duties and responsibilities as pharmacists and are not entitled to the protections of a qualified privilege. *See* Ind. Code Ann. § 25-26-19-2 (a "pharmacy technician is an individual who: (1) works under the direct supervision of a pharmacist licensed under this article; and (2) performs duties to assist a pharmacist in activities that do not require the professional judgment of a pharmacist").

A-000232

Beyond even Indiana law as to who is entitled to qualified immunity, the statements made

by CVS exceed the scope of any privilege that might have existed.  The specific statements made

by CVS employees – whether pharmacists or not – lose their privileged status because of the abuse

shown by such statements, as a matter of law.

> A statement otherwise protected by the doctrine of qualified privilege may lose its
> privileged character upon a showing of abuse wherein: (1) the communicator was
> primarily motivated by ill will in making the statement; (2) there was excessive
> publication of the defamatory statements; *__or__* (3) the statement was made without
> belief or grounds for belief in its truth.

Schrader, 639 N.E.2d at 262 (emphasis added).  Though the Court ultimately did not even need to

address this issue, Plaintiff would still prevail, as he has evidence supporting all of the Schrader

elements and can prove CVS abused such a privilege.

Therefore, a pharmacist-patient qualified privilege is not supported by existing case law,

and the Court has said that it certainly does not apply to non-pharmacists, statements made to non-

patients (i.e. David Seeman), or defamatory statements about the prescribing doctor.  Any attempt

to include evidence of qualified privilege should be denied.

## MOTION IN LIMINE NO 8.

Defendant's attempt to exclude references to CVS as a large entity should be denied

because it is common knowledge that CVS is a large retailer, and the large corporate structure is

probative as to Plaintiff's case for malice.  Even beyond the large corporate structure issue, the

statements at issue are defamatory *per se* – and Plaintiff is not limited to "nominal" damages;

Plaintiff is entitled to "substantial" damages.  Glasscock v. Corliss, 823 N.E.2d 748, 757–58 (Ind.

Ct. App. 2005); Rambo v. Cohen, 587 N.E.2d at 145-146.  Further still, evidence of actual malice

on CVS's part will permit an award of punitive damages.  Weenig v. Wood, 169 Ind. App. 413,

442, 349 N.E.2d 235, 252 (1976).  In awarding punitive damages, "the economic wealth of the

A-000233

defendant should be considered." Ford Motor Co. v. Ammerman, 705 N.E.2d 539, 563 (Ind. Ct. App. 1999).  Therefore, references to the wealth or "deep pockets" of CVS or the comparative wealth between the parties is absolutely relevant.  The issue is adverse to CVS, but this does not make it inadmissible testimony.

## MOTION IN LIMINE NO. 9

Defendant's attempt to exclude evidence of investigations of CVS by law enforcement agencies should be denied, as they have opened the door to said evidence by discussing the alleged investigation of Plaintiff by said agencies.  Such evidence is relevant to Plaintiff's case because any alleged investigation of Plaintiff was a result of the investigations of and lawsuits against CVS and not due to any wrongdoing on the part of Plaintiff.  In order to prove its case, Plaintiff should have the right to introduce evidence of these investigations, cases and settlements of CVS, and it is not unfairly prejudicial to CVS to do so.

## MOTION IN LIMINE NO. 10

Defendant's attempt to exclude evidence of the Summary Judgment already entered in this case should be denied because it is essential to Plaintiff's case that the Court has already ruled that statements made by CVS employees were defamatory.  To exclude such evidence would be a mischaracterization of the law of the case to date and cause undue burden on Plaintiff – in effect, forcing Plaintiff to try the case as if the ruling did not exist; further, such evidence is not prejudicial to Defendant, because there are still issues of fact to be proven by Plaintiff at trial.

## CONCLUSION

Based upon the applicable law, the Motions in Limine of CVS discussed above fail to prove that any prejudice they may cause outweighs their probative nature, and many of the statements

A-000234

CVS is trying to exclude have already been ruled as defamatory by this Court. For the reasons stated above, Motions in Limine 1-15 should be denied.

Respectfully submitted,

LAW OFFICE OF JASON D. MAY, LLC

*s/ Jason D. May*
Jason D. May, Atty No. 27434-49
9201 N. Meridian Street, Suite 220
Indianapolis, IN  46260
Telephone: (317) 218-3859
Jason.May@JasonMayLaw.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2017, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Robert H. Griffith (pro hac vice)
Jonathan W. Garlough, Attorney #30329-45
Foley & Lardner, LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60654-5313
E-mail: rgriffith@foley.com
jgarlough@foley.com

Andrew W. Hull
Alice McKenzie Morical
Amanda L.B. Mulroony
Hoover Hull Turner, LLP
111 Monument Cir # 4400
Indianapolis, IN 46204
E-mails: awhull@hooverhullturner.commailto:fgipson@hooverhullturner.com
amorical@hooverhullturner.com
amulroony@hooverhullturner.com

*s/ Jason D. May*
Jason D. May

A-000235